ERIN E. SCHNEIDER (Cal. Bar No. 216114)
MONIQUE C. WINKLER (Cal. Bar No. 213031)
ANDREW J. HEFTY (Cal. Bar. No. 220450)
 E-mail: heftya@sec.gov
SHEILA O'CALLAGHAN (Cal. Bar No. 131032)
JASON H. LEE (Cal. Bar No. 253140)
 Email:  leejh@sec.gov
WILLIAM T. SALZMANN (Cal. Bar No. 205808)
 Email:  salzmannw@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>     vs.<br><br>CHOICE ADVISORS, LLC and<br><br>MATTHIAS O'MEARA,<br><br>             Defendants. | Case No.   **'21CV1669 CAB MSB**<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("the Commission" or "SEC")
alleges as follows:

<u>INTRODUCTION</u>

1.     This case concerns misconduct by the municipal advisory firm Choice
Advisors, LLC ("Choice") and one of its founders, Matthias O'Meara.

2.     Municipal advisors are registered market professionals who provide advice to municipal issuers and related entities about, among other things, the issuance of municipal bonds.  Municipal advisors and their associated persons are fiduciaries, and owe their clients a duty of care and a duty of loyalty.  Municipal advisors must deal honestly and with the utmost good faith and act in the client's best interest without regard to their own financial or other interests.  As described below, defendants (1) provided municipal advisory services to four charter school clients without being properly registered, (2) breached their fiduciary duty to their charter school clients, and (3) engaged in other unfair and deceptive conduct as to the charter schools.

3.     Defendants' misconduct was in connection with municipal advisory services that they, and Choice's other co-founder, Paula Permenter, provided to four charter schools in 2018.  Each of the schools was inexperienced in municipal finance and hired Choice to help navigate the path for obtaining funds for new school facilities.  None of the schools had ever before participated in a bond issuance.

4.     At the time each of these schools employed Choice as its municipal advisor, O'Meara and Permenter had not registered Choice with either the Commission or the Municipal Securities Rulemaking Board ("MSRB")—a fact they withheld from the four schools.

5.     By serving as the schools' municipal advisors while unregistered, Choice, O'Meara and Permenter violated the Commission's and the MSRB's registration requirements.  Indeed, Choice's attorney had specifically advised O'Meara and Permenter not to provide municipal advisory services until after Choice was registered and that, if they nevertheless engaged municipal advisory clients prior to Choice being registered, this fact should be disclosed to the schools.  Nevertheless, the two co-founders failed to follow this guidance and improperly provided municipal advice to the four schools prior to Choice's registration.

6.     In addition, in connection with bond offerings for these same four schools, Choice, O'Meara, and Permenter formed an impermissible fee-splitting arrangement with O'Meara and Permenter's former employer, which served as the underwriter on all four transactions (the "Underwriter").  Municipal advisors are prohibited from engaging in fee-splitting arrangements with underwriters on any offering for which the municipal advisors provide advice.  Moreover, Choice, O'Meara and Permenter falsely told each of the schools that they had no conflicts of interest, and did not adequately disclose to the schools the conflicts arising out of their unregistered status, the fee-splitting agreement, or their relationship with the Underwriter.

7.      Choice and O'Meara engaged in additional misconduct.  O'Meara deceptively operated in a dual capacity while still employed by the Underwriter, simultaneously serving as a registered representative for the benefit of the Underwriter in an arms-length transaction and also as a municipal advisor purportedly serving as his client's fiduciary.  O'Meara manipulated this improper dual role to his advantage, and took steps to increase the overall fees paid by two schools to enrich Choice and himself, ultimately costing one school approximately $40,000 in additional fees.

8.     As a result of the conduct described herein, both defendants violated Sections 15B(a)(5) and 15B(c)(1) of the Securities Exchange Act of 1934 ("Exchange Act") and MSRB Rules G-17 and G-42.  Additionally, Choice violated Section 15B(a)(1) of the Exchange Act and MSRB Rule A-12, and O'Meara aided and abetted Choice's violations of Sections 15B(a)(1) and 15B(c)(1) of the Exchange Act and MSRB Rule A-12.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Sections 21(d), 21(e), 21(f) and 27 of the Exchange Act.

10.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the dealings, transactions, acts, practices, and courses of business alleged in this Complaint.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because events or omissions giving rise to the alleged claim(s) occurred in substantial part within this district.  Specifically, the charter school that paid approximately $40,000 in additional fees as a result of O'Meara's fee manipulation is located in this district, and events and communications relevant to the claims involving this school occurred in this district.

## DEFENDANTS

12.     **Choice Advisors, LLC** is a Texas limited liability company with its primary place of business in Houston, Texas as well as operations out of Denver, Colorado.  It registered as a municipal advisor with the Commission in or around August 2018 and with the MSRB in or around October 2018.  As described herein, starting in or about May 2018, Choice acted as a municipal advisor, as defined by Section 15B(e)(4) of the Exchange Act, to the four school clients at issue in this Complaint.

13.     **Matthias O'Meara** resides in Denver, Colorado.  He co-founded Choice around May 2018 and has been a partner with Choice since its founding.  From around June 2014 through May 2018, O'Meara was a registered representative of the Underwriter.  As described herein, starting in or about May 2018, O'Meara was a municipal advisor and an associated person of Choice, as those terms are defined by Sections 15B(e)(4)(A) and 15B(e)(7) of the Exchange Act and MSRB Rule D-11.

## RELEVANT INDIVIDUAL AND ENTITIES

14.     **Paula Permenter** resides in Houston, Texas.  She co-founded Choice around May 2018 and has been a partner with Choice since its founding.  From around October 2013 through May 2018, Permenter was a registered representative of the Underwriter.  As described herein, starting in or about May 2018, Permenter was a municipal advisor and an associated person of Choice, as those terms are defined by Sections 15B(e)(4)(A) and 15B(e)(7) of the Exchange Act.  In a September 23, 2021 Commission enforcement action, Permenter consented, without admitting or denying the findings, to the institution of a Commission Order finding that she violated certain provisions of the federal securities laws in connection with some of the misconduct described herein.

15.     The "**Underwriter**" is a Delaware limited liability company with its principal place of business in Richmond, Virginia.  From about June 2007 through June 2021, it was a broker-dealer registered with the Commission.

16.     "**School Client A**" is a K-8 charter school located in San Diego County, California.  School Client A operates pursuant to California law under a charter granted by a California public school district, and is both a "municipal entity" and an "obligated person" as those terms are defined by Sections 15B(e)(8) and 15B(e)(10) of the Exchange Act.

17.     "**School Client B**" is a K-12 charter school located in El Paso County, Colorado.  School Client B operates pursuant to Colorado law under a charter granted by a Colorado public school district, and is both a "municipal entity" and an "obligated person" as those terms are defined by Sections 15B(e)(8) and 15B(e)(10) of the Exchange Act.

18.     "**School Client C**" is a K-12 charter school located in Butte County, California.  School Client C operates pursuant to California law under a charter granted by a California public school district, and is both a "municipal entity" and an

"obligated person" as those terms are defined by Sections 15B(e)(8) and 15B(e)(10) of the Exchange Act.

19. "**School Client D**" (or, together with School Client A, School Client B, and School Client C, the "Four School Clients") is a K-8 charter school located in San Bernardino County, California. School Client D operates pursuant to California law under a charter granted by a California public school district, and is both a "municipal entity" and an "obligated person" as those terms are defined by Sections 15B(e)(8) and 15B(e)(10) of the Exchange Act.

STATEMENT OF FACTS

**A. Respective Roles of the Borrower, the Underwriter, and the Municipal Advisor in Municipal Bond Offerings**

20. In a municipal bond offering, a borrower raises money from investors for a particular purpose and is responsible for paying the principal and interest on the bonds and the costs of the bond offering. In this case, the Four School Clients were borrowers and sought to raise money to construct new school facilities through the issuance of municipal bonds. The bonds issued on behalf of each of the Four School Clients described herein are "securities" under Section 3(a)(1) of the Exchange Act.

21. To facilitate the bond offering, the borrower selects an underwriter to market and sell the bonds to investors. The borrower negotiates the terms of the offering with the underwriter. The underwriter purchases the bonds on those terms and then sells the bonds to the underwriter's customers, the investors. Since the underwriter has financial and other interests that are <u>adverse</u> to the borrower, the underwriter has an arms-length relationship with the borrower.

22. Borrowers like the Four School Clients may retain a municipal advisor to navigate the relationship with the underwriter and other aspects of the bond offering process. Under the federal securities laws, municipal advisors are required to register with the SEC and the MSRB. A municipal advisor serves the borrower in

a fiduciary capacity, must act in the best interest of the borrower within the scope of the engagement, and must disclose any conflicts of interest to its borrower clients.  As a representative and fiduciary of the borrower, the municipal advisor is also in an arms-length relationship with the underwriter.

23.    In this case, the Underwriter and the defendants sent engagement letters to each of the Four School Clients, in which they acknowledged their respective obligations and responsibilities as underwriter and municipal advisor.

24.    The Underwriter disclosed in its respective engagement letters to each of the Four School Clients that: (i) the Underwriter was engaging in an arms-length transaction with each school, (ii) the Underwriter may have financial and other interests that differ from the schools, and (iii) if the school wanted a representative to operate in a fiduciary capacity it was free to engage a municipal advisor.

25.    Likewise, defendants' engagement letters to each of the Four School Clients explicitly acknowledged that, as their municipal advisor: (i) defendants were required to act in a fiduciary capacity, (ii) defendants were required to act solely in the school's best interests, and (iii) defendants were required to fully and fairly disclose in writing all material actual or potential conflicts of interest.

26.    As described below, defendants failed to meet these obligations.  Their misconduct arises from their failure to register Choice as a municipal advisor and their intertwined relationship with the Underwriter, which resulted in undisclosed conflicts of interest.  For two of the Four School Clients, defendant O'Meara's misconduct included operating simultaneously as <u>both</u> the underwriter and the municipal advisor.

**B. Formation of Choice Advisors and Establishment of a Prohibited Fee-Splitting Arrangement**

27.    From approximately 2014 through May 2018, O'Meara was employed as a registered representative of the Underwriter.  From approximately 2013 through May 2018, Permenter was employed as a registered representative of the

Underwriter.  As registered representatives of the Underwriter, both O'Meara and Permenter underwrote bonds for borrowers like the Four School Clients.

28.     In or around February 2018, while employed at the Underwriter, O'Meara and Permenter decided to form Choice as a new municipal advisory firm.  They engaged legal counsel to advise them as to the steps necessary to start a municipal advisory firm.  At this time, and throughout the formation and registration of Choice, counsel informed O'Meara and Permenter that they should not provide municipal advisory services to clients until after the firm had registered as a municipal advisor with both the Commission and the MSRB.  As discussed below, despite this advice, O'Meara and Permenter provided municipal advice to the Four School Clients before Choice had registered as a municipal advisor with the Commission or MSRB.

29.     In or around May 2018, O'Meara and Permenter informed a manager at the Underwriter that they intended to resign their positions at the Underwriter to form Choice.  At the time, both O'Meara and Permenter were registered representatives responsible for underwriting certain municipal bond offerings.

30.     After they gave notice of their intention to resign, O'Meara and Permenter negotiated an "agreement of fee-splits" with the manager at the Underwriter.  The arrangement contemplated that, for bond transactions that O'Meara and Permenter had originated as underwriting business for the Underwriter, the borrowers would engage Choice as their municipal advisor.  Pursuant to the arrangement, the Underwriter would lower its underwriting fees by an amount equal to the amount that Choice would then receive as municipal advisor for anticipated bond transactions.  The fee-splitting arrangement covered several of the Underwriter's existing bond transaction customers, including at least the Four School Clients.

31.     The Four School Clients had not sought or requested municipal advisory services from O'Meara, Permenter or Choice.  Rather, O'Meara and Permenter presented the engagement of Choice to the Four School Clients as a way for the Four

School Clients to avoid any disruption to their respective transactions as a result of O'Meara and Permenter's decision to leave their employment with the Underwriter.

32.     Neither O'Meara nor Permenter consulted with the Four School Clients before entering into the fee-splitting arrangement, and none of the Four School Clients was even aware that the arrangement had been formed until O'Meara and Permenter informed them that they were leaving the Underwriter to form Choice.

### C. O'Meara Drafted the Engagement Letter to School Client A that Included Material Misrepresentations and Omissions.

33.     In or around early May 2018, O'Meara drafted Choice's engagement letter to School Client A.

34.     O'Meara solicited School Client A as a client and obtained its agreement to serve as its municipal advisor for the bond offering at issue even though he knew, or should have known, (i) that it was unlawful to conduct municipal advisory activities without first registering Choice with the Commission and the MSRB, and (ii) that he was, at the time, still operating in a dual capacity for both the benefit of the Underwriter and as a partner at Choice.

35.     O'Meara sent a draft of the proposed engagement letter for School Client A to Choice's counsel in or around May 2018.  Choice's counsel advised that O'Meara should clarify any conflict of interest arising out of O'Meara's relationship with the Underwriter, and confirm that Choice and the Underwriter had no compensation agreement impacting the transaction.

36.     Despite his counsel's advice, O'Meara did not modify the proposed engagement letter to disclose his conflicts of interest or fee-splitting arrangement.

37.     Instead, O'Meara signed and sent the engagement letter to School Client A on or about May 8, 2018, and in it identified that he was sending the letter pursuant to MSRB Rule G-42.  The letter did not give the required full and fair disclosure of Choice's and O'Meara's conflicts of interest.  Rather, O'Meara falsely stated in the letter that "Choice Advisors does not share fees with any other parties and [sic] any

provider of investments or services to the Client."  The letter also stated that (i) Choice was obliged to "fully and fairly disclose…in writing all material actual or potential conflicts of interest that might impair [Choice's] ability to render unbiased and competent advice" and that Choice had no such "known actual or potential conflicts of interest;" and (ii) municipal advisors are "required to act solely in [the client's] best interest."  These statements were misleading because Choice did, in fact, have actual and potential conflicts of interest and was not acting in School Client A's best interest.

38.     In light of his counsel's advice, O'Meara failed to exercise due care in making these materially misleading statements.  He also did not exercise due care in failing to disclose that he and Choice did, in fact, have conflicts of interest arising out of their relationship with the Underwriter, the fee-splitting agreement, and Choice's unregistered status.

39.     The engagement letter for School Client A became Choice's template, and either O'Meara or Permenter used a form of the same engagement letter for each of the Four School Clients.  Each of the engagement letters to the Four School Clients contained the same misstatements and omissions as the engagement letter to School Client A.

**D. While Still Working at the Underwriter, O'Meara Deceptively Operated in a Dual-Capacity to Increase the Cost of Issuance for School Client A.**

40.     O'Meara also violated his fiduciary duties of care and loyalty owed to School Client A by manipulating the engagement letters for both the Underwriter and Choice to create a fee structure that would increase the overall cost of issuance for School Client A.

41.     In or around May 2018, O'Meara responded to an email from the manager at the Underwriter confirming the "agreement of fee splits," and indicated

that he would get to work on the Underwriter's engagement letters for School Client A and School Client B.

42.     According to the terms of the "agreement of fee splits" outlined by the manager at the Underwriter, neither School Client A nor School Client B would pay any additional costs as a result of hiring Choice.  Instead, the Underwriter and Choice would split the originally contemplated underwriting fee.

43.     The Underwriter's original engagement letter to School Client A, signed by O'Meara and dated May 30, 2017, set the underwriting fee at 2% of the par amount of the bonds.

44.     Under the "agreement of fee splits," instead of taking the entire 2%, the Underwriter would instead take 1.25% of the par amount of School Client A's bonds, and Choice would then take the remaining 0.75%.

45.     On or about May 8, 2018, O'Meara sent an updated version of the Underwriter's engagement letter to School Client A's executive director.  Consistent with the fee-splitting arrangement, the updated engagement letter contained a potential overall underwriting fee of 1.25%.  However, the engagement letter split the 1.25% fee into two portions—a 1% fee to be paid at closing, and a conditional 0.25% fee that could only be charged in the event the bonds were "non-investment grade."

46.     The Underwriter's original 2017 engagement letter to School Client A did not contain a conditional term based on the bonds' rating.

47.     As the term is used in the municipal finance industry, "non-investment grade" generally means a bond rating of "Ba1" or lower.

48.     O'Meara had knowledge of and responsibility for navigating the credit rating process for School Client A's bonds.  In the weeks prior to leaving the Underwriter, O'Meara served as School Client A's representative in communications with the rating agency, and School Client A hired Choice and O'Meara in part to assist in the remainder of the credit rating process.  As O'Meara was aware, the Underwriter's internal documents tracking the transaction contemplated that School

Client A's offering may be rated below investment grade, which was not surprising given that School Client A was a small, first-time borrower.

49.     Nevertheless, O'Meara did not tell School Client A that the new version of the Underwriter's engagement letter included a new conditional fee, and he did not advise his client that agreeing to the Underwriter's revised 2018 engagement letter would create a new risk of increased fees associated with the bond rating.  O'Meara's failure to discuss these facts was a failure to exercise due care given that the revised engagement letter came as a result of his plan to leave the Underwriter to become School Client A's municipal advisor and fiduciary.

50.     On or about the same day that he sent the Underwriter's engagement letter, O'Meara also sent Choice's engagement letter to School Client A.  Choice's engagement letter stated that Choice's fees would be 1% of the par amount of the bonds, which was 0.25% higher than the amount set by the fee-splitting arrangement with the Underwriter.

51.     O'Meara did not tell School Client A that Choice's fee was higher than the amount set by Choice's fee-splitting arrangement with the Underwriter, nor did he tell School Client A that, in the event that the Underwriter's conditional fee was triggered, Choice's and the Underwriter's combined fees would cost the school 0.25% more in fees than if the school had kept with the original underwriting fee and chose not to engage Choice as its municipal advisor.

52.     Rather, both in person and in email, O'Meara deceptively represented the engagement of Choice as a way for School Client A to keep the original terms intact.  He told the executive director of School Client A the half-truth that the Underwriter agreed to reduce its fee to accommodate the hiring of Choice and ensure there was no change for School Client A.  O'Meara knew, or should have known, that this misrepresentation was misleading in light of the omission that hiring Choice under the terms set by the two engagement letters would create at least a risk that School Client A would have to pay an additional 0.25% in fees.

53.     Moreover, O'Meara's fee manipulation and dual-role further rendered Choice's engagement letter misleading, in light of its claims that Choice had no fee-splitting arrangements or conflicts of interest, and that Choice was acting in the best interests of School Client A.

54.     By putting his and Choice's interests ahead of his client's, O'Meara violated the fiduciary duty he and Choice owed to School Client A.

55.     Throughout the next weeks, O'Meara and Choice provided municipal advice and other municipal advisory services for School Client A in their capacity as the school's municipal advisor.

56.     School Client A's approximately $15.97 million bond offering ultimately received a rating of "Ba1," below-investment grade, triggering the additional 0.25% underwriting fee increase.

57.     School Client A's offering closed on or about July 11, 2021, at which point Choice was paid approximately $159,700 from bond proceeds, approximately $39,925 of which resulted from the misleading 0.25% fee increase.

### E.  O'Meara Took Steps to Similarly Increase the Fees for School Client B, But Was Stopped by Other Deal Participants.

58.     While still working at the Underwriter, O'Meara similarly took steps to alter the fee-splitting arrangement with respect to another charter school client, School Client B.

59.     As with School Client A, the original contemplated underwriting fee for School Client B was 2% of the par amount of the bonds, but in this transaction the fee-splitting arrangement between the Underwriter and Choice set the Underwriter's revised fee at 1.5% and Choice's corresponding fee at 0.5%.

60.     Under O'Meara's proposed plan for School Client B, Choice would receive 0.75%, meaning that School Client B, like School Client A, would pay an additional 0.25%.  However, unlike with School Client A, O'Meara was working with an additional registered representative at the Underwriter to underwrite School

Client B's transaction.  This registered representative and others at the Underwriter disagreed with O'Meara's proposed plan, which would increase School Client B's fees by 0.25%.

61.     While the Underwriter and O'Meara were engaged in this dispute over fees, another municipal advisory firm working for School Client B became aware of the proposed fees.  The other municipal advisory firm intervened, and demanded that both the Underwriter and Choice <u>decrease</u> their fees.

62.     O'Meara signed and provided the other municipal advisor Choice's engagement letter on or about May 15, 2018.  The engagement letter was based on the same template as the one sent to School Client A, and contained the same misrepresentations and omissions.

63.     O'Meara failed to exercise due care in making these omissions and misstatements to School Client A and School Client B.

64.     O'Meara never disclosed to School Client B that he took steps to increase Choice's fees and the overall cost of issuance for the school, or that he had conflicts of interest arising out of his relationship with the Underwriter, the fee-splitting arrangement, or Choice's unregistered status.

65.     By attempting to increase the costs of issuance for School Client A and School Client B, O'Meara breached his fiduciary obligations to these clients.  His conduct was deceptive, manipulative and unfair to these clients.

66.     Throughout the next few months, O'Meara and Choice provided municipal advisory services in their capacity as one of School Client B's municipal advisors.

67.     On or about September 21, 2018, School Client B's offering closed and bond proceeds were used to pay the Underwriter a fee of 1.3% and Choice a fee of 0.45%.

### F.  Permenter Also Performed Unregistered Municipal Advisory Activities and Failed to Disclose Material Conflicts of Interest.

68.     Unlike O'Meara, Permenter waited until after she had left the Underwriter before she approached potential municipal advisory clients to seek their agreement to retain Choice as a municipal advisor.  However, at no point did either she or O'Meara disclose to their clients that their connections to the Underwriter presented conflicts of interest.  The conflicts of interest arose from, among other things, the fact that, as a municipal advisor, Choice would be in the position of evaluating the Underwriter's work.

69.     By email in or around June 2018, Permenter informed Choice's counsel that she was formalizing her municipal advisory relationship with School Client C through a written engagement letter and inquired whether she should disclose that Choice was not yet registered as a municipal advisor.  Permenter sent the email to both Choice's counsel and O'Meara.  Counsel, in an email sent to both O'Meara and Permenter, advised that Choice's engagement letter should disclose its unregistered status.  Despite this, neither Permenter nor O'Meara ever disclosed to any of the Four School Clients that Choice was not registered as a municipal advisor.  This omission was material because a reasonable client would have considered it important to know that Choice, O'Meara and Permenter were not permitted under the securities laws to act as a municipal advisor.

70.     The engagement letter to School Client C, sent in or around June 2018, was signed by Permenter but was based on the template drafted by O'Meara.  It contained the same misstatements and omissions as the engagement letters sent to School Client A and School Client B.  Permenter never disclosed to School Client C that she had conflicts of interest arising out of her fee-splitting arrangement and her relationship with the Underwriter.

71.     Choice and Permenter continued to provide municipal advice to School Client C in the months that followed despite the fact that Choice was not registered as a municipal advisor.

72.     By around July 2018, Choice and Permenter had also begun to provide municipal advisory services to School Client D.  Permenter did not disclose to School Client D that Choice was not registered as a municipal advisor, and also did not disclose that she had conflicts of interest arising out of her fee-splitting arrangement and relationship with the Underwriter.

73.     Permenter failed to exercise due care in making these omissions and misrepresentations to School Client C and School Client D.

### G. The Transactions for School Client B, School Client C, and School Client D Closed, and Choice and Permenter Sign a Misleading Engagement Letter to School Client D.

74.     On or about August 27, 2018, Choice completed its registration with the Commission.

75.     On or about September 21, 2018, School Client B's bond offering closed, and Choice was paid from bond proceeds pursuant to the instructions provided by the Underwriter.

76.     On or about October 16, 2018, Choice completed its registration with the MSRB.

77.     On or about October 18, 2018, School Client C's bond offering closed. Pursuant to instructions provided by the Underwriter, Choice was paid for this transaction from bond proceeds in amounts consistent with the fee-splitting arrangement between Choice and the Underwriter.

78.     Although Choice and Permenter had completed much of the municipal advisory work for School Client D months earlier, it was not until on or about January 2, 2019, that Permenter signed, and caused to be delivered, an engagement letter for Choice to School Client D.  This version of the engagement letter disclosed

that Permenter had previously been employed by the Underwriter.  However, in the engagement letter, Choice and Permenter failed to exercise due care by repeating the same misleading statements and omissions that appeared in Choice's engagement letters with School Client A, School Client B, and School Client C, including that Choice did not "share fees with...any provider of investments or services to [School Client D]" and that Choice had no "material actual or potential conflicts of interest."

79.     On or about February 14, 2019, the municipal bond offering for School Client D closed.  Pursuant to instructions provided by the Underwriter, Choice was paid for this transaction from bond proceeds in amounts consistent with the fee-splitting arrangement between Choice and the Underwriter.

## FIRST CLAIM FOR RELIEF

### *Violations of Section 15B(a)(5) of the Exchange Act by Choice and O'Meara (Deceptive or Manipulative Act or Practice by a Municipal Advisor)*

80.     Paragraphs 1 through 79 are hereby re-alleged and are incorporated herein by reference.

81.     By reason of the foregoing, defendants Choice and O'Meara, used the mails or other means or instrumentality of interstate commerce to provide advice to or on behalf of a municipal entity or obligated person with respect to municipal financial products or the issuance of municipal securities, in connection with which Choice and O'Meara engaged in a deceptive or manipulative act or practice.

82.     By reason of the forgoing, defendants Choice and O'Meara violated and, unless enjoined will continue to violate, Section 15B(a)(5) of the Exchange Act [15 U.S.C. § 78o-4(a)(5)].

## SECOND CLAIM FOR RELIEF

### *Violations of Section 15B(c)(1) of the Exchange Act by Choice and O'Meara (Breach of Fiduciary Duty)*

83.     Paragraphs 1 through 79 are hereby re-alleged and are incorporated herein by reference.

84.     Pursuant to Section 15B(c)(1) of the Exchange Act, a municipal advisor and any person associated with a municipal advisor shall be deemed to have a fiduciary duty to any municipal entity for whom the municipal advisor acts as a municipal advisor, and no municipal advisor may engage in an act, practice or course of business that is not consistent with a municipal advisor's fiduciary duty.

85.     By engaging in the conduct alleged above, defendant Choice acted as a municipal advisor and defendant O'Meara acted as a municipal advisor and person associated with a municipal advisor, as those terms are defined in Sections 15B(e)(4)(A) and 15B(e)(7) of the Exchange Act [15 U.S.C. §§ 78o-4(e)(4) and (7)]. As such, Choice and O'Meara owed a fiduciary duty to School Client A and School Client B.

86.     By reason of the forgoing, defendants engaged in the acts, practices and courses of business described above, and Choice and O'Meara breached their fiduciary duty to School Client A and School Client B.

87.     By reason of the forgoing, defendants Choice and O'Meara violated and, unless enjoined will continue to violate, Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)].

## THIRD CLAIM FOR RELIEF

### *Violations of Section 15B(a)(1)(B) of the Exchange Act by Choice*
### *(Failure to Register as a Municipal Advisor with the Commission)*

88.     Paragraphs 1 through 79 are hereby re-alleged and are incorporated herein by reference.

89.     By reason of the forgoing, Choice provided advice to or on behalf of a municipal entity or obligated person with respect to the issuance of municipal securities without first being registered with the Commission as a municipal advisor.

90.     By reason of the forgoing, Choice violated and, unless enjoined will continue to violate, Section 15B(a)(1)(B) of the Exchange Act [15 U.S.C. § 78o-4(a)(1)(B)].

## FOURTH CLAIM FOR RELIEF

### *Violations of MSRB Rule A-12 by Choice*
### *(Failure to Register as a Municipal Advisor with the MSRB)*

91.     Paragraphs 1 through 79 are hereby re-alleged and are incorporated herein by reference.

92.     By reason of the forgoing, Choice engaged in municipal advisory activities without first registering with the MSRB.

93.     By reason of the forgoing, Choice violated and, unless enjoined will continue to violate, MSRB Rule A-12.

## FIFTH CLAIM FOR RELIEF

### *Violations of MSRB Rule G-17 by Choice and O'Meara*
### *(Engaging in a Deceptive, Dishonest, or Unfair Practice)*

94.     Paragraphs 1 through 79 are hereby re-alleged and are incorporated herein by reference.

95.     By reason of the forgoing, defendants Choice and O'Meara, in the conduct of their municipal securities or municipal advisory activities, failed to deal fairly with all persons and engaged in a deceptive, dishonest, or unfair practice or practices.

96.     By reason of the forgoing, defendants Choice and O'Meara violated and, unless enjoined will continue to violate, MSRB Rule G-17.

## SIXTH CLAIM FOR RELIEF

### *Violations of MSRB Rule G-42 by Choice and O'Meara*
### *(Breaches of Duties of Non-Solicitor Municipal Advisors)*

97.     Paragraphs 1 through 79 are hereby re-alleged and are incorporated herein by reference.

98.     By reason of the forgoing, defendants Choice and O'Meara (i) breached their duty of care to their obligated person client or clients; (ii) breached their fiduciary duty, duty of loyalty, or duty of care to their municipal entity client or clients; (iii) failed to provide their municipal advisory client or clients full and fair disclosures in writing of all material conflicts of interest; (iv) failed to evidence each of their municipal advisory relationships in a writing prior to or promptly after the establishment of the municipal advisory relationship or relationships; (v) failed to document the form and basis of direct or indirect compensation for the municipal advisory activities to be performed; (vi) made a representation or submission of information that defendants knew or should have known was either materially false or materially misleading due to the omission of a material fact about the capacity, resources or knowledge of the municipal advisor to a client or prospective client, for the purpose of obtaining or retaining an engagement to perform municipal advisory activities; or (vii) made or participated in a fee-splitting arrangement with an underwriter on a municipal securities transaction as to which Choice or O'Meara provided or was providing advice.

99.    By reason of the forgoing, defendants Choice and O'Meara violated and, unless enjoined will continue to violate, MSRB Rule G-42.

## SEVENTH CLAIM FOR RELIEF

### *Violations of Section 15B(c)(1) of the Exchange Act by Choice and O'Meara (Acts in Contravention of Any Rule of the MSRB)*

100.    Paragraphs 1 through 79 are hereby re-alleged and are incorporated herein by reference.

101.    By reason of the forgoing, defendants Choice and O'Meara violated MSRB Rules G-17 and G-42, and defendant Choice violated MSRB Rule A-12.

102.    By reason of the forgoing, defendants Choice and O'Meara acted in contravention of a rule or rules of the MSRB while making use of the mails or any means or instrumentality of interstate commerce to provide advice to or on behalf of a municipal entity or obligated person with respect to municipal financial products or the issuance of municipal securities.

103.    By reason of the forgoing, defendants Choice and O'Meara violated and, unless enjoined will continue to violate, Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)].

## EIGHTH CLAIM FOR RELIEF

### *Aiding and Abetting Liability Against O'Meara for Choice's Violations of Sections 15B(a)(1)(B) and 15B(c)(1) of the Exchange Act and MSRB Rule A-12*

104.    Paragraphs 1 through 79 are hereby re-alleged and are incorporated herein by reference.

105.    By reason of the foregoing, Choice violated Sections 15B(a)(1)(B) and 15B(c)(1) of the Exchange Act and MSRB Rule A-12.

106.    O'Meara was aware of, or recklessly disregarded, that Choice's conduct was improper and rendered Choice substantial assistance in this conduct.

107.   By reason of the foregoing, O'Meara aided and abetted and, unless enjoined will continue to aid and abet, violations of Sections 15B(a)(1)(B) and 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(a)(1)(B) and 15 U.S.C. § 78o-4(c)(1)] and MSRB Rule A-12.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Enter an Order permanently restraining and enjoining Choice and O'Meara from committing and/or aiding and abetting the violations of the federal securities laws alleged against Choice and/or O'Meara in this Complaint.

II.

Enter an Order requiring defendants to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)].

III.

Enter an Order imposing civil money penalties upon defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

1

V.

2

Grant such other relief as this Court may deem just and appropriate.

3

4

Dated: September 22, 2021                    Respectfully Submitted,

5

6

7

8

/s/ William T. Salzmann

9

William T. Salzmann

10

Attorney for Plaintiff

11

SECURITIES AND EXCHANGE

12

COMMISSION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28