# EXHIBIT C

**EXHIBIT C**
**1**

*In re O'Brien Partners, Inc.*, Securities Act Release No. 7594, Investment Advisers Act Release No. 1772, A.P. File No. 3-9761 (October 27, 1998).

**I.** The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings be, and they hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 8A of the Securities Act of 1933 ("Securities Act") against O'Brien Partners, Inc. ("O'Brien Partners" or the "Respondent").

**II.** In anticipation of the institution of these administrative proceedings, the Respondent has submitted an Offer of Settlement for the purpose of disposing of the issues raised in these proceedings. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party, the Respondent, without admitting or denying the findings set forth herein, except that it admits to the jurisdiction of the Commission over it and over the subject matter of these proceedings, consents to the entry of the findings and to the issuance of this Order Instituting Proceedings ("Order").

**III.** On the basis of this Order and the Respondent's Offer of Settlement, the Commission finds the following:

**A. RESPONDENT**

O'Brien Partners, whose offices are located in New York and Los Angeles, was incorporated in November 1987, and was registered with the Commission as an investment adviser during all relevant periods. O'Brien Partners served as an investment adviser, as well as a financial advisor[1] to state and local government agencies on a variety of matters, including bond transactions and refundings, and the investment of bond proceeds. O'Brien Partners withdrew its registration with the Commission in March 1996.

**B. OTHER RELEVANT ENTITIES AND PERSON**

OBP Municipals Corporation ("OBPM"), an affiliate of and under common control with O'Brien Partners, was registered with the Commission as a broker-dealer during all relevant periods, and received nine of the ten third-party payments that are discussed below. OBPM withdrew its registration with the Commission on March 10, 1997, and the company was dissolved on July 15, 1997.

Pacific Matrix Financial Group, Inc. ("Pacific Matrix") acted as a finder of investments for bond proceeds, including guaranteed investment contracts ("GICs") and other complex investment vehicles during all relevant periods. A Pacific Matrix vice president, Christopher Winters ("Winters"), left Pacific Matrix in late 1992, along with a colleague, to form Feld Winters Financial Inc. ("Feld Winters"), which also acted as a finder of investments for bond proceeds. In instances in which it successfully brokered agreements that were used for the investment of bond proceeds, Pacific Matrix and Feld Winters generally received a commission equal to the maximum allowable commission calculated in accordance with the five basis point formula set forth in the applicable tax regulations. In 1991, Pacific Matrix, through Winters, began an arrangement that led to its sharing with O'Brien Partners approximately 50 percent of the commissions that Pacific Matrix received for brokering investment agreements used by O'Brien Partners' clients to invest bond proceeds. Winters and O'Brien Partners continued this practice when Winters left Pacific Matrix to form Feld Winters.

**C. FACTS**

1. Summary

This case concerns O'Brien Partners' failure adequately to disclose to its municipal advisory clients that it had arranged to obtain a portion of the commissions paid to the broker involved in the placement of interim investments of the proceeds of O'Brien Partners' clients' bond offerings. O'Brien Partners, directly or through OBPM, received approximately $450,000 in ten third-party payments in connection with investments by four municipal bond issuers from August 1991 through November 1993. Although there is no evidence that the payments directly affected the cost of those investments to O'Brien Partners' clients, the payments created at least a potential conflict of interest for O'Brien Partners in discharging its duty to provide impartial advice to its clients concerning the choice of the fee-sharing broker to handle investments for the issuers' bond proceeds. O'Brien Partners thus breached its fiduciary duty to its clients to disclose all actual or potential conflicts of interest

**EXHIBIT C**

2

by not adequately disclosing fees it shared in handling investments for the issuer's bond proceeds. After considering legal advice that it solicited in late 1991, O'Brien Partners decided that disclosure should be made, and took certain steps to implement that decision, but those steps were not effective. In addition, amendments and annual supplements to O'Brien Partners' Form ADV filed with the Commission failed to disclose O'Brien Partners' receipt of such payments as additional compensation. Additionally, O'Brien Partners failed to provide either a copy of Part II of its Form ADV or a document containing the information required in Part II to its advisory clients, as required by the Advisers Act.

2. Background

In its role as financial advisor to municipalities, O'Brien Partners offers a range of services, the precise scope of which varies from engagement to engagement depending on the bond offering and client. O'Brien Partners typically assists in preparing the preliminary official statement, and may assist the issuer in selecting and/or negotiating with the underwriter. O'Brien Partners also, among other things, advises the issuer on the optimum time to issue bonds to minimize interest costs; attends the signing of the bond purchase agreement; and assists in the preparation of the Official Statement and the formal signing and delivery of the bonds.

During the period relevant to this Order, O'Brien Partners also advised clients in their investments of bond proceeds in securities, consistent with the limitations thereon as generally described in the bond issue indenture or bond resolution. [12] In such instances, O'Brien Partners identified appropriate investment vehicles, solicited potential investment providers, prepared and disseminated bid forms, and collected and evaluated the bids. At times, O'Brien Partners used Winters as a broker to assist in various aspects of the process.

3. O'Brien Partners Begins Receiving A Split Of Brokerage Commissions Without Notice to its Client

In August 1991, O'Brien Partners accepted its first payment from Pacific Matrix in connection with a reinvestment transaction. The payment occurred in a transaction involving the Wisconsin Public Power Inc. System ("Wisconsin"), for whom O'Brien Partners served as financial advisor for bond offerings in 1990 and 1991 and subsequent investments of bond proceeds used for reserve funds. [13] The 1990 bond issue of approximately $113 million was Wisconsin's first bond offering ever, and Wisconsin looked to O'Brien Partners for special guidance concerning the offering and investment of proceeds in securities, including repurchase agreements, consistent with the limitations in the bond offering documents or bond resolution. As part of the transaction, O'Brien Partners used Pacific Matrix to broker the investment agreement for the approximately $9.4 million held in the debt service reserve fund. Pacific Matrix and O'Brien Partners entered into an arrangement whereby Pacific Matrix would pay 50 percent of its resulting commission to O'Brien Partners. At O'Brien Partners' recommendation, Wisconsin entered into a repurchase agreement with the winning bidder, Mitsui Taiyo Kobe Global Capital Inc. ("MTK"). MTK paid a $68,000 commission to Pacific Matrix, which wrote a check dated August 22, 1991 made payable to O'Brien Partners in the amount of $34,000. [14]

The O'Brien Partners employee responsible for the Wisconsin offerings asked John O'Brien, the President of O'Brien Partners, whether he should notify Wisconsin of the Pacific Matrix payment. The O'Brien Partners employee stated that John O'Brien replied that he believed that notice wasn't necessary because the client was getting the best price available after receiving at least three bids and the fee was being paid not by the client but by the third-party provider. Accordingly, O'Brien Partners did not disclose that payment to Wisconsin. O'Brien Partners' invoice to Pacific Matrix incorrectly described the services for which payment was sought (i.e., a share of the commissions that Pacific Matrix was receiving from MTK) as "Professional Services" related to "Tax Exempt Market Information Pertaining to Municipal Issues Debt Service Reserve Fund Investments."

O'Brien Partners also advised Wisconsin with respect to its July 1991 bond offering of approximately $42 million and the subsequent investment of bond proceeds for the reserve fund. As with the previous transaction, Wisconsin relied on O'Brien Partners' expertise with respect to the investment of proceeds in securities, including repurchase agreements. At O'Brien Partners' request, Pacific Matrix brokered a repurchase agreement to invest moneys from the debt service reserve fund. Pacific Matrix and O'Brien Partners again agreed to share the commission. The winning bidder paid a commission of $48,733.52 to Pacific Matrix, which, in turn, paid $24,366 to OBPM. [15] O'Brien Partners followed the same process as in the first Wisconsin transaction and, for the same reasons, did not notify the client of Pacific Matrix's payment to OBPM.

**EXHIBIT C**
3

While OBPM's invoice to Pacific Matrix described the $24,366 due as a "referral fee for investments services," other than a handwritten entry by an O'Brien Partners bookkeeper it did not identify the issuer, bond offering, investment provider, or any other information. [16]

4. O'Brien Partners Reevaluates Its Notice Obligation But Fails to Adopt Procedures Adequate to Ensure Successful Notice to Clients

By late 1991, when it became apparent that additional opportunities to share brokerage commissions would become available, O'Brien Partners began to analyze further whether it needed to notify its clients of its receipt of third-party commissions. O'Brien Partners sought legal advice on the issue of client notification in late 1991. Counsel opined in an advice memorandum dated November 18, 1991 that while it did not believe that legal authority specifically mandated disclosure, "[n]onetheless, published disclosure guidelines, the spirit and intent of securities disclosure laws, and a related statutory provision suggest that such disclosure to the Issuer and the Seller should be made." [17]

Shortly thereafter, John O'Brien decided that O'Brien Partners would notify its clients of its opportunity to receive third-party payments and seek permission to do so, but did not implement an effective notification procedure. John O'Brien orally informed O'Brien Partners employees that such notice should be given, but O'Brien Partners did not provide written direction to its employees or instructions as to the precise form and substance of such disclosure. At relevant times, O'Brien Partners' policy also did not contemplate any written disclosure. Nor did it require that the notice be given to a particular decision-making body within each issuer, such as a board or committee. Rather, the procedures adopted by O'Brien Partners called for the employee who handled the transaction at issue to inform the official at the client handling the transaction that O'Brien Partners had the opportunity to receive a third-party payment stemming from the investment of bond proceeds. John O'Brien said that he would confirm with that employee that notice had been given; if not, John O'Brien would notify the client himself. The policy of O'Brien Partners was to inform clients that the total payment in which it would share would equal up to five basis points of the investment. They did not inform the clients of the dollar amount that it had received, unless asked. [18]

The disclosure procedures adopted by O'Brien Partners at that time were not adequate to inform its clients of the facts creating a potential conflict of interest. The disclosure failure is evident from the disparate statements of O'Brien Partners and its clients. Although John O'Brien and other O'Brien Partners' officers and employees stated that from the time its disclosure procedures began, in late 1991 or early 1992, each client was informed of each third-party payment to be made to O'Brien Partners or OBPM, no O'Brien Partners clients discussed herein recalled receiving any such notice, or knew of any third-party payment. [19]

a. Calleguas Municipal Water District

O'Brien Partners served as financial advisor to Calleguas Municipal Water District ("Calleguas") in its 1991 offering of approximately $62 million and investments of bond proceeds held in the construction and debt service reserve funds. [20] The offering was Calleguas' first since the 1970s, and the issuer relied on O'Brien Partners' advice concerning the offering and the investments of proceeds in securities, including repurchase agreements, consistent with the limitations in the bond offering documents or bond resolution. O'Brien Partners used Pacific Matrix to broker the two above-mentioned investments, and they again agreed to share the commissions. The two winning bidders paid commissions to Pacific Matrix in the amount of $50,000 and $33,000, and it, in turn, paid OBPM $25,000 and $16,500, respectively.

John O'Brien stated that, at the outset of the engagement, he had a general conversation with the Calleguas Board Chairman in which he discussed reinvestment of proceeds and that OBPM could receive a brokerage fee on reinvestments. Also, an O'Brien Partners' officer stated that she explained the process of investing proceeds to Calleguas' Controller, informing the Controller how the bidding worked, that the winning bidder generally paid a brokerage commission, and that O'Brien Partners might receive a split of that commission. The officer also stated that Calleguas' bond counsel participated in this conversation, and that, after its conclusion, the Controller stated that she had the authority to and did approve O'Brien Partners' request to receive brokerage fees of up to five basis points. While bond counsel recalled a general conversation about the investment process, including the payment of fees, bond counsel and the Controller stated that they could not recall any discussion that O'Brien Partners and OBPM would be sharing in such payments.

**EXHIBIT C**
**4**

O'Brien Partners also advised Calleguas in its August 1993 bond offering of approximately $57 million and the investment of certain bond proceeds in GICs. At O'Brien Partners' request, Feld Winters brokered an investment agreement for approximately $3.2 million held in the reserve fund. The winning bidder paid a commission of $19,540 to Feld Winters, which, in turn, paid 60 percent of that total, or $11,724, to OBPM. [21] Although an O'Brien Partners employee who worked on the transaction recalled that this payment was disclosed during a Calleguas Board meeting, Calleguas' Controller, bond counsel, and outside counsel, who attended the meeting, said they did not recall such a discussion and were not aware of the payment.

b. Southern California Public Power Authority

Pursuant to a January 1989 contract, O'Brien Partners served as financial advisor to the Southern California Public Power Authority ("SCPPA") for various bond offerings, including two 1993 transactions discussed below. SCPPA relied on O'Brien Partners' advice with respect to, among other things, the timing and pricing of the offering, and the investment of bond proceeds in securities, including repurchase agreements and GICs.

O'Brien Partners advised SCPPA in connection with two bond offerings in March 1993 and July 1993 for a combined $520 million. At O'Brien Partners' request, Feld Winters brokered the repurchase agreement used to invest the reserve funds in each offering. The winning bidders paid commissions of $72,000 and $200,000 to Feld Winters, which, in turn, paid $36,000 and $125,000 to OBPM.

The O'Brien Partners point person on the transactions said that he spoke with a SCPPA representative several times about sharing brokerage fees, and received permission from that representative for O'Brien Partners to receive such fees. That representative stated that no such conversations occurred, and he and other high-level SCPPA officials who were involved in the offerings stated that they were not aware of, and did not consent to, these payments.

c. City of Anaheim, California

Pursuant to an April 1989 contract, O'Brien Partners served as financial advisor to the City of Anaheim, California ("Anaheim"), for four bond offerings in the summer of 1993. [22] In each transaction, Anaheim relied on O'Brien Partners' advice on various matters, including the investment of certain bond proceeds in repurchase agreements. At O'Brien Partners' request, Feld Winters conducted the bidding process and brokered three agreements used to invest certain proceeds resulting from the above-mentioned Anaheim offerings. OBPM received three payments from Feld Winters totaling approximately $180,000 in connection with these investments. [23]

John O'Brien and another O'Brien Partners employee asserted that they discussed the payments with an Anaheim official prior to the offerings, saying they disclosed that O'Brien Partners might be able to share in a brokerage commission of up to five basis points. Although O'Brien Partners representatives claim that the Anaheim official consented to O'Brien Partners' receipt of the third-party fees, the Anaheim official said no such discussions occurred, that he was not aware of and did not consent to O'Brien Partners' receipt of any such payments.

Further, sometime in 1994 (several months after the Feld Winters payments), Anaheim's City Treasurer stated that she learned for the first time that investment providers occasionally pay commissions in connection with the investment of bond proceeds, and that payments that exceed the maximum allowable commission calculated in accordance with the five basis point formula set forth in the applicable tax regulations could affect the tax-exempt status of the bonds. [24] She then asked O'Brien Partners for a written record of any such payments. The point person on the transactions created a multi-page document entitled "Summary of Investments" ("Summary"), which referenced all bids submitted for each investment vehicle discussed above, who solicited each bid, and the total payments made by the winning bidder. A copy of the Summary was provided to Anaheim.

The Summary accurately identified the total dollar amounts paid by two of the winning bidders, (Transamerica Life ($39,922) and Societe Generale ($217,000)), but did not identify the payees, and did not disclose that O'Brien Partners or OBPM had received any part of the payments. [25] The Summary incorrectly stated that O'Brien Partners solicited all bids for the forward supply contract and that no payments were made by the winning bidder, but Feld Winters ultimately assisted in securing the winning bidder, Merrill Lynch, and Merrill Lynch paid a $61,000 commission to Feld Winters, which paid $25,250 to OBPM.

EXHIBIT C
5

5. O'Brien Partners Fails to Report Its Third-Party Fees in Amended Forms ADV, and Fails to Provide Such Information to Its Clients

None of the amendments to O'Brien Partners' Form ADV filed from 1991-93 disclosed the third-party payments discussed herein. Furthermore, an amendment to O'Brien Partners' Form ADV filed with the Commission on February 18, 1992 incorrectly indicated, in a section entitled "Additional Compensation," that neither O'Brien Partners nor any related person had any written or oral arrangements under which it received cash or "some economic benefit," including "commissions," from a "non-client in connection with giving advice to clients." Moreover, O'Brien Partners failed to provide either a copy of Part II of its Form ADV or a document containing at least the information required in Part II to its municipal advisory clients, as required by Rule 204-3 under the Advisers Act.

**D. LEGAL DISCUSSION**

1. O'Brien Partners Provided Investment Advice to its Municipal Clients

O'Brien Partners acted as an investment adviser to Wisconsin, Calleguas, SCPPA, and Anaheim for purposes of the Advisers Act because it rendered advice to those clients concerning their investment of bond proceeds in securities, including repurchase agreements and GICs, and was compensated for that advice. See Section 202(a)(11) of the Advisers Act; [26] see also Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services, Release No. IA-1092, 39 SEC Docket 653 (October 8, 1987) (hereinafter "Advisers Act Release No. 1092"). O'Brien Partners' relationship with these issuers generally envisioned that O'Brien Partners would advise them as to how they should invest their bond proceeds, including whether to invest them in securities, whenever such advice might be requested. O'Brien Partners' contracts with Wisconsin and Calleguas specifically provided that O'Brien Partners would provide "expert advice" on a variety of matters, including the "reinvestment of the bond proceeds." SCPPA and Anaheim also entered into each bond transaction relying on O'Brien Partners' advice concerning how to invest their proceeds. Although municipal issuers have somewhat limited options with respect to how they can invest bond proceeds, [27] a sufficient number of alternatives existed in each transaction at issue so as to support the issuers' need for investment advice. O'Brien Partners selected the GIC broker used in each transaction and advised the issuers on the possible alternatives with respect to how to invest their proceeds. By overseeing the competitive bidding process for locating appropriate investment vehicles for the bond proceeds, reviewing the bid forms, and assuring that the investments met the client's guidelines and were within the parameters of the bond offering, O'Brien Partners advised its clients regarding the investment of their bond proceeds in non-government securities and the type of securities in which to invest. Based on O'Brien Partners' advice, each municipality at issue invested the relevant bond proceeds in government securities or in separate investment agreements, including GICs, forward supply contracts, and repurchase agreements. All of the GICs, forward supply contracts and repurchase agreements discussed herein were securities for purposes of the federal securities laws. Other recent enforcement proceedings have been based on similar transactions. See e.g., SEC v. Stifel, Nicolaus and Company, Inc., Lit. Rel. No. 14587 (August 3, 1995) (complaint alleged undisclosed payments stemming from issuer's investment of bond proceeds in GICs and forward purchase agreements); In the Matter of Pacific Matrix Financial Group, Inc., Administrative Proceeding File No. 3-9539 (January 30, 1998).

Finally, O'Brien Partners was compensated for rendering advice concerning its clients' investments in securities. This compensation was received in a variety of ways. As discussed above, O'Brien Partners' contracts with its clients in some cases explicitly provided that investment advice was among the services to be provided in exchange for the contractual payments. In one instance, O'Brien Partners separately invoiced its client for its advice concerning the reinvestment of proceeds. In addition, O'Brien Partners was compensated for this advice through its receipt of third-party payments. Compensation for advisory services rendered can be demonstrated by showing the adviser received compensation "from some source for his services;" it is not necessary to show the compensation was paid directly by the person receiving the investment advisory services. See Advisers Act Release No. 1092, 39 SEC Docket at 662.

O'Brien Partners' arrangement with its clients is distinguishable from the arrangement described in The Knight Group, 1991 SEC No-Act. LEXIS 1303 (Nov. 13, 1991). In that no-action letter, the staff of the Division of Investment Management said that it would not recommend enforcement action against a financial advisor to issuers of municipal securities if, without registering as an investment adviser, the financial advisor assisted clients in structuring new bond issues and occasionally made

**EXHIBIT C**
6

recommendations of temporarily idle proceeds pending their project use. The staff's response noted in particular that The Knight Group would not be compensated for making such recommendations.

2. O'Brien Partners Violated Section 206(2) of the Advisers Act

Section 206(2) makes it unlawful for an investment adviser to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or potential client and codifies the fiduciary duty of investment advisers to act for the benefit of their clients, requiring advisers to exercise the "utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." SEC v. Moran, 922 F. Supp. 867, 895-96 (S.D. N.Y. 1996); see also SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194 (1963). An investment adviser's failure to disclose an actual or potential conflict of interest violates Section 206(2). Capital Gains, 375 U.S. 180; In the Matter of Patrick Clements d/b/a/ Patrick Clements & Assoc., 42 S.E.C. 373 (1964). Proof of scienter is not required to establish a violation of Section 206(2). See Capital Gains, 375 U.S. at 195.

As an investment adviser, O'Brien Partners owed a fiduciary duty to its clients, Wisconsin, Calleguas, SCPPA and Anaheim, to disclose all material facts, including all instances in which "the adviser is in a situation involving a conflict, or potential conflict, of interest with a client. The type of disclosure required by an investment adviser who has a potential conflict of interest with a client will depend upon all the facts and circumstances. As a general matter, an adviser must disclose to clients all material facts regarding the potential conflict of interest so that the client can make an informed decision as to whether to enter into or continue an advisory relationship with the adviser or whether to take some action to protect himself against the specific conflict of interest involved." Advisers Act Release No. 1092, 39 SEC Docket at 667-68. See also Capital Gains, 375 U.S. at 191-92 (Congress's intent in enacting the Advisers Act was "to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser -- consciously or unconsciously -- to render advice which was not disinterested").

O'Brien Partners breached its fiduciary duty to Wisconsin, Calleguas, SCPPA, and Anaheim by failing adequately to disclose that, while providing advisory services to these issuers, O'Brien Partners also was receiving payments from third parties that brokered agreements used by these issuers to invest their bond proceeds. These third-party payments were material because they gave rise to a risk that O'Brien Partners would not provide impartial advice to its financial advisory clients with respect to the use of Pacific Matrix and Feld Winters as investment brokers, and how the issuers should invest their bond proceeds. [28]"An investor seeking the advice of a registered investment adviser must . . . be permitted to evaluate such overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving two masters or only one, `especially . . . if one of the masters happens to be economic self-interest.' " Capital Gains, 375 U.S. at 196 (citations omitted). The payments also cast doubt on the integrity of the offering process. O'Brien Partners' clients lacked material information they needed to consider in deciding whether to proceed with the offerings, the manner in which to invest the bond proceeds, and whether to heed O'Brien Partners' advice. See Wilson v. Great American Industries, Inc., 855 F.2d 987, 993-94 (2d Cir. 1988) (where a person with a duty to investors makes a decision or recommendation on a matter important to investors, but fails to disclose that he has a potential conflict that might have influenced his decision, the existence of the conflict of interest is material and should be disclosed); Steadman v. SEC, 603 F.2d 1126, 1130 (5th Cir. 1979). [29]

In view of the materiality of these payments and the actual or potential conflict they created, O'Brien Partners was obligated, but failed, to adopt procedures that would insure effective notice was given to its clients. By failing adequately to advise its clients of its receipt of these payments, O'Brien Partners violated Section 206(2) of the Advisers Act.

3. O'Brien Partners Violated Sections 17(a)(2) and (3) of the Securities Act

Sections 17(a)(2) and (3) of the Securities Act prohibit misrepresentations or omissions of material facts in the offer or sale of any security. Scienter is not required to prove violations of Sections 17(a)(2) or (3). Aaron v. SEC, 446 U.S. 680, 697 (1980). Instead, violations of these sections may be established by showing negligent conduct. SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997). For purposes of the Securities Act, a duty to disclose material information may be premised upon a fiduciary relationship, or the existence of a similar relationship of trust and confidence, which results in the party charged with the disclosure obligation being aware that the other party is relying on the relationship in making his or her investment decisions. See Chiarella v. United States, 445 U.S. 222, 228 (1980); United States v. Chestman, 947 F.2d 551, 568 (2d Cir. 1991), cert. denied, 112 S. Ct. 1759 (1992); Zweig v. Hearst Corp., 594 F.2d 1261, 1268 (9th Cir. 1979). A

**EXHIBIT C**
7

fiduciary relationship can exist between financial advisor and client when the relationship is marked by dependency and influence. Chestman, 947 F.2d at 568-69. Further, as mentioned earlier, an investment adviser also owes a fiduciary duty to its clients. Capital Gains, 375 U.S. at 194.

O'Brien Partners owed a fiduciary duty to its clients, both as a financial advisor and as an investment adviser. [30] As a result, it was obligated to disclose the material facts concerning its arrangement to share commissions paid to the brokers on its clients' transactions. See Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949) (petitioner acted in dual capacity of investment adviser and broker, owed a fiduciary duty to her clients, and violated Section 17(a) by failing to make full disclosure concerning certain securities transactions). O'Brien Partners' failure to make full disclosure of those facts violated Sections 17(a)(2) and (3) of the Securities Act.

4. O'Brien Partners Violated The Reporting, Disclosure and Recordkeeping Provisions of the Advisers Act

Section 207 of the Advisers Act makes it unlawful for any person "willfully to make any untrue statements of a material fact," or "willfully to omit to state ... or report any material fact," in any "report" filed with the Commission. The term "report" includes amendments to Form ADV and Forms ADV-S. [31] Rule 204-3 under the Advisers Act requires investment advisers to furnish to each advisory client either a copy of Part II of the adviser's Form ADV or a document containing at least the information required therein. Under Rule 204-2(a)(5) under the Advisers Act, investment advisers must maintain "true, accurate and current" records forming the basis of entries in any ledger and "all bills or statements . . . relating to the business of the investment adviser."

None of O'Brien Partners' amendments to Form ADV filed between 1991 and 1993 disclosed its receipt of the additional compensation generated by its fee-sharing arrangements with Pacific Matrix and Feld Winters. Furthermore, the amendment to Form ADV filed on February 19, 1992, incorrectly indicated that O'Brien Partners received no economic benefit (defined as including commissions) from a non-client in connection with giving advice to clients. In addition, O'Brien Partners' Forms ADV-S filed between 1991 and 1993 incorrectly certified that no amendment needed to be filed to correct any information contained in the Form ADV. Accordingly, O'Brien Partners violated Section 207 of the Advisers Act, which makes it unlawful for "any person willfully to make any untrue statements of a material fact," or "willfully to omit to . . . report any material fact" in an amended Form ADV or other report filed with the Commission.

In addition, O'Brien Partners failed to provide the information set forth in Part II of its Form ADV, and amendments thereto, to Wisconsin, Calleguas, SCPPA, or Anaheim or other municipal issuers, as required by the Advisers Act. Accordingly, O'Brien Partners violated Section 204 of the Advisers Act and Rule 204-3 thereunder.

Finally, O'Brien Partners generated and submitted to Pacific Matrix an incorrect invoice in 1991 concerning the $34,000 paid in connection with Wisconsin's investment of bond proceeds. Accordingly, O'Brien Partners failed to make and keep true and accurate books and records as required under Section 204 of the Advisers Act and Rule 204-2(a)(5) thereunder.

**IV.** FINDINGS

On the basis of this Order and the Offer of Settlement submitted by the Respondent, the Commission finds that O'Brien Partners willfully violated Sections 17(a)(2) and (3) of the Securities Act, and Sections 204, 206(2) and Section 207 of the Advisers Act and Rules 204-2 and 204-3 thereunder. [32]

**V.** In view of the foregoing, the Commission has determined it is in the public interest to accept the Respondent's Offer of Settlement. Accordingly, IT IS HEREBY ORDERED, effective immediately, that O'Brien Partners:

A. be, and hereby is, censured;

B. shall cease and desist from committing or causing any violation and any future violation of Sections 17(a)(2) and (3) of the Securities Act, and Sections 204, 206(2) and Section 207 of the Advisers Act and Rules 204-2 and 204-3 thereunder; and

C. shall pay a civil penalty in the amount of $250,000 to the United States Treasury, which shall be paid pursuant to the following schedule: $100,000 shall be paid within ten (10) days of the date of this Order; $75,000 shall be paid within three (3) months of the date of this order; and $75,000 shall be paid within six (6) months of the date of this Order. Such payments shall be: (1) made by United States postal money order, certified check, bank cashier's check or bank money order; (2) made

**EXHIBIT C**
8

payable to the Securities and Exchange Commission; (3) delivered to the Comptroller, Securities and Exchange Commission, 450 Fifth Street, N.W., Mail Stop 0-3, Washington D.C. 20549; and (4) submitted under cover letter which identifies O'Brien Partners as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Erich T. Schwartz, Assistant Director, Securities and Exchange Commission, 450 Fifth Street, N.W., Mail Stop 7-6, Washington, D.C. 20549.

**EXHIBIT C**
**9**