# EXHIBIT F

U.S. Securities and Exchange Commission

**UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION**

SECURITIES ACT OF 1933
Release No. 7826 \ April 6, 2000

SECURITIES EXCHANGE ACT OF 1934
Release No. 42632 \ April 6, 2000

ADMINISTRATIVE PROCEEDING
File No. 3-10176

| In the Matter of | ORDER INSTITUTING ADMINISTRATIVE PROCEEDINGS, MAKING FINDINGS OF FACT, ISSUING A CEASE-AND-DESIST ORDER, AND IMPOSING REMEDIAL SANCTIONS |
|---|---|
| WILLIAM R. HOUGH & CO., Respondent. | |

I.

The Commission deems it appropriate and in the public interest that public administrative proceedings be, and they hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Sections 15(b)(4) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") against William R. Hough & Co. ("Hough").

In anticipation of the institution of these proceedings, Hough has submitted an offer of settlement, which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party, Hough, without admitting or denying the findings contained herein, except that it admits to the jurisdiction of the Commission over it and over the subject matter of these proceedings, consents to the entry of the findings, the issuance of the cease-and-desist order, and the imposition of the remedial sanctions set forth below.

II.

Based on the foregoing, the Commission finds as follows:

A. Respondent

William R. Hough & Co. ("Hough") is a financial services firm with its principal place of business in St. Petersburg, Florida. At all relevant times, Hough was registered with the Commission as a broker-dealer pursuant to Section 15(b) of the Exchange Act.

B. Summary

This is a municipal finance case involving the breach of Hough's fiduciary duty to the Canaveral Port Authority, one of its financial advisory clients in Florida. The breach of duty involved Hough's failure to make necessary disclosures in a 1992 advance refunding transaction in which it served as the Port Authority's financial adviser and also sold Treasury securities to the

EXHIBIT F
2

Port Authority as principal. This case also involves Hough's sale of the Treasury securities to the Port Authority at excessive, undisclosed markups.

In addition, in connection with a 1992 refunding in Florida by the City of Boynton Beach, Hough certified the fairness of the price paid to Boynton Beach by the provider of a forward supply contract. The certification was materially misleading because it failed to disclose that at the same time that Hough was certifying the fairness of this price, Hough was seeking a $300,000 payment from the provider of the forward supply contract, which Hough contends was for work on a separate project.

C. Background

1. Advance Refundings

When interest rates fall, state and local governments often seek to reduce their borrowing costs by paying off outstanding bonds through the issuance of new bonds paying lower interest rates. When the old bonds cannot be paid off until a future call date, the municipality can still obtain a benefit from lower interest rates through an advance refunding. An advance refunding can lock in current interest rates and ensure that the municipality will realize debt service savings over the life of the new bonds.

In an advance refunding, the municipality issues new "refunding" bonds and immediately invests the proceeds in a portfolio of U.S. Treasury or agency securities structured to pay the principal and interest obligations on the old bonds until the call date and then to pay off the outstanding principal and any call premium. The portfolio of government securities is normally placed in a defeasance escrow to guarantee repayment of the old bonds.

Defeasance escrow portfolios are subject to Internal Revenue Code provisions and Treasury regulations that prohibit the issuer of tax-exempt refunding bonds from earning tax arbitrage (that is, a profit from the rate differential between the taxable and tax-exempt markets). I.R.C. § 148; Treas. Reg. §§1.148-0 *et seq*. The regulations provide that the issuer cannot receive a yield on the securities held in escrow that exceeds the yield it pays on the refunding bonds. In addition, to prevent an issuer from diverting tax arbitrage to the seller of the escrow securities by paying artificially high prices, the regulations provide, in effect, that the price paid by refunding bond issuers for escrow securities purchased in the secondary market (known as "open market securities") cannot exceed the fair market value or market price of the securities as defined in those regulations.

When the yield on the investments in the escrow, if purchased at fair market value, would exceed the yield on the refunding bonds, the transaction is said to be in "positive arbitrage." Overcharging by dealers for open market escrow securities in a positive arbitrage situation diverts tax arbitrage to the dealers at the expense of the U.S. Treasury.[1] This diversion, known colloquially as "yield burning," is illegal. If yield burning occurs, the IRS can declare interest paid on the refunding bonds taxable. See Harbor Bancorp & Subsidiaries v. Commissioner, 115 F.3d 722 (9th Cir. 1997), *cert. denied*, 118 S. Ct. 1035 (1998).[2]

2. Forward Supply Contracts

When an open market defeasance escrow for an advance refunding is structured to contain securities that will mature before their cash flow is needed to make debt service payments on the refunded bonds, the refunding bond issuer often enters into a forward supply contract. In a forward supply contract, the issuer gives the provider of the contract the right to receive the cash from the early-maturing securities. In return, the provider must supply securities to the escrow to replace the cash, so that

**EXHIBIT F**

3

the escrow continues to satisfy the refunded bonds' debt service requirements. In addition, because the substituted securities will predictably cost the provider less than the cash it will receive, the provider agrees to pay the issuer an initial sum of money, sometimes called the "facility fee," which is the yield of the forward supply contract to the issuer.

Because the facility fee increases the escrow's yield, federal tax regulations require the issuer to include the amount of the facility fee in the escrow's yield calculation. *See* Treas. Reg. §1.148-5(b)(1). Moreover, like any escrow investment, a forward supply contract must be priced at fair market value for purposes of calculating escrow yield. *See* Treas. Reg. §1.148-5(d)(6)(i). Pricing a forward supply contract below fair market value artificially depresses the escrow's yield. A forward supply contract provider that underpays an issuer in a positive arbitrage situation engages in yield burning, because the transaction diverts tax arbitrage to the provider at the expense of the U.S. Treasury.

D. Hough Failed to Make Required Disclosures to the Canaveral Port Authority

The Canaveral Port Authority (the "Port Authority") priced a $46,315,000 refunding bond issue on October 6, 1992. Hough served as the Port Authority's financial advisor for the refunding pursuant to a written financial advisory agreement. The refunding required the Port Authority to purchase for the defeasance escrow a portfolio of Treasury securities costing over $29 million. Hough and the senior managing underwriter agreed to share the risk and profits from the sale of the defeasance escrow securities. Hough then sold the defeasance escrow securities to the Port Authority as principal from Hough's own account. Hough did not discuss the prices it charged for the securities with anyone from the Port Authority.

The Port Authority's personnel had no prior experience with refundings. They depended on Hough's expertise in all aspects of the refunding. They believed that Hough was acting on the Port Authority's behalf in purchasing the Treasury securities and believed that the compensation Hough would earn on the refunding would be limited to its fees under the financial advisory agreement. The Port Authority also relied on Hough to advise the Authority regarding the prices that the senior manager and other underwriters would pay the Port Authority for the refunding bonds.[3]

On the refunding's closing date, October 20, 1992, Hough provided a certificate stating that it had acted as the seller of the securities for the escrow and that "the prices quoted for the U.S. Treasury Securities resulted in yields on such Securities to the Authority at least as high as the yield offered on similar securities in the secondary market for trades which have similar complexities...." In turn, the Port Authority certified that "in reliance upon the certifications made [by Hough], the prices for all of such securities were determined in arms-length negotiations, without any intent to reduce yield." Hough failed to disclose to the Port Authority the amount of profit it made on the escrow securities, or that Hough could have arranged for the Port Authority to buy the escrow securities for less than Hough charged. Hough contends that it disclosed to the Port Authority its profit-sharing arrangement with the senior manager and the possibility that Hough would make a substantial profit on the escrow securities, but no one at the Port Authority can recall learning about the profit-sharing arrangement or knowing that there would be a profit. In connection with the October 6 refunding, Hough eventually received a fee of more than $35,000 from the Port Authority for services it performed under the financial advisory agreement.

E. Hough Sold Treasury Securities to the Canaveral Port Authority at Excessive, Undisclosed Markups

**EXHIBIT F**

4

Hough's profit from the sale of $30.7 million in escrow securities to the Port Authority was $393,475 from markups charged and carry received.[4] Hough paid 45 percent of this profit to the senior manager pursuant to their agreement to share escrow profits. The total markup and carry on the transaction was approximately 1.29 percent of the prevailing interdealer market prices of the Treasury securities sold to the Port Authority. At the time, other dealers generally charged materially lower markups on escrow securities when the prices were determined through competition or bona fide arm's length negotiation. Under the facts and circumstances, Hough's prices were above fair market value as defined by federal tax laws. Because the Port Authority's refunding was a positive arbitrage transaction, the profit made by Hough and the senior manager on the escrow securities by charging more than their fair market value diverted tax arbitrage to Hough and the senior manager at the expense of the U.S. Treasury.

F. Hough Signed a Materially Misleading Market Price Certificate Concerning a Forward Supply Contract in a City of Boynton Beach Refunding

In late June 1992, Hough served as a co-managing underwriter of a refunding by the City of Boynton Beach, Florida. In addition, Hough assisted in structuring the defeasance escrow and sold the open market Treasury securities to the City for the defeasance escrow. On June 26, the refunding's underwriters and a forward supply contract provider agreed on the price, terms, and conditions of a forward supply contract that the provider would enter into with the City when the refunding closed. Bond counsel for the refunding did not require-and there is no evidence that the underwriters used-a competitive process to select the provider or to determine the size of the facility fee that the provider would pay to the City for the forward supply contract rights. Bond counsel did, however, discuss with Hough that if the City did not receive fair value for the forward supply contract rights, the defeasance escrow would exceed the permitted yield and, thereby, jeopardize the tax-exempt status of the bond issue.

Before the refunding's closing date, July 22, 1992, Hough certified in writing, at bond counsel's request, on a certificate dated July 22, 1992, that the facility fee of $2,089,935 paid by the provider to the City for the forward supply contract rights "was established at arm's length without any amount being withheld by [the provider] from the Escrow Agent in order to reduce the yield on the Investments in the Escrow Fund." Under the circumstances, if the provider had withheld as little as $4,000 in order to reduce the yield-that is, paid less than fair value for the contract rights-the defeasance escrow would have exceeded the permitted yield and the tax-exempt status of the City's bond issue would have been jeopardized.

On the closing date, Hough sent the provider an invoice for $300,000. The invoice said that the $300,000 was for services that Hough was performing for the provider to develop a "forward supply assignment program." Hough failed to disclose to the issuer, bond counsel, and bond investors, when certifying the fairness of the price paid by the provider for the forward supply contract, that Hough would receive a $300,000 payment from the provider. The day after closing, the provider sent the $300,000 payment to Hough.[5]

III.

Section 17(a) of the Securities Act prohibits materially false or misleading statements, or material omissions when there is a duty to speak, in the offer or sale of any security. Section 17(a)(1) requires a showing of scienter; however, Sections 17(a)(2) and 17(a)(3) do not require such a showing. Aaron v. SEC, 446 U.S. 680, 697 (1980). Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit materially false or

**EXHIBIT F**
5

misleading statements, or material omissions when there is a duty to speak, made with scienter, in connection with the purchase or sale of any security. Both knowing and reckless conduct satisfy the scienter element. *See, e.g.*, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990). A duty to speak arises, and material omissions become fraudulent, when a person or entity has information that another is entitled to know because of a fiduciary or similar relationship of trust and confidence. *See* Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-55 (1972); Chiarella v. United States, 445 U.S. 222, 228 (1980); In re Arleen W. Hughes, 27 S.E.C. 629 (1948), *aff'd sub nom.* Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949).

A. Material Omissions in Connection with the Sale of Securities to the Canaveral Port Authority

Generally, a municipality's financial advisor owes fiduciary obligations to it in connection with bond financings by the municipality. *See* In re Lazard Freres & Co. LLC, Securities Act Release No. 41318 (April 21, 1999). In addition, Florida courts have found a fiduciary relationship implied in law when "confidence is reposed by one party and a trust accepted by the other." Capital Bank v. MVB, Inc., 644 So.2d 515, 518 (Fla. 3d DCA 1994). The Port Authority reposed confidence in Hough, and Hough accepted that trust. Therefore, based on the facts and circumstances, Hough had a fiduciary or similar relationship of trust and confidence with the Port Authority.

Courts have imposed on a fiduciary affirmative duties of utmost good faith and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading its client. SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194 (1963); *see also* Capital Bank, 644 So.2d at 520 ("A fiduciary owes to its beneficiary the duty to refrain from self-dealing, the duty of loyalty, the overall duty to not take unfair advantage and to act in the best interest of the other party, and the duty to disclose material facts.") A broker-dealer that seeks to sell securities from its own account, as principal, to a client to whom it owes fiduciary duties must follow well-established standards. Under both common law and federal securities law, the broker-dealer can only deal with its fiduciary client as a principal by making full disclosure-before entering into the transaction-of the nature and extent of any adverse interest that the broker-dealer may have with the client. *See* In re Arleen W. Hughes, 27 S.E.C. at 635-36; Restatement (Second) of Agency § 390 (1958). A broker-dealer subject to fiduciary obligations must disclose all material facts, including any current market price at which the customer could effect the transaction that is better than the price that the dealer intends to provide to the customer. In re Lazard Freres, Securities Act Release No. 41318 (April 21, 1999).

Hough violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder when it failed to obtain the Port Authority's fully informed consent before engaging in the escrow securities transaction as principal. Hough failed to disclose-in a manner that its client would be sure to understand-(1) that it would sell the escrow securities to the Port Authority from Hough's own account, and (2) the nature and extent of its actual and apparent conflicts of interest, including the conflict of interest posed by Hough's profit-sharing agreement with the refunding's senior manager. Under the circumstances, Hough had, at a minimum, an obligation to investigate whether another seller would have provided the escrow securities to the Port Authority at better prices, to disclose to the Port Authority the results of that investigation and to adequately advise the Port Authority that if Hough provided the escrow securities, it would seek to

make a profit and would share any profit made with the refunding's senior manager.

B. Material Misrepresentations and Omissions in the Sale of Securities to the Canaveral Port Authority

As to the pricing of the escrow securities sold to the Port Authority, Hough violated Sections 17(a)(2) and 17(a)(3) of the Securities Act by effecting that transaction at prices not reasonably related to the current wholesale market prices for the securities under the particular facts and circumstances, including the pertinent tax regulations, and by representing to the Port Authority that Hough had sold the securities at fair market value. *See, e.g.*, Grandon v. Merrill Lynch & Co., 147 F.3d 184, 192 (2d Cir. 1998) (under the shingle theory, a broker-dealer has a duty to disclose excessive markups); In re Lazard Freres, Securities Act Release No. 41318 (April 21, 1999). Hough's markup and carry on the transaction was 1.29 percent of the prevailing interdealer market prices of the Treasury securities sold to the Port Authority. Based on all the relevant facts and circumstances, Hough knew or should have known that the prices it charged were not reasonably related to the prevailing wholesale market prices of the securities. The excessive markups operated as a fraud or deceit on the Port Authority because unbeknownst to the Port Authority the excessive markups diverted money from the U.S. Treasury to Hough and thereby jeopardized the tax-exempt status of the Port Authority's refunding bonds.

C. Material Omission in the Market Price Certificate for the Forward Supply Contract in the City of Boynton Beach Refunding

When Hough certified the fairness of the price paid by the provider for the forward supply contract, Hough failed to disclose to the City of Boynton Beach, bond counsel, and bond investors that Hough would receive a substantial payment from the provider. Hough knew or should have known that a reasonable investor (whether the bond issuer or a purchaser of the tax-exempt bonds) would have wanted to know about that apparent conflict of interest. Under the circumstances, the tax-exempt status of the bonds depended on the validity of Hough's certification of the fairness of the facility fee. Disclosure of Hough's conflict would have permitted the issuer and bond counsel to consider whether they should ask another firm to certify the fairness of the fee. If the issuer had decided to proceed with Hough as the certifier, disclosure of the conflict would have permitted bond investors to assess properly the credibility of Hough's certification.[6] By signing a certificate and failing to disclose a material fact, Hough violated Sections 17(a)(2) and 17(a)(3) of the Securities Act.

IV.

On the basis of this Order and the offer of settlement made by Hough, the Commission finds that Hough willfully violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5.

V.

Accordingly, IT IS ORDERED, pursuant to Section 8A of the Securities Act and Sections 15(b)(4) and 21C of the Exchange Act, that:

A. Hough is censured;

B. Hough shall cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

C. Within ten days of the entry of the Order, Hough shall, by a postal or bank money order, certified check or bank cashier's check, pay to the United States Treasury disgorgement and prejudgment interest of (1) $241,906.57 in connection with the Canaveral Port Authority refunding that settled on October 20, 1992, and (2) $555,119.26 in connection with the City of Boynton Beach refunding that settled on July 22, 1992. Documentation confirming the wire transfer shall be hand-delivered or mailed to the Comptroller, Securities and Exchange Commission, Operations Center, 6342 General Green Way, Alexandria, VA 22312-0003, under cover of letter identifying the name and number of this administrative proceeding and the name of the Respondent. A copy of the cover letter and wire transfer documentation shall be simultaneously transmitted to Lawrence A. West, Assistant Director, Securities and Exchange Commission, Washington, DC 20549-0807.

D. Within ten days of the entry of this order, Hough shall comply with its undertaking to make certain payments totaling $136,668.94 related to sales of defeasance escrow securities to certain municipal issuers in connection with advance refundings in negative arbitrage, as set forth in Hough's offer of settlement;

E. Hough shall comply with its undertaking to pay $2,329,977.60 to the United States Treasury under an agreement simultaneously entered into among Hough, the Internal Revenue Service and the United States Attorney for the Southern District of New York; and

F. Copies of payments made to the municipalities and the United States Treasury as described in sub-paragraphs D and E above and any cover letters accompanying them shall be sent by Hough to Lawrence A. West, Assistant Director, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549-0807.

By the Commission.

Jonathan G. Katz

Secretary

---

**Footnotes**

[1] In contrast, in a "negative arbitrage" situation-when the yield on open market securities purchased at fair market value would be *below* the yield on the refunding bonds-overcharging by dealers for open market escrow securities takes money away from the municipality rather than the Treasury by reducing, dollar for dollar, the present value savings the municipality obtains through the advance refunding.

[2] There are several lawful methods to limit the yield of the defeasance escrow in a positive arbitrage situation. One method is to purchase from the Bureau of Public Debt at the Department of the Treasury below-market-interest Treasury securities-known as State and Local Government Series securities ("SLGS")-customized to match the yield limitation. Alternatively, the municipality can purchase open market securities of shorter durations than those required to match the escrow requirements; when these securities mature, the cash proceeds are invested for the remaining period of the escrow in non-interest-bearing SLGS. When either of these methods is used, the Treasury obtains a benefit by issuing debt at interest rates lower than those prevailing in the taxable market. In some instances, an all-SLGS escrow can be more expensive for the issuer than an escrow containing open market securities. However, even in those instances, overcharging by the dealer

for open market securities still burns yield illegally and can cause the issuer's refunding bonds to lose their tax exemption.

3  There is no evidence that the profit-sharing arrangement affected the prices that the senior manager and other underwriters paid the Port Authority for the refunding bonds.

4  Profit on open market escrow securities generally has two components: markup and carry. Markup is the difference between the price that the dealer charges the issuer and the prevailing wholesale market price. <u>In re Lehman Bros. Inc.</u>, Exchange Act Release No. 37673 (Sept. 12, 1996). Carry is the difference between (a) the interest and accretion produced by the escrow securities between the sale date and closing date and (b) the cost of financing those securities during that period. *See* Board of Governors of the Federal Reserve System, <u>Trading Activities Manual</u>, Part 2 at 2-8 (March 1994).

5  There is no evidence that the $300,000 payment affected either the selection of the forward supply contract provider or the amount of the facility fee paid to Boynton Beach. Confirmation of the terms of the forward supply contract were sent to the senior managing underwriter, not to Hough.

6  See <u>Statement of the Commission Regarding Disclosure Obligations of Municipal Securities Issuers and Others</u>, Securities Act Release No. 7049 (March 9, 1994) ("Information concerning financial and business relationships and arrangements among the parties involved in the issuance of municipal securities may be critical to evaluating an offering....[S]uch information could indicate the existence of actual or potential conflicts of interest, breaches of duty, or less than arms' length transactions. Similarly, these matters may reflect upon the qualifications, level of diligence, and disinterestedness of financial advisers, underwriters, experts and other participants in an offering. Failure to disclose material information concerning such relationships, arrangements or practices may render misleading statements made in connection with the process ....")

*http://www.sec.gov/litigation/admin/33-7826.htm*

Home | Previous Page                                  Modified:04/07/2000