ERIN E. SCHNEIDER (Cal. Bar No. 216114)
MONIQUE C. WINKLER (Cal. Bar No. 213031)
SHEILA O'CALLAGHAN (Cal. Bar No. 131032)
  ocallaghans@sec.gov
ANDREW J. HEFTY (Cal. Bar No. 220450)
  heftya@sec.gov
JASON H. LEE (Cal. Bar No. 253140)
  leejh@sec.gov
WILLIAM T. SALZMANN (Cal. Bar No. 205808)
  salzmannw@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Tel: (415) 705-2500

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>  vs.<br><br>CHOICE ADVISORS, LLC and MATTHIAS O'MEARA,<br><br>    Defendants. | Case No. 21-CV-01669-JO-MSB<br><br><br>SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   FACTS ALLEGED IN THE COMPLAINT .........................................2

III.  LEGAL STANDARDS ..........................................................................4

      A.   The Standard Under Federal Rule of Civil Procedure 12(b)(6)..........4

      B.   The Standard Under Federal Rule of Civil Procedure 9(b) .................5

IV.   ARGUMENT .........................................................................................6

      A.   Defendants Violated MSRB Rule G-42 by, Among Other Things, Participating in a Prohibited "Fee-Splitting" Arrangement .................6

           1.   *The Complaint Amply Alleges the Violative Fee-Splitting Conduct* ...........................................................................7

           2.   *Defendants Had Fair Notice That Fee-Splitting Was Wrong*..12

      B.   Violations of Exchange Act Section 15B(a)(5) and MSRB Rule G-17 Do Not Require Proof of Scienter .....................................................15

           1.   *Exchange Act Section 15B(a)(5)* ........................................15

           2.   *MSRB Rule G-17* ...............................................................20

      C.   The Complaint Adequately Alleges Defendants' Deceptive Conduct ...........................................................................................21

V.    CONCLUSION....................................................................................24

**TABLE OF AUTHORITIES**

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980)...............................................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................5, 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................................5, 23

*Bernhardt v. County of Los Angeles*, 279 F.3d 862 (9th Cir. 2002)............................24

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ...........................17, 18, 19

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) ......................................6, 24

*Fireman's Fund Ins. Co. v. City of Lodi,* 302 F.3d 928 (9th Cir. 2002)........................5

*Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590 (1921) ..........................8

*Grayned v. City of Rockford,* 408 U.S. 104 (1972) ..........................................12

*Hollinger v. Titan Capital Corp.* 914 F.2d 1564 (9th Cir. 1990) ............................3

*Holloway v. Arkansas*, 435 U.S. 475 (1978) ...................................................8

*In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008)................................5

*In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541 (9th Cir. 1994) ...................................6

*In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, Rel. No. 7566, 1998 WL 518489 (S.E.C. Aug. 24, 1998) ..................................................21

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)..................5

*Mannix v. Phillips*, 619 F.3d 187 (2d Cir. 2010)............................................13

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ..........................................5, 6

*Rock of Ages Corp. v. Secretary of Labor*, 170 F.3d 148 (2d Cir. 1999) ...................12

*Santa Ana Water Co. v. Town of San Buenaventura*, 65 F. 323 (S.D. Cal. 1895) ........8

*SEC v. Berry*, 580 F. Supp. 2d 911 (N.D. Cal. 2008)......................................6

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) .........16, 20, 21, 23

*SEC v. CapWealth Advisors, LLC*, --- F. Supp. 3d ---, 2021 WL 3121489 (M.D. Tenn. July 23, 2021) ............................................................................16

*SEC v. Dain Rauscher, Inc.*, 254 F.3d 852 (9th Cir. 2001) ...................................17, 20

*SEC v. Fitzgerald*, 135 F. Supp. 2d 992 (N.D. Cal. 2001) .........................................20

*SEC v. ICN Pharm., Inc.*, 84 F. Supp. 2d 1097 (C.D. Cal. 2000) ...............................6

*SEC v. Sablok*, No. 08 Civ. 4238 CRB, 2009 WL 1069031 (N.D. Cal. Feb. 18, 2009) ............................................................................................5

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ...............................................19, 20

*Sherwood & Roberts-Kennewick, Inc. v. St. Paul Fire & Marine Ins. Co.*, 322 F.2d 70 (9th Cir. 1963) ............................................................................20

*United States v. Willis*, 737 F. Supp. 269 (S.D.N.Y. 1990) .......................................10

*Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987) ........................................5

*Walling v. Beverly Enters.*, 476 F.2d 393 (9th Cir. 1973) ...........................................6

*Warshaw v. Xoma Corp.*, 74 F.3d 955 (9th Cir. 1996) .................................................6

**Statutes**

15 U.S.C. § 77q(a) ......................................................................................................19

15 U.S.C. § 78j............................................................................................................18

15 U.S.C. § 78o-4(a)(5) ..............................................................................................15

15 U.S.C. § 78o-4(c)(1) ..............................................................................................16

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. Law 111-203, 124 Stat. 1376 (July 21, 2010)................................................................16

Section 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(4) .........16

**Other Authorities**

"Excerpt from Notice of Application of MSRB Rules to Solicitor Municipal Advisors: Conduct of Municipal Securities and Municipal Advisory Activities, Rule G-17" (May 4, 2017) at 13-14 (available at: https://www.msrb.org/pdf.aspx?url=https%3A%2F%2Fwww.msrb.org%

2FRules-and-Interpretations%2FMSRB-Rules%2FGeneral%2FRule-G-17%3Ftab%3D2%23_3D2F04DD-BAE1-4530-B2F5-7D01D543F081) ........21

https://msrb.org/msrb1/pdfs/MSRB-Rulemaking-Process.pdf....................................13

https://www.dictionary.com/browse/fee-splitting .........................................9

https://www.sec.gov/rules/sro/msrb/2015/34-74860.pdf..................................9, 12, 14

https://www.sec.gov/rules/sro/msrb/2015/34-74860.pdf) (Proposed New Rule G-42, on Duties of Non-Solicitor Municipal Advisors, and Proposed Amendments to Rule G-8, on Books and Records to be Made by Brokers, Dealers, Municipal Securities Dealers, and Municipal Advisors)........................................................................13

*In re Arthurs Lestrange & Co., Inc, et al.* (Nov. 17, 1999) (Ex. E to Mot.) ..............10

*In re John S. Reger II, et al.* (Apr. 23, 2001) (Ex. G to Mot.) ....................................10

*In re O'Brien Partners, Inc.* (Oct. 27, 1998) (Ex. C to Mot.) ..............................10, 11

*In re William R. Hough & Co.* (Apr. 6, 2000) (Ex. F to Mot.)....................................10

MSRB Notice 2014-01, available at https://www.msrb.org/-/media/Files/Regulatory-Notices/RFCs/2014-01.ashx??n=1 ...........................14

MSRB Notice 2014-12, available at https://www.msrb.org/-/media/Files/Regulatory-Notices/RFCs/2014-12.ashx??n=1 ...........................14

Order Granting Approval of Proposed Rule Change (Dec. 23, 2015) at 22-83 https://www.sec.gov/rules/sro/msrb/2015/34-76753.pdf ..................................15

**Rules**

17 C.F.R. § 240.10b-5.........................................................................18

MSRB Rule G-17...................................................................2, 20-21

MSRB Rule G-42..........................................................................*passim*

# I.    INTRODUCTION

The Securities and Exchange Commission ("SEC") alleges that defendant Choice Advisors, LLC and one of its founders, defendant Matthias O'Meara, engaged in deceptive and manipulative practices in violation of the duty of a municipal advisor, a position with fiduciary obligations. In this federal securities enforcement action, the SEC alleges that defendants' fraudulent conduct was in connection with services they promised to certain charter schools that were raising money from the public through the sale of bonds. Defendants have moved to dismiss two of the eight claims of the complaint, and a portion of a third claim. Because the targeted claims are appropriately alleged violations of the federal securities laws by defendants Choice and O'Meara, their motion should be rejected.

Defendants are municipal advisors and advise clients, such as the charter schools in this case, in raising money through municipal bond offerings. Under Municipal Securities Rulemaking Board ("MSRB") Rule G-42, municipal advisors such as the defendants are prohibited from entering into fee-splitting arrangements with underwriters to the same transaction. This prohibition holds regardless of whether such arrangements are disclosed to the clients. As alleged in the complaint, in derogation of his duties as a fiduciary, O'Meara negotiated a fee-splitting agreement in which Choice, as municipal advisor, was to receive a portion of the fees originally committed to the underwriter for deals with certain school clients. Compl. ¶¶6, 30. O'Meara also engaged in additional misconduct, as he worked for a period of time in a dual-capacity for both Choice and the underwriter firm, and used this arrangement to increase Choice's fees by approximately $40,000 for one school client, while deceiving the school's executive director about the costs to the school. *Id*. ¶¶7, 40-67. Defendants further compounded their breaches of their fiduciary duties when they failed to disclose any of the conflicts of interest created by their relationship to the underwriter, the fee-splitting arrangement, or Choice's unregistered status. *Id*. ¶¶6, 32-39, 69.

Despite these facts alleging specific deceptions to specific clients and repeated breaches of their fiduciary duties, defendants now argue that they should not be held to account for their prohibited fee-splitting arrangement, or for their deceptions. But defendants' arguments as to each of the three claims they attack are based on their misreading of the applicable law, and thus should be rejected. In short, defendants acted contrary to the very specific requirements imposed on a municipal advisor under MSRB Rule G-42, and they engaged in deceptive conduct that had the obvious effect of misleading their clients, in violation of Section 15B(a)(5) of the Securities Exchange Act of 1934 ("Exchange Act") and MSRB Rule G-17. Accordingly, their motion should be denied.

## II. FACTS ALLEGED IN THE COMPLAINT

In May 2018, O'Meara and Choice's other co-founder, Paula Permenter,[1] left their employment at a municipal underwriting firm to start a new municipal advisory firm. Compl. ¶¶6, 13, 14, 27. The transition from serving as an underwriter to a municipal advisor was an important one, as it involved moving from an arms-length, potentially adverse relationship with the borrower, to a fiduciary role legally binding defendants to act in the borrowers' best interests. *Id*. ¶¶21-26.

Nevertheless, Choice and O'Meara did little to manage the heightened obligations of their new positions and elected to become the municipal advisor for the four school clients at issue in the complaint, even though O'Meara or Permenter had previously represented the underwriter in the very same transactions. Compl. ¶6, 30. Disregarding their fiduciary obligations, and in an effort to secure Choice's fees even before the four school clients were aware of the existence of the new firm, O'Meara

---

[1] While the present action addresses Permenter's conduct insofar as it is attributable to defendant Choice, Permenter is not a party. Her violations were addressed in a separate September 23, 2021 SEC enforcement action. *See* Compl. ¶14 (identifying Order Instituting Proceedings, *In the Matter of Paula Permenter,* Admin. Proc. File No. 3-20593, available at https://www.sec.gov/litigation/admin/2021/34-93105.pdf).

(with Permenter) negotiated an agreement for Choice to split the fees already committed to the underwriter on each of the four transactions. *Id*. ¶30. In correspondence among O'Meara, Permenter, and a manager at the underwriter, they called this agreement an "agreement of fee splits." *Id.* Their agreement contemplated that the underwriter would effect a fee-split for each client, by lowering its underwriting fees by an amount equal to the amount that Choice would then receive as municipal advisor for the anticipated bond transactions. *Id.*

Moreover, in spite of repeated advice from counsel to the contrary, Choice and O'Meara chose to provide municipal advisory services to these clients without first registering Choice as a municipal advisor, as required under federal securities laws. Compl. ¶¶4-5, 26, 28. Even after being explicitly told by counsel that, if Choice nevertheless engaged municipal advisory clients while unregistered, they were obliged to inform their clients of this shortcoming, O'Meara chose to hide Choice's unregistered status from their clients. *Id*. ¶¶6, 38, 69. Indeed, defendants falsely told each of the school clients that they had no conflicts of interest, and failed to disclose the conflicts arising out of their unregistered status, the fee-splitting agreement, and their relationship to the underwriter. *Id*. ¶¶6, 32-39, 69.[2]

O'Meara also engaged in additional unfair and deceptive conduct. Not satisfied with the terms struck in the original fee-splitting arrangement with the underwriter, O'Meara chose to surreptitiously increase the fees paid to Choice by the school clients. Compl. ¶¶4-5, 26, 28. For one school client, O'Meara deceptively used his dual-role at both the underwriter and Choice to increase the client's fees. *Id*. ¶¶7, 26, 40-57. O'Meara sent that school client engagement letters for both the underwriter

---

[2] As the complaint explains, two clients, School Client A and School Client B, worked directly with O'Meara. *Id*. ¶¶34, 60. (Permenter worked with School Clients C and D. *Id*. ¶¶69, 72.) Defendant Choice's violations are premised upon the allegations regarding all four school clients, since the actions of both O'Meara and Permenter are legally imputed to Choice. *See Hollinger v. Titan Capital Corp*. 914 F.2d 1564, 1578 (9th Cir. 1990).

and Choice, setting forth terms that increased the fees beyond the terms of the fee-splitting agreement. *Id.* As a result, the school had to pay an additional approximately $40,000 over the amount it had originally negotiated with the underwriter. *Id.* ¶57. O'Meara hid this manipulation by increasing Choice's fee by an additional $40,000, while simultaneously burying $40,000 of the underwriting fee under a confusing new term to make it appear that the combined fee was unchanged. *Id.* ¶¶45-51. As the complaint specifies, O'Meara sent a revised underwriter's engagement letter with a new conditional fee defined by a term-of-art unlikely to be understood by a small, first-time issuer—that the $40,000 fee would be charged only in the event the bonds were "non-investment grade." *Id.* ¶3, 45. O'Meara then deceptively represented the engagement of Choice as a way for the school client to keep the original terms intact, telling the school client that the underwriter had agreed to lower its fees to allow for the hiring of Choice with no change to the school's prior arrangement. *Id.* ¶51-52. As alleged in the complaint, O'Meara knew or should have known, that this claim was misleading and that he was not operating in the school's best interest. *Id.* ¶52.

Indeed, the complaint further describes how O'Meara then attempted to similarly increase the fees for another school client, but was stopped when the underwriter and the school's other municipal advisor became aware of his scheme. Compl. ¶¶58-67. O'Meara never told either of his two clients of his efforts to raise their overall costs of issuance. *Id.* ¶¶51-53, 64. Instead, O'Meara and Choice claimed to their clients that they were fulfilling the role of a fiduciary, stating in their engagement letters that, as a municipal advisor, Choice was required to act solely in the schools' best interests and had to fully and fairly disclose in writing all material actual or potential conflicts of interest. *Id.* ¶25.

## III. LEGAL STANDARDS

### A. The Standard Under Federal Rule of Civil Procedure 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering whether the complaint states a claim, the court must "presume all factual allegations of the complaint to be true and to draw all reasonable inferences in favor of the nonmoving party." *SEC v. Sabhlok*, No. 08 Civ. 4238 CRB, 2009 WL 10690310, at *2 (N.D. Cal. Feb. 18, 2009) (quoting *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)). *Accord In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008); *Fireman's Fund Ins. Co. v. City of Lodi,* 302 F.3d 928, 939 (9th Cir. 2002). A complaint survives a motion to dismiss when the plaintiff pleads facts that allow the Court to reasonably draw the inference that the defendant is liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. at 677-78; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is proper only where there is no cognizable legal theory or the complaint does not allege sufficient facts to support a cognizable legal theory. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

Generally, material outside the pleadings is not considered when assessing the sufficiency of a complaint under Rule 12(b)(6), except under the incorporation-by-reference doctrine and where it is appropriate to take judicial notice under Federal Rule of Evidence 201. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). However, courts frown upon attempts to "exploit[] these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Id.*

## B. The Standard Under Federal Rule of Civil Procedure 9(b)

Rule 9(b) provides, in part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In securities fraud actions, the plaintiff must plead

with particularity the circumstances constituting the fraud so that the defendant can prepare an adequate answer. *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995); *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994) (en banc). This notice requirement is satisfied by allegations of the "time, place and nature of the alleged fraudulent activities." *Fecht*, 70 F.3d at 1082 (quoting *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir. 1973)); *accord Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996). However, unlike private securities plaintiffs, the SEC need only plead scienter generally. *See SEC v. Berry*, 580 F. Supp. 2d 911, 921 (N.D. Cal. 2008) (citations omitted); *SEC v. ICN Pharm., Inc.*, 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000).

## IV.    ARGUMENT

### A.    Defendants Violated MSRB Rule G-42 by, Among Other Things, Participating in a Prohibited "Fee-Splitting" Arrangement

In the Sixth Claim for Relief, the complaint alleges that both defendants engaged in acts and practices prohibited by MSRB Rule G-42, including the final allegation that they "made or participated in a fee-splitting arrangement with an underwriter on a municipal securities transaction as to which Choice or O'Meara provided or was providing advice." Compl. ¶ 98. Although defendants concede that the complaint alleges that defendants violated MSRB Rule G-42 in a variety of ways, defendants challenge only the allegations that they "made or participated in a fee-splitting arrangement" in violation of the rule. Mot. at 8, n.1. Thus, even if their argument aimed at the illegal fee-splitting arrangement had any merit—which it does not—it would not result in the dismissal of the Sixth Claim. "Dismissal is proper only where there is *no cognizable legal theory* or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d at 732. By defendants' own concession, this is not such a case.

1

2

**1.** ***The Complaint Amply Alleges the Violative Fee-Splitting***
***Conduct***

3

4 In Rule G-42, the MSRB established "the core standards of conduct and duties

5 of municipal advisors when engaging in municipal advisory activities." MSRB Rule

6 G-42 (summary) (available at: https://msrb.org/Rules-and-Interpretations/MSRB-

7 Rules/General/Rule-G-42). The rule is detailed, and divided into six subparts, the last

8 of which provides certain definitions of the technical terms used in the rule. The first

9 five subparts describe duties and prohibitions, including: "(a) *Standards of Conduct*";

10 "(b) *Disclosure of Conflicts of Interest and Other Information*"; "(c) "*Documentation*

11 *of Municipal Advisory Relationship*"; (d) "*Recommendations and Review of*

*Recommendations of Other Parties*"; and, (e) "*Specified Prohibitions.*" *Id.*

12 The rule begins with the broad dictate that municipal advisors who advise

13 municipal entities such as the public charter school issuers of bonds involved in this

14 case are "subject to a fiduciary duty that includes a duty of loyalty and a duty of

15 care." MSRB Rule G-42(a)(ii). Consistent with this core fiduciary duty, and the

16 statutory fiduciary duty owed under Section 15B(c)(1) of the Exchange Act, the

17 MSRB Rule sets forth actions a municipal advisor must do, actions it may never do,

18 and standards of conduct of conduct for its provision of municipal advice, each

19 offering additional clarity as to the core standards of conduct and duties of a

20 municipal advisor. In so doing, Rule G-42 describes not just the general principles

21 guiding these core standards, but also very specific conduct necessary to stay in line

22 with these principles, such as the requirement that the advisor provide to the client

23 "full and fair disclosure in writing of: . . . all material conflicts of interest, including: .

24 . . any fee-splitting arrangements involving the municipal advisor and any provider of

25 investments or services to the client." MSRB Rule G-42(b)(1)(D). The purpose of this

26 subsection is to ensure that clients, such as the schools that defendants advised, are

27 fully apprised of any arrangement where fees are shared, because such arrangements

28 are deemed to be "material conflicts of interest" under this subsection of the rule.

The rule is equally clear when it delves into conduct and arrangements that are strictly prohibited, for which even "full and fair disclosure in writing" would not suffice, as they are deemed to represent conflicts of interest so inimical to the fiduciary obligations that disclosure would not cure the defect: "A municipal advisor is prohibited from: . . . making, or participating in, any fee-splitting arrangement with underwriters on any municipal securities transaction as to which it has provided or is providing advice, and any undisclosed fee-splitting arrangements with providers of investments or services to a municipal entity or obligated person client of the municipal advisor." MSRB Rule G-42(e)(i)(D).

Of course, disclosures of conflicts of interest, and direct prohibitions against fiduciaries engaging in conduct that is in conflict with the persons to whom they owe a duty, are not concepts unique to securities professionals; they have a long tradition in law stemming from the principal that no person can serve two masters. "The general principle is that no man can faithfully serve two masters whose interests are or may be in conflict. The law, therefore, will not permit one who acts in a fiduciary capacity to deal with himself in his individual capacity." *Santa Ana Water Co. v. Town of San Buenaventura*, 65 F. 323, 327 (S.D. Cal. 1895).[3]

The complaint identifies precisely how defendants violated the various provisions of MSRB Rule G-42, including but going well beyond the provision prohibiting arrangements to split fees with underwriters. Indeed, defendants' violations were bold: In breaching his fiduciary obligations to his clients, O'Meara literally served two masters as he acted both as an employee of the underwriter and as

---

[3] *See, e.g., Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 598-99 (1921) (sale of company led by board member, a fiduciary, who also served on the board of the acquiring company, failed in a fairness challenge, as such "transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation"). *Accord Holloway v. Arkansas*, 435 U.S. 475 (1978) (criminal defendant was deprived of effective assistance of counsel where court-appointed attorney was required to represent him and co-defendants).

a principal of Choice—a municipal advisor—simultaneously. Compl. ¶¶4-5, 26, 28. And from this vantage point, O'Meara went so far as to change the terms to which the client had originally agreed, in order to further enrich Choice and himself under the guise of the fee-splitting arrangement he had entered into with the underwriter. *Id*. ¶¶7, 26, 40-57. It would be difficult to imagine a more blatant realization of the concerns underlying the fee-splitting prohibition set forth in MSRB Rule G-42(e)(i)(D)—that by engaging in a fee-splitting arrangement with an underwriter, a municipal advisor is set on a path to violate its fiduciary obligations. *See* https://www.sec.gov/rules/sro/msrb/2015/34-74860.pdf at 97; Ex. H to Mot.

Despite the clear description of the time, place and nature of the violative conduct, defendants complain that the complaint does not supply a "definition" of the phrase "fee-splitting"; however, defendants then concede that "the Complaint does at least identify the conduct that it asserts the Defendants engaged in that it alleges constitutes 'fee splitting.'" *See* Mot. at 10. Contrary to defendants' argument, Rule 9(b) requires the plaintiff to identify the conduct that is alleged to be violative; it does not impose a separate or additional duty to supply "definitions."[4]

Defendants further argue, citing several prior SEC orders, that those SEC actions which predate MSRB Rule G-42 did not involve the type of fee-splitting arrangement in which they engaged; focusing on these factual distinctions, defendants argue that their arrangement should not be a violation of the rule.[5] *See*

---

[4] Defendants' overreliance on dictionary definitions as a substitute for legal or factual analyses further hampers their argument. For instance, they argue for a particular dictionary definition of "fee splitting" that refers to instances where one of the persons splitting a fee "refers" a client to the other person. However, other dictionaries are not so narrow, defining fee splitting to mean: "dividing a fee for professional service between two professional persons." *See* https://www.dictionary.com/browse/fee-splitting.

[5] Several of the supposedly distinguishing facts are based on a misreading of the complaint. For instance, defendants argue that they somehow stumbled into a fee-

Mot. at 10-13 (citing four settled SEC Orders: *In re O'Brien Partners, Inc.* (Oct. 27, 1998) (Ex. C to Mot.); *In re Arthurs Lestrange & Co., Inc, et al.* (Nov. 17, 1999) (Ex. E to Mot.); *In re William R. Hough & Co.* (Apr. 6, 2000) (Ex. F to Mot.); *In re John S. Reger II, et al.* (Apr. 23, 2001) (Ex. G to Mot.)). Defendants' argument is specious. First, defendants' argument presupposes that if the specific conduct is novel—or at least not previously addressed by a court or the SEC—then it cannot be considered violative of the rule. "The fact that there is no litigated fact pattern precisely in point may constitute a tribute to the cupidity and ingenuity of the malefactors involved but hardly provides an escape from the penal sections of the securities fraud provisions here involved." *United States v. Willis*, 737 F. Supp. 269, 277 (S.D.N.Y. 1990).

Second, among the examples cited by defendants are situations that foreshadow defendants' own misconduct. Thus, defendants cite to the Order: *In re Arthurs Lestrange & Co., Inc, et al.* (Nov. 17, 1999) (Ex. E) in which a small broker-dealer sought to enlist a larger broker-dealer on two transactions involving municipal bond refundings for the Commonwealth of Pennsylvania; Arthurs Lestrange was a fiduciary to the Commonwealth. Ex. E at 3. Although Arthurs Lestrange and the larger broker-dealer, Alex. Brown & Co., informed the client that they would "pool" and "allocate" the fees, they did not disclose that, as a result of their fee-splitting arrangement, Arthurs Lestrange would be paid the largest portion of the fee; their failure to disclose was material because it called into question why the entities had

---

splitting arrangement simply by getting paid at the same time as the underwriter (Def. Mot to Dismiss at 8), which ignores the fact that defendants prearranged the method of payment pursuant to their "agreement of fee splits." Moreover, they attempt to distinguish precedent by claiming the client directly paid both the underwriter and the municipal advisor. In addition to missing the point that the mechanics of the payment cannot negate the fact of a fee-splitting agreement, defendants' characterization is also incorrect and attempts to inject facts that are inconsistent with the complaint. At the close of each of the four transactions, both the defendants and the underwriter were paid from bond proceeds held by the bond trustee, pursuant to instructions provided by the underwriter. Compl. ¶¶ 57, 67, 77, 79.

combined their efforts in the first place. *Id*. at 5. They also failed to disclose that they further split fees with a third person who had located the larger broker dealer. *Id*. at 5-6. In violating their fiduciary duties, the respondents (the firm, and its principal) violated Section 17(a) of the Securities Act, which prohibits fraud in the offer and sale of securities. Notably, the discussion in the Order does not limit the undisclosed and problematic "fee-splitting" to a kickback to the third person, but instead includes the only partially-disclosed arrangement between the two broker-dealers. It thus defies the theory proposed by defendants that "fee splitting" can only refer to kickbacks or referral fees involving the fiduciary and a third party, in exchange for finding a client.[6] What is more, even if the prohibition against fee-splitting

---

[6] Defendants argue: "In addition to presenting abusive conduct that involved undisclosed payments and breaches of fiduciary duty, all of these prior cases are consistent with the dictionary definition of "fee splitting," and none of them align with the novel interpretation of the term that Plaintiff relies on in the current case." Mot. at 13. But the orders cited by defendants simply fail to support their narrow reading of fee-splitting conflicts. For instance, in *O'Brien Partners*, the fees were not paid to the respondent as "referral" fees; quite the contrary, the Order suggests that the split was between two parties who were both performing actual work on behalf of the client. Ex. C at 3. Payments into a pool from which the funds are reallocated to the parties splitting the fees are also described in the attached orders. Indeed, the examples defendants cite should have put them on notice that their interpretation of fee splitting was far too narrow and created a conflict of interest. For instance, in the litigation release cited as Exhibit D to their motion, the defendant (Ferber) who was a principal of Lazard, which advised municipal and governmental issuers, arranged for another bank, Merrill Lynch, to jointly market securities issued by Lazard's clients, and to share fees, but without disclosing their arrangement to the clients. As the Order states: "[t]he contract created at least a potential conflict of interest for Ferber in that it gave rise to a significant risk that Ferber would not provide impartial advice to the financial advisory clients that were considering the selection of Merrill Lynch as a provider of financial services. Thus, the contract created the potential for Ferber to abuse his influence over the financial advisory clients." Ex. D at 2. Indeed, the fact that each of these examples also predate the mandate in MSRB Rule G-42 against fee-splitting arrangements between municipal advisors and the underwriters on a deal should have further led defendants to recognize that their arrangements constituted misconduct.

arrangements was somehow limited to those involving finder's fees, which it is not, that is essentially what happened in the instant case: The underwriter only split its fees on transactions in which O'Meara or his partner (Permenter) had originated the clients. Compl. ¶ 30.

### 2. *Defendants Had Fair Notice That Fee-Splitting Was Wrong*

In the alternative, defendants argue that the subpart of MSRB Rule G-42 regarding "fee splitting" deprives them of due process. Mot. at 14. Defendants complain that the MSRB rules are not clear, and that defendants did not have notice that would have allowed them to avoid the conduct at issue. To satisfy due process, a regulation should be sufficiently specific to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972). "Accordingly, regulations satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require." *Rock of Ages Corp. v. Secretary of Labor*, 170 F.3d 148, 156 (2d Cir. 1999). Here, the stated purpose and the context for the fee-splitting prohibition is clear: arrangements to split fees between a municipal advisor and an underwriter for a client, such as a school district, were prohibited because the MSRB found them to create an irreconcilable conflict between the municipal advisor and the client. *See* https://www.sec.gov/rules/sro/msrb/2015/34-74860.pdf at 97 (in rejecting suggestions to remove the prohibition against fee-sharing with underwriters, the MSRB stated that it "believes the proposed rule change would help prevent violations of fiduciary duties and duty of care by clearly identifying and prohibiting specific fee-splitting arrangements that are particularly prone to conflict with such duties. Other fee-splitting arrangements would be permitted, provided they are fully and fairly disclosed.").

Defendants' argument is not improved by their reliance on *Upton v. SEC,* 75 F.3d 92 (2d Cir.1996). In *Upton*, the regulations at issue were found to have been

enforced contrary to due process where it was "undisputed" that the registrant had complied with the "literal terms" of the rule, and that registrants' practice was common in the industry. *Id*. at 94. Here, in contrast, the SEC contends that the defendants *failed* to comply with the literal terms of the rule, and there is no evidence—and of course no allegation in the complaint—that such fee-splitting arrangements are common practice. Defendants resort, again, to their claim that the prohibited fee-splitting does not fit into their dictionary definition, but they simply ignore definitions into which it fits squarely. *See supra*, n.4. In any event, defendants' argument ignores the law providing that statutes and regulations "need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010).

Finally, to bolster their due process claim, defendants make a tortured argument about the process by which Rule G-42 was adopted by the MSRB, much of which misconceives the process. The motion incorrectly states that "the SEC, through the MSRB, was directly asked to provide a clear definition of 'fee splitting.'" Mot. at 15. The SEC was not asked to provide a definition of "fee-splitting." This would not be consistent with the SEC's role in the MSRB rulemaking process, which involves two different stages. At the first stage, the Board follows its procedures, typically (as in the case of MSRB Rule G-42), publishing a request for comment to solicit public comment. *See, e.g.* https://msrb.org/msrb1/pdfs/MSRB-Rulemaking-Process.pdf. Once the Board approves a proposed rule change, the Exchange Act requires that the proposal be filed with the SEC, which then publishes notice of the proposed rulemaking in the Federal Register to solicit public comment.

The MSRB filed the proposed rule change regarding MSRB Rule G-42 with the SEC on April 24, 2015 (available at https://www.sec.gov/rules/sro/msrb/2015/34-74860.pdf) (Proposed New Rule G-42, on Duties of Non-Solicitor Municipal Advisors, and Proposed Amendments to Rule G-8, on Books and Records to be Made by Brokers, Dealers, Municipal Securities Dealers, and Municipal Advisors). In it, the

MSRB summarizes written comments it received, as well as its detailed responses to any significant issues that those comments raised. Before making that filing with the SEC, the MSRB issued two separate requests for comment: the first, on January 19, 2014 (see MSRB Notice 2014-01, available at https://www.msrb.org/-/media/Files/Regulatory-Notices/RFCs/2014-01.ashx??n=1); and the second on July 23, 2014 (see MSRB Notice 2014-12, available at https://www.msrb.org/-/media/Files/Regulatory-Notices/RFCs/2014-12.ashx??n=1).

In Exhibit H to their Motion, defendants include just three pages of the 126-page notice of filing by the MSRB of the proposed rule change. *See* https://www.sec.gov/rules/sro/msrb/2015/34-74860.pdf. Beginning on page 33 and continuing until page 124 of the notice is the "Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received from Members, Participant, or Others." *Id*. As is clear from the document, all of the comments were made to the MSRB, not to the SEC. Further, the only comment in Exhibit H that directly requested a clarification regarding the prohibition on fee-splitting with underwriters was from Piper Jaffrey, which sought to clarify that the prohibition only applies on transactions in which the municipal advisor has or is providing advice. *Id*. at 95-97; Ex. H to Mot. In response, the MSRB agreed with the comment and revised the rule text before filing with the SEC, as described. *Id*. All other comments received by the MSRB on fee-splitting arrangements sought allowance for specific kinds of fee-splitting arrangements with affiliates and other closely associated entities typically arguing that the fee-splitting arrangements should remain permissible if they are properly disclosed. The MSRB declined to make those allowances, instead maintaining the prohibition against fee-splitting arrangements with underwriters, but allowing other fee-splitting arrangements with providers of investments or other services so long as they were disclosed. Far from any failure to provide "notice" to defendants that fee splitting was prohibited, the MSRB's summary of comments and its responses further highlights the fact that the MSRB expected that all such

arrangements between municipal advisors and underwriters working on behalf of a client issuing municipal bonds, such as the schools in this case, would be prohibited. After the SEC published its notice in the Federal Register on May 4, 2015, it did not receive any comments relating to the prohibition on fee-splitting arrangements. *See* Order Granting Approval of Proposed Rule Change (Dec. 23, 2015) at 22-83 https://www.sec.gov/rules/sro/msrb/2015/34-76753.pdf (summarizing comments received to all aspects of the rule change).

Accordingly, defendants received adequate notice that their conduct was prohibited.

**B.    Violations of Exchange Act Section 15B(a)(5) and MSRB Rule G-17 Do Not Require Proof of Scienter**

**1.    *Exchange Act Section 15B(a)(5)***

Section 15B(a)(5) of the Exchange Act states: "No municipal advisor shall make use of the mails or any means or instrumentality of interstate commerce to provide advice to or on behalf of a municipal entity or obligated person with respect to municipal financial products [or] the issuance of municipal securities. . . in connection with which such municipal advisor engages in any fraudulent, deceptive, or manipulative act or practice." 15 U.S.C. § 78o-4(a)(5). From the plain language of the statute, Section 15B(a)(5) prohibits a person who (1) acts as a "municipal advisor" (2) in connection with providing advice to a "municipal entity" such as a school about "municipal financial products" or "the issuance of municipal securities" such as bonds (3) while utilizing interstate commerce, (4) from "engag[ing] in any fraudulent, deceptive, or manipulative act or practice." The Exchange Act further explains: "A municipal advisor and any person associated with such municipal advisor shall be deemed to have a fiduciary duty to any municipal entity for whom such municipal advisor acts as a municipal advisor, and no municipal advisor may engage in any act, practice, or course of business which is not consistent with a municipal advisor's fiduciary duty or that is in contravention of any rule of

the [Municipal Securities Rulemaking] Board." 15 U.S.C. § 78o-4(c)(1).

The Exchange Act provisions addressing municipal advisors were enacted in 2010, as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. Law 111-203, 124 Stat. 1376 (July 21, 2010). There are no reported decisions interpreting Exchange Act Section 15B(a)(5). However, fatal to defendants' argument that Exchange Act Section 15B(a)(5) requires proof of scienter is the fact that the most closely-worded federal securities statute to Section 15B(a)(5), Section 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(4), was interpreted by the Court in *SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 198-99 (1963), and in subsequent decisions, as permitting liability based upon negligence. *Accord SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992) ("Although it uses the adjectives 'fraudulent, deceptive, or manipulative,' section 206(4) does not speak in terms of the 'device, scheme, or artifice' that the *Aaron* Court believed connoted so strongly a knowledge or intent requirement."); *SEC v. CapWealth Advisors, LLC*, --- F. Supp. 3d ---, 2021 WL 3121489 (M.D. Tenn. July 23, 2021) (denying motion to dismiss and finding that SEC need only plead negligence for violations of Sections 206(2) and 206(4) of the Advisers Act).

Indeed, the *Capital Gains* Court rejected the argument that the language of Section 206(4)—"to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative"—suggested that "deliberate dishonesty" should be implied. 375 U.S. at 199-200. Instead, that statute, like others that apply to fiduciaries, requires full disclosure to clients or investors of conflicts of interests, and encompasses acts that include omissions through misleading statements, the failure to fully disclose conflicts of interest, and the failure to undertake a reasonable investigation before disseminating information or recommending securities. *See, e.g., id*. at 196-99 (Advisers Act Section 206(4), and related Section 206(2), applied to investment adviser's failure to disclose the conflict of interest that arose from its trading on the market effect of its own recommendations to clients); *Steadman*, 967

F.2d at 646-47 (failure to comply with requirements to maintain separate accounts for funds, and to organize surprise audits of funds operated as a fraud under Advisers Act Section 206(4)). *Accord SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856-58 (9th Cir. 2001) (finding sufficient facts for jury to determine liability under both scienter-based and non-scienter claims under the Exchange Act and the Securities Act, where the lead investment banker for bond offerings, as a securities professional, owed duty to investigate the securities recommended).

Defendants argue that the use of the adjectives "fraudulent, deceptive, or manipulative" preceding "act or practice" in Exchange Act Section 15B(a)(5) must be read as requiring proof of intent to deceive, or "scienter." *See* Mot. at 17-19. For this interpretation of the statutory language, defendants rely almost entirely on the interpretation of Exchange Act Section 10(b) and Rule 10b-5 in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976). But the decision in *Hochfelder* does not support defendants' argument. Importantly, in *Hochfelder*, the Court recognized that Congress did not fashion the same standard for liability under each of the federal securities laws, and cited a panoply of different statutes. 425 U.S. at 200 & n.26 (distinguishing statutes, such as Securities Act Section 11, creating liability for failure to exercise reasonable care, from those for which "good faith" or reasonable "due diligence" provide complete defenses). "Ascertainment of congressional intent with respect to the standard of liability created by a particular section of the Acts must therefore rest primarily on the language of that section." *Id*. Based on the specific language used in Exchange Act Section 10(b),[7] and consistent with its legislative

---

[7]  Exchange Act Section 10 provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . .

(b) To use or employ, in connection with the purchase or sale of any security

history, the Court found that Section 10(b) "clearly connotes intentional misconduct." *Id*. at 201.

In arriving at this conclusion, the *Hochfelder* decision does not focus solely on the adjectives "manipulative" or "deceptive," the inclusion of which defendants argue are the only determinant of whether scienter is implied. According to the Court: "The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that §10(b) was intended to proscribe knowing or intentional misconduct." *Id*. at 197. It was thus critical to the statutory interpretation of Section 10(b) that the statutory language connotes action that is aimed at defrauding another person, as opposed to actions that may have the *effect* (whether or not intended) of misleading someone else. For instance, the Court focused as much attention on the dictionary definition of "device," as synonymous with contrivance, scheme, and artifice, as well as the predicate phrase "to use or employ." *See id*. at n.20. Indeed, the Court observed that the language of the second and third subsections of Rule 10b-5,[8]

---

registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

[8] Exchange Act Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

standing alone, "could be read as proscribing, respectively, any type of material misstatement or omission, and any course of conduct, that has the effect of defrauding investors, whether the wrongdoing was intentional or not." *Id*. at 212. However, because those subsections were promulgated pursuant to Exchange Act Section 10(b), and consistent with the adopting history of the rule, scienter must be proven under each subsection of the rule, as well. *Id*.

Since the decision in *Hochfelder*, courts construing the statutory language and the purposes of other federal securities laws to determine whether scienter must be proven to establish liability under such statutes, have frequently concluded that negligence will suffice if the statute can be read as proscribing conduct that has the *effect* of misleading or defrauding other persons. Thus, the Supreme Court in *Aaron v. SEC*, 446 U.S. 680 (1980), found that the language of Section 17(a) of the Securities Act—which Exchange Act Rule 10b-5 mirrors—suggested two different mental states: violations of Section 17(a)(1) require scienter, while negligence will suffice to prove violations of Sections 17(a)(2) and (3).[9] *Id*. at 695-97. In following *Hochfelder*, the Court in *Aaron* focused not on the use of the words "fraud" or "deceit," but rather on the entirety of the language in each of the subsections. Hence, the third subsection,

---

[9] Section 17(a) of the Securities Act provides:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

which uses the phrase "fraud or deceit," does not, according to the Court, suggest that the intent to defraud must be an element:

> Finally, the language of § 17(a)(3), under which it is unlawful for any person "to engage in any transaction, practice, or course of business which *operates* or *would operate* as a fraud or deceit," (emphasis added) quite plainly focuses on the *effect* of particular conduct on members of the investing public, rather than on the culpability of the person responsible.

*See id*. at 696-97. As the Court further observed, their reading of Securities Act Section 17(a)(3) was consistent with the Court's earlier interpretation of Investment Advisers Act Section 206(2) in *Capital Gains, supra*, which similarly did not require a showing of deliberate dishonesty. *Id*. at 697.[10]

### 2.     *MSRB Rule G-17*

MSRB Rule G-17 provides: "In the conduct of its municipal securities or municipal advisory activities, each broker, dealer, municipal securities dealer, and municipal advisor shall deal fairly with all persons and shall not engage in any deceptive, dishonest, or unfair practice." Similar to Exchange Act Section 15B(a)(5), the rule addresses conduct by, among others, "municipal advisors," in connection with providing "municipal advisory" services. The rule imposes an obligation on such municipal advisors to "deal fairly with all persons," and prohibits municipal advisors from engaging "in any deceptive, dishonest, or unfair practice." MSRB Rule G-17, also called the "fair dealing" rule, has been interpreted by courts and the Commission, which have concluded that such a violation requires proof of negligence or that the actor knew "or should have known" that the conduct was deceptive. *See, e.g., SEC v. Dain Rauscher, Inc.*, 254 F.3d at 856; *SEC v. Fitzgerald*, 135 F. Supp. 2d

---

[10]  Defendants also rely on a decision interpreting a jury instruction describing "dishonest or fraudulent" conduct, which did not involve the federal securities statutes. *See* Mot. to Dismiss at 18 (citing *Sherwood & Roberts-Kennewick, Inc. v. St. Paul Fire & Marine Ins. Co.*, 322 F.2d 70 (9th Cir. 1963)). Defendants' reliance on this decision to suggest that the term "fraudulent" in a federal securities statute automatically requires proof of scienter (which they incorrectly equate with "willful" conduct) ignores decades of securities law decisions that found otherwise.

992, 1026-27 (N.D. Cal. 2001); *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, Rel. No. 7566, 1998 WL 518489, at *13 (S.E.C. Aug. 24, 1998).

Defendants simply overlook this case law in arguing otherwise. Defendants also ignore the guidance provided by the MSRB interpreting Rule G-17. In a May 2017 interpretation, the MSRB repeated a basic tenet of Rule G-17: the rule is designed to both prohibit fraud and to additionally impose a duty of fair dealing:

> Rule G-17 contains an anti-fraud prohibition similar to the standard set forth in Rule 10b-5 adopted by the SEC under the Exchange Act. Thus, all municipal advisors must refrain from engaging in certain conduct and must not misrepresent or omit the facts, risks, or other material information about municipal advisory activities undertaken. However, Rule G-17 does not merely prohibit deceptive conduct on the part of a municipal advisor. The rule also establishes a general duty of a municipal advisor to deal fairly with all persons, even in the absence of fraud.

"Excerpt from Notice of Application of MSRB Rules to Solicitor Municipal Advisors: Conduct of Municipal Securities and Municipal Advisory Activities, Rule G-17" (May 4, 2017) at 13-14 (available at: [https://www.msrb.org/pdf.aspx?url=https%3A%2F%2Fwww.msrb.org%2FRules-and-Interpretations%2FMSRB-Rules%2FGeneral%2FRule-G-17%3Ftab%3D2%2523_3D2F04DD-BAE1-4530-B2F5-7D01D543F081](https://www.msrb.org/pdf.aspx?url=https%3A%2F%2Fwww.msrb.org%2FRules-and-Interpretations%2FMSRB-Rules%2FGeneral%2FRule-G-17%3Ftab%3D2%2523_3D2F04DD-BAE1-4530-B2F5-7D01D543F081)). In short, the MSRB, by the language of the rule and its consistent interpretation has made it clear that MSRB Rule G-17 aims to prohibit a wide range of conduct, which is not limited to intentional fraud.

## C. The Complaint Adequately Alleges Defendants' Deceptive Conduct

As the facts alleged in the complaint make clear, defendants Choice and O'Meara were fiduciaries to the schools they advised, with the "affirmative obligation to employ reasonable care to avoid misleading [their] clients." *See Capital Gains*, 375 U.S. at 194. As such, they owed their school clients the "full and fair disclosure of all material facts." *Id*. Instead, O'Meara and Choice used their positions of trust, the inexperience of their clients, and O'Meara's dual-role at the underwriter and Choice to scheme additional fees at their clients' expense. Compl. ¶¶40-67.

O'Meara deceived one client into paying these additional fees by inserting a confusing conditional fee in the underwriter's revised fee agreement, and was only stopped from repeating the ploy on another client by the actions of the underwriter and a different municipal advisor. *Id.* Moreover, in the transactions with all four school clients, defendants hid the fact that Choice was not registered as a municipal advisor, misleadingly represented that defendants did not share fees with other professionals on the bond offerings, and failed to disclose any of the conflicts of interest created by their relationship to the underwriter, the fee-splitting arrangement, or Choice's unregistered status. *Id.* ¶¶6, 32-39, 69.

As the complaint further alleges, O'Meara was aware that the conditional fee presented a risk to the charter school that would not be there had it not entered into new agreements to allow Choice to become its municipal advisor, but he hid this fact from his client. Compl. ¶¶48-49. When O'Meara deceptively represented that the original terms for the client would stay intact, he "knew, or should have known that this misrepresentation was misleading in light of the omission that hiring Choice" created a likelihood that the school would have to pay an additional approximately $40,000 in fees. *Id.* ¶52.

Defendants argue that these straightforward allegations are "not facts" but are instead "legal conclusions." Mot. at 21. Not so. The complaint, for instance, provides specific details supporting the "conclusion" that O'Meara and Choice had—and failed to disclose—actual and potential conflicts of interest in their engagement with School Client A. Thus, the complaint alleges the facts that defendants disguised from their client: (i) the fact that the engagement letters enabling Choice to become the municipal advisor included a confusing conditional underwriting fee (Compl. ¶¶ 45-49); (ii) the fact that O'Meara increased the amounts set by the fee-splitting agreement with the underwriter to take additional fees for Choice (*id.* ¶ 51); (iii) the affirmative statements made in the letter to School Client A to the contrary (*id.* ¶¶ 34-37), including the untrue assertions that "Choice Advisors does not share fees with

22

any other parties and [sic] any provider of investments or services to the Client" (*id*. ¶ 37) and that Choice has no "known actual or potential material conflicts of interest" (*id*.); and (iv) the fact that, when O'Meara was drafting the letter, O'Meara's own counsel asked for reassurance that there were no compensation agreements between Choice and the Underwriter regarding the transaction (*id*. ¶ 35). These are all "facts" alleged from which it would be wholly reasonable for a jury to conclude that O'Meara and Choice withheld key information about their conflict of interest arising from their prohibited fee-splitting arrangement with the underwriter from their client, contrary to their fiduciary obligations to make a full and fair disclosure.[11]

In short, the fact that defendants were not permitted in the first place to engage in the type of fee-splitting arrangement they made does not obviate their duty to also disclose the fact that they entered into the arrangement. Far from representing "legal conclusions" such allegations are precisely what was intended by Congress in creating disclosure obligations, especially for fiduciaries, under the securities laws. *See, e.g., Capital Gains*, *supra*, 375 U.S. at 198 ("It was understandable, therefore, for Congress, in declaring certain practices unlawful, to include both a general proscription against fraudulent and deceptive practices and, out of an abundance of caution, a specific proscription against nondisclosure.").

Defendants further fight the facts, and ask the Court to examine certain pieces

---

[11] Defendants' citation to *Ashcroft v. Iqbal*, 556 U.S. at 678 and *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555, does not rescue their argument. *See* Mot. at 21-22. In *Iqbal*, the Court addressed a complaint that made "bald assertions" about a policy but left unstated any factual allegations that would permit an inference that the "policy" had been adopted "because of" its effect on the group to which plaintiff belonged; rather, the complaint required that those facts be assumed in its conclusory allegation. *Id*. at 681. The Court similarly characterized the rejected allegation of "conspiracy" in *Twombly*. *Id*. Here, in contrast, the complaint describes the deceptions and how they were false. It does not rely on any presumptions of falsehood but instead spells out where and how defendants' conduct breached their fiduciary duties and created a misleading impression for their clients.

of evidence (two letters they attach as Exhibits I and J), from which they suggest the Court should infer that there was no misrepresentation. Mot. at 24 & n.5. Contrary to their argument, nowhere does the complaint allege (or concede) any facts suggesting that O'Meara or Choice "communicated all of [the] details" accurately to either of the school clients that defendants misled. Mot. at 26. To the contrary. At best, defendants hope that a trier of fact would ultimately draw an inference in their favor that is at odds with the complaint's allegations; but that is nothing more than a factual dispute. Since all factual allegations must be accepted as true and all reasonable inferences must be drawn in favor of the complaint, their argument fails. *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002). Moreover, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation omitted). Furthermore, these allegations are more than adequate to satisfy Federal Rule of Civil Procedure 9(b), as they specify the "time, place and nature of the alleged fraudulent activities," *see Fecht*, 70 F.3d at 1082, and allege that defendants knew, or should have known, the effect of their deceptive conduct on their clients.

## V. CONCLUSION

For all of the above reasons, the SEC respectfully requests that defendants' Motion to Dismiss be denied.

Dated: January 14, 2022                Respectfully Submitted,


                                       */s/ William T. Salzmann*

                                       WILLIAM T. SALZMANN
                                       Attorney for Plaintiff
                                       SECURITIES AND EXCHANGE
                                       COMMISSION