1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>v.<br><br>CHOICE ADVISORS, LLC, and MATTHIAS O'MEARA,<br><br>         Defendants. | Case No.:  21-CV-1669-JO-MSB<br><br>**ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND (2) DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

   Plaintiff Securities and Exchange Commission brought a civil law enforcement action against municipal advisors, Choice Advisors, LLC and Matthias O'Meara, alleging that they failed to represent their clients fairly and honestly.  The SEC moved for partial summary judgment on several of its claims based on Defendants' (1) failure to properly register with the appropriate agencies before providing municipal advisory services; (2) entering into a prohibited fee-splitting agreement; (3) serving two masters—the bank and school who sought financing from that bank—at the same time; and (4) failure to disclose to their clients the conflicts of interests created by these actions.  Dkt. 62.  Defendants in turn moved for partial summary judgment on a subset of these claims arguing that their agreement with the bank did not constitute illegal fee-splitting and that the above actions

did not breach the fiduciary duties Defendants owed to their clients. Dkt. 65. For the reasons stated below, the Court grants in part and denies in part Plaintiff's motion for partial summary judgment and denies Defendants' motion for partial summary judgment in its entirety.

## I.    BACKGROUND

The SEC filed a civil law enforcement action against municipal advisor[1] Matthias O'Meara and his municipal advisory company, Choice Advisors, LLC, alleging that they violated the law and breached their fiduciary duties in providing municipal advisory services to their charter school clients, Bella Mente Montessori Academy and Liberty Tree Academy. *See* Dkt. 1.

Bella Mente and Liberty Tree retained Defendants to assist them in the process of issuing municipal bonds so that they could raise money to build new school facilities. *See id.* ¶¶ 20–21. As first-time issuers of municipal bonds, these schools sought Defendants' help in structuring a deal with a bank underwriter to raise the funds at the lowest cost possible. *See id.* ¶¶ 3. To facilitate the municipal bond offering, the borrower selects a bank underwriter to market and sell the bonds to investors. *See id.* ¶ 21. The borrower negotiates the terms of the municipal bond offering with the underwriter, which typically involves the school paying a "fee," "spread," or "discount"—usually a percentage of the total value of the bond issued—to its bank underwriter in exchange for the bank purchasing the school's bond and "lending" the school money. *See id.* ¶¶ 20–21. After purchasing the bonds from the school, bank underwriters then resell these bonds to third-party investors for a profit. *See id.* This financing structure essentially enables the school to "borrow" the money needed for building projects or operations by issuing bonds that the schools ultimately repay with interest. *See id.* The municipal advisor's role in these complex

---

[1] Municipal advisors are defined as "persons . . .who provide advice to, or on behalf of, a municipal entity or obligated entity with respect to municipal financial products or the issuance of municipal securities, including advice with respect to the structure, timing, terms, and other similar matters concerning such financial products or issues." 15 U.S.C. § 78o-4(e)(4).

financial transactions is to act as the school's "skilled representative in the bond offering transaction" and help it negotiate favorable financing terms in the school's best interest. *See id.* ¶22; *see also* Municipal Securities Rulemaking Board, *Roles and Responsibilities: The Financing Team in an Initial Municipal Bond Offering*, https://www.msrb.org/sites/default/files/Financing-Team.pdf (last visited on February 28, 2024); *see also* Apfelbacher Expert Report, Dkt. 64-3 at 4.[2]

Before becoming a municipal advisor for schools and school districts, O'Meara worked as an underwriter at investment bank BB&T.  Dkts.  65-1; 62-4, O'Meara Dep. Tr. at 26:15–27:12.  Because his job duties in this role included persuading schools to choose BB&T as the underwriter for their municipal bond offerings, *see* Dkt. 62-4, O'Meara Dep. Tr. at 26:15–27:12, O'Meara became acquainted with various schools including Defendants' future clients, Bella Mente and Liberty Tree, *see* Dkts. 62-19, Salzmann Decl. Ex. Q; 62-20, Salzmann Decl. Ex. R.  Around January or February 2018, O'Meara and another BB&T employee, Paula Permenter,[3] decided to leave their job at BB&T to start a municipal advisory firm, Choice.  Dkt. 62-4, O'Meara Dep. Tr. at 32:15–24, 35:10–25. Instead of working for the banks to bring in school clients and negotiate the most favorable terms for the bank, *see id.* at 29:1–20, O'Meara's new role would focus on using his expertise to advise schools issuing municipal bonds and to obtain the most favorable financing terms and conditions for the schools, *id.* at 28:6–10, 29:1–30:18.  On May 1, 2018, O'Meara tendered his resignation and gave BB&T two weeks' notice of his departure.  Dkt.  62-4, Salzmann Decl. Ex. B at 68:1–9, 86:14–87:16.

Before O'Meara left BB&T, he negotiated a deal with the bank: for every school that O'Meara brought to the bank for underwriting, BB&T would split its underwriter's fee

---

[2] The Court only relies on Mr. Apfelbacher's expert report to explain the role municipal advisors play in a municipal bond offering.  Defendants have not disputed or raised any objections to this portion of Mr. Apfelbacher's report.  *See* Dkts. 64, Def.'s Mot. to Exclude Testimony of Expert; 77, Def.'s Reply in Support of Mot. to Exclude Expert Testimony.

[3] Paula Permenter is a co-founder of Choice.  Dkt. 62-4, O'Meara Dep. Tr. at 35:10–25.  She worked at BB&T as an underwriter with O'Meara before leaving the bank to help form Choice.  *Id.*

with O'Meara and Choice.  Dkt. 62-17, Salzmann Decl. Ex. O.  Two days after O'Meara gave notice of his resignation, Defendants and BB&T manager, Richard Harmon, reached such an agreement, not only with respect to Bella Menta and Liberty Tree but also for three other schools that O'Meara planned to represent.  *See id.*  As memorialized in an email sent by Harmon, BB&T and O'Meara agreed that they would split the two percent underwriter fee for Bella Mente's bond offering as follows: the bank's $20.00 fee per every $1,000.00 (i.e. two percent) of the total bond amount would be divided as "$7.50 Choice/$12.50 BBT."  *Id.*  Likewise, for the Liberty Tree offering, BB&T and Defendants also agreed to split the two percent underwriter fee.  *Id.*; *see also* Dkt. 62-19, Salzmann Decl. Ex. Q.  Under the agreement, Choice would receive $5.00 and "BB&T [would] receive $15.00" of the $20.00 underwriter fee per every $1,000.00 of the total bond amount.  Dkt. 62-17, Salzmann Decl. Ex. O.  This arrangement also included three other schools that O'Meara planned to represent: Temecula Valley, La Verne, and Monterey Bay.  *Id.*  The parties called this arrangement an "agreement of fee splits" and anticipated that this would be the "course of action for prospects and future deals[.]"  *Id.*[4]

During his last two weeks at BB&T, O'Meara not only negotiated the above fee-splitting arrangement, but also worked for the bank as an underwriter *and* for the schools as their municipal advisor.  Dkts. 62-21, Salzmann Decl. Ex. S; 62-23, Salzmann Decl. Ex. U; 62-24, Salzmann Decl. Ex. V.  On May 8, 2018, O'Meara sent an engagement letter to Bella Mente memorializing the municipal advisory relationship between the school and Choice.  Dkt. 62-21, Salzmann Decl. Ex. S.  While the engagement letter set forth the scope of the municipal advisory relationship between Bella Mente and Choice, it made no mention of O'Meara's dual employment or that this situation could pose a conflict of

---

[4] Six days after O'Meara tendered his resignation, Harmon also sent an email to all BB&T employees assuring them that O'Meara and Permenter "[were] not competitors."  Dkt. 62-16 at 3, Salzmann Decl. Ex. N.  Harmon further communicated that BB&T "ha[d] already seen transaction volume flow both ways, even after only a few days" and anticipated "more deal flow coming [their] way from referrals."  *Id.*

interest for Bella Mente.  *See* Dkt. 62-21, Salzmann Decl. Ex. S.  In fact, it affirmed that there were "no known actual or potential material conflicts of interest that might impair [Choice's] ability to render unbiased or competent advice or to fulfill its fiduciary duty" to Bella Mente.  *Id.*  It also affirmatively represented that there were no "Other Engagements or Relationships Impairing [Choice's] Ability to Provide Advice."  *Id.*  That same day, O'Meara also sent Bella Mente an engagement letter on behalf of BB&T confirming that BB&T would provide underwriting services for the school's bond offering.  Dkt. 62-23, Salzmann Decl. Ex. U.  On May 14, 2018, O'Meara's second-to-last day as an underwriter at BB&T, he sent an engagement letter to Liberty Tree memorializing its municipal advisory relationship with Choice.  Dkt. 62-24, Salzmann Decl. Ex. V.

When Defendants started working for the two schools, O'Meara and Choice were not registered with the appropriate agencies as required by law.  Although Defendants were not registered with the SEC until August 27, 2018 and with the Municipal Securities Rulemaking Board ("MSRB")[5] until October 16, 2018, O'Meara engaged Bella Mente and Liberty Tree as municipal advisory clients on May 8, 2018 and May 15, 2018, respectively.  Dkts. 62-21, Salzmann Decl. Ex. S; 62-24, Salzmann Decl. Ex. V.  Defendants did not inform either school that Defendants were not registered during this engagement process.  *See* Dkts. 62-21, Salzmann Decl. Ex. S; 62-24, Salzmann Decl. Ex. V.  Moreover, before Defendants were officially registered, they completed the bond offering transactions on the schools' behalf and received payment for their services.  *See* Dkts. 62-25, Salzmann Decl. Ex. W; 62-26, Salzmann Decl. Ex. X; 65-16; 65-17.  The bond offerings were finalized on

---

[5] Established by Congress in 1975, the MSRB is a regulatory organization that promulgates rules for financial professionals involved in municipal securities; their goal is "to ensure a fair and efficient market by preventing fraud and other unfair practices, establishing professional qualifications, supporting market transparency and applying uniform practices to the industry."  15 U.S.C. § 78o-4a(a); Municipal Securities Rulemaking Board, *The Municipal Advisor's Introduction to MSRB Rules*, https://www.msrb.org/sites/default/files/2022-09/Municipal-Advisor_Introduction-to-MSRB-Rules.pdf (last visited January 30, 2024); Municipal Securities Rulemaking Board (2021), *The Role and Jurisdiction of the MSRB*, https://www.msrb.org/sites/default/files/2022-09/Role-and-Jurisdiction-of-MSRB.pdf.

July 11, 2018 and September 21, 2018, Dkts. 62-14, Salzmann Decl. Ex. L; 62-15, Salzmann Decl. Ex. M; 62-25, Salzmann Decl. Ex. W; 62-26, Salzmann Decl. Ex. X, and at the closing of these transactions Choice was paid $157,000.00 by Bella Mente and $53,437.50 by Liberty Tree.  Dkts. 62-25, Salzmann Decl. Ex. W; 62-26, Salzmann Decl. Ex. X; 65-16; 65-17.

Based on the above facts, the SEC filed its complaint against Defendants alleging eight causes of action. *See* Dkt. 1.  The SEC bases its various claims against Defendants on some or all of the following predicate acts: (1) performing municipal advisory services for the schools without being registered; (2) impermissibly agreeing to split fees with BB&T; (3) "deceptively operat[ing] in a dual capacity" as both bank underwriter and municipal advisor while O'Meara was still employed by BB&T; and (4) failing to disclose the material conflicts of interest created by the above facts to their school clients. *Id.* ¶¶ 4–8; 20–79.  In its first claim, the SEC alleges that by participating in the conduct set forth above, Defendants engaged in deceptive or manipulative practices by a municipal advisor in violation of Section 15B(a)(5) of the Securities Exchange Act, 15 U.S.C. § 78o-4(a) ("Section 15B(a)(5)").  *Id.* ¶¶ 4–7; 80–82.  In its second claim, the SEC alleges that, by engaging in the above acts, Defendants also breached their fiduciary duties in violation of Section 15B(c)(1) of the Securities Exchange Act, 15 U.S.C. § 78o-4(c)(1)  ("Section 15B(c)(1)"). *Id.* ¶¶ 83–87.  In its third and fourth claims, the SEC alleges that Choice failed to register as municipal advisors in violation of the requirements set forth in Section 15B(a)(1)(B) of the Securities Exchange Act, 15 U.S.C. § 78o-4(a)(1)(B)  ("Section 15B(a)(1)(B)") and MSRB Rule A-12.  *Id.* ¶¶ 88–93.  The SEC's fifth claim alleges that by performing the above predicate acts, Defendants unfairly dealt with their clients and engaged in deceptive, dishonest, or unfair practices in violation of MSRB Rule G-17.  *Id.* ¶¶ 94–96.  In its sixth claim, the SEC alleges that Defendants (1) entered into an illegal fee-splitting agreement in violation of MSRB Rule-G42(e)(i)(D) and (2) also violated their fiduciary duties as municipal advisors in violation of MSRB Rule G-42 by participating in the predicate acts set forth above.  *Id.* ¶¶ 97–99.  In its seventh claim, the SEC alleges

Defendants also violated Section 15B(c)(1), which makes it illegal to engage in any act or practice that is not consistent with the advisor's fiduciary duty or in contravention of any of the MSRB Rules, because Defendants (1) provided municipal services without being registered as required by MSRB Rule A-12; (2) entered into an illegal fee-splitting in violation of MSRB Rule G-42; and (3) breached their fiduciary duties set forth in MSRB Rules G-17 and G-42. *Id.* ¶¶ 100–103. Finally, in its eighth claim, the SEC alleges O'Meara aided and abetted Choice's failure to register in violation of Section 15B(a)(1)(B) and (c)(1), and MSRB Rule A-12. *Id.* ¶¶ 4–7; 104–107.

The SEC moved for partial summary judgment on its second, third, fourth, fifth, sixth, seventh, and eighth claims. Dkt. 62. In turn, the Defendants moved for partial summary judgment on the SEC's first, second, and sixth claims. Dkt. 65.

## I. STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248–50.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. When the moving party has the burden of proof at trial, they must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party meets its initial burden, the burden shifts to the non-moving party to set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e). The non-moving party cannot merely rest on his pleadings,

but must direct the court to specific, triable facts by "*citing to particular parts* of materials in the record." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added); *see also Anderson*, 477 U.S. at 250. When the moving party does not have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the non-moving party's case or by pointing to evidence that negates an essential element of the non-moving party's claim. *Soremekun*, 509 F.3d at 984 (citing *Anderson*, 477 U.S. at 250).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *Id.* Rather, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## II. EVIDENTIARY OBJECTIONS

Before turning to the substance of the parties' summary judgment motions, the Court first addresses the SEC's evidentiary objections to O'Meara's declaration submitted in support of Defendants' motion for partial summary judgment. Dkt. 67 at 19 (citing Dkt. 65-3, Def.'s Ex. A ("O'Meara Decl."). The SEC objects to portions of his declaration on the grounds that (1) statements about what O'Meara's school clients "wanted" or "knew or understood" are irrelevant and beyond the scope of O'Meara's knowledge; (2) his claims concerning the bond industry and what might have happened if O'Meara acted differently are statements of opinions, not fact; and (3) representations that O'Meara's complied with the law are improper legal conclusions. *Id.* (citing Dkt. 65-3, O'Meara Decl. ¶¶ 14, 15, 18, 20–26).

The Court declines to address these objections individually as they are superfluous and redundant of the summary judgment standard itself. In deciding a summary judgment motion, the Court may only consider legally relevant facts contained in declarations, not legal conclusions or argumentative statements. *Burch v. Regents of Univ. of Cal.*, 433 F.

Supp. 2d 1110, 1119 (E.D. Cal. 2006). "[O]bjections on the grounds that the evidence is irrelevant, speculative, argumentative, prejudicial, that it constitutes hearsay or inadmissible lay opinion, or that there is a lack personal knowledge" are "all duplicative of the summary judgment standard itself." *Holt v. Noble House Hotels & Resort, Ltd*, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019) (citing *Burch*, 433 F. Supp. 2d at 1119, 1122 and *Anderson*, 477 U.S. at 248). Applying this standard, the Court did not consider any irrelevant statements, improper opinions, or legal conclusions contained in the O'Meara declaration in reaching its decisions. Where a paragraph containing an improper legal conclusion otherwise contained admissible statements, the Court considered the admissible evidence but disregarded the improper legal conclusions.

### III. DISCUSSION

First, the Court will determine whether the undisputed facts establish that Defendants illegally acted as municipal advisors before registering with the SEC and MSRB. Second, the Court will assess whether Defendants entered into an impermissible fee-splitting agreement with BB&T in violation of MSRB Rule G-42. Third, the Court will consider whether Defendants breached their fiduciary duties when they failed to disclose (1) their lack of registration with the SEC and MSRB before providing municipal advisory services; (2) the conflicts of interest posed by O'Meara operating in a dual capacity as both bank underwriter and municipal advisor; and (3) their agreement to split fees with BB&T. Finally, the Court will determine whether Defendants' above actions also constituted violations of MSRB Rule G-17's requirement to deal fairly with all persons and its prohibition against engaging in deceptive, dishonest, or unfair practices.

### A. Registration with the SEC and MSRB

The Court first considers whether Defendants violated Section 15B(a)(1)(B) and MSRB Rule A-12 by acting as municipal advisors to Bella Mente and Liberty Tree without first being registered with the SEC and MSRB.

In passing the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), Congress decided to regulate services provided by municipal

advisors, i.e., individuals who provide financial or securities advice to municipal entities like schools.  *See* 15 U.S.C. § 78o-4(a)(1)(B); Registration of Municipal Advisors, Exchange Act Release No. 34-70462 at 5 (Sept. 20, 2013) (describing new requirement). This statutory framework requires all municipal advisors to register with the SEC *before* they can begin providing financial or securities advice to clients.  15 U.S.C. § 78o-4(a)(1)(B) (stating that municipal advisors cannot "provide advice to or on behalf of a municipal entity . . . with respect to municipal financial products or the issuance of municipal securities . . . unless the municipal advisor is registered" with the SEC).  The MSRB, which promulgates rules for financial professionals involved in municipal securities and regulates the activities of municipal advisors, likewise imposes a registration obligation before advisors can provide such services.  Municipal Securities Rulemaking Board, *The Municipal Advisor's Introduction to MSRB Rules*, https://www.msrb.org/sites /default/files/2022-09/Municipal-Advisor_Introduction-to-MSRB-Rules.pdf  (last  visited January 30, 2024).  Specifically, the MSRB requires that all advisors must register with the MSRB in addition to registering with the SEC.  MSRB Rule A-12 (requiring municipal advisors to register with the MSRB).

Here, the undisputed evidence shows that Defendants provided municipal advisory services to Bella Mente and Liberty Tree prior to registering with the appropriate agencies. *See* Dkts. 62-6, Salzmann Decl. Ex. D; 62-8, Salzmann Decl. Ex. F; 62-13 at 5:3–6:19, Def. O'Meara's Responses to RFAs Set 1, Nos. 3–8; 62-14, Salzmann Decl. Ex. L; 62-21, Salzmann Decl. Ex. S; 62-23, Salzmann Decl. Ex. U; 62-24, Salzmann Decl. Ex. V.  Choice was not registered with the SEC and MSRB until August 27, 2018, and October 16, 2018, respectively.  *See* Dkts. 62-6, Salzmann Decl. Ex. D; 62-8, Salzmann Decl. Ex. F.  But months prior to completing these registration requirements, Choice and O'Meara had already started to provide municipal advisory services to the two schools.  Dkts. 62-4, Salzmann Decl. Ex. B, at 170:12–14; 62-21, Salzmann Decl. Ex. S; 62-24, Salzmann Decl. Ex. V.  In May of 2018, Defendants entered into formal contracts with Bella Mente and Liberty Tree to advise the schools as they raised money by issuing bonds.  Dkts. 62-21,

Salzmann Decl. Ex. S; 62-22, Salzmann Decl. Ex. T; 62-23, Salzmann Decl. Ex. U; 62-24, Salzmann Decl. Ex. V.  Not only did O'Meara and Choice engage the schools as clients prior to completing registration, but they assisted the schools in structuring their deals with BB&T and helped to complete their bond offerings.  Dkts. 62-14, Salzmann Decl. Ex. L; 62-15, Salzmann Decl. Ex. M; 62-21, Salzmann Decl. Ex. S; 62-22, Salzmann Decl. Ex. T; 62-23, Salzmann Decl. Ex. U; 62-24, Salzmann Decl. Ex. V; 62-25, Salzmann Decl. Ex. W; 62-26, Salzmann Decl. Ex. X.  When the bond offering transactions for Bella Mente and Liberty Tree closed on July 11, 2018 and September 21, 2018, respectively, Defendants received compensation for the completion of their municipal advisory services.  Dkts. 62-25, Salzmann Decl. Ex. W; 62-26, Salzmann Decl., Ex. X.  Defendants point to no evidence to the contrary.  *See* Dkt. 72.  In fact, they conceded in their briefing and during oral argument on January 12, 2024 that Choice was not registered as a municipal advisor when it provided municipal advisory services to the schools.  *Id.* at 7:1–8; Dkt. 82, Hr'g Tr. 18:14–20:5.

Accordingly, because the undisputed facts establish that Choice and O'Meara advised the schools prior to completing their registration requirements, the Court grants summary judgment as to the SEC's third claim for failure to register with the SEC in violation of Section 15B(a)(1)(B) and fourth claim for failure to register with the MSRB in violation of MSRB Rule A-12.  The Court also grants partial summary judgment on the SEC's seventh claim that Defendants violated Section 15B(c)(1)'s prohibition against acts contravening the MSRB Rules, based on Defendants' violation of MSRB Rule A-12's registration requirement.[6]

---

[6] The SEC also moves for summary judgment on its eighth claim arguing O'Meara aided and abetted Choice's failure to register in violation of Section 15B(a)(1)(B) and (c)(1) and MSRB Rule A-12. Dkts. 62 at 2:13–19; 62-1 at 16:14–25.  However, given the SEC's limited briefing addressing this claim and dearth of authority provided regarding "aiding and abetting" violations of Section 15B of the Securities Exchange Act—only offering one citation about the legal standards for "aiding and abetting" violations of Section 10(b), 13(a),(b), and 15(d) of the Securities Exchange Act—the Court finds that the SEC has not met its initial burden of affirmatively demonstrating that no reasonable trier of fact could find

## B. Fee-Splitting Agreement

The Court next examines whether Defendants violated MSRB Rule G-42 by entering into an illegal fee-splitting agreement with BB&T.

Section 15B(c)(1) and MSRB Rule G-42 set forth the standards of conduct for municipal advisors including the fiduciary duties of loyalty and care owed to their clients. 15 U.S.C. § 78o-4(c)(1); MSRB Rule G-42(a).[7]  In specifying the contours of these fiduciary duties, MSRB Rule G-42(e) imposes a specific prohibition against municipal advisors "making, or participating in, any fee-splitting arrangement with underwriters on any municipal securities transaction as to which it has provided or is providing advice." MSRB Rule G-42(e)(i)(D).

Here, the undisputed facts show that Defendants and BB&T agreed that, for every school client that Defendants brought to BB&T to underwrite a bond offering, BB&T would split a portion of its fee.  Dkt. 62-17, Salzmann Decl. Ex. O.  The parties also do not dispute that underwriters commonly charge a maximum of two percent for their services in issuing municipal bonds.  Dkt. 62-4, O'Meara Dep. Tr. 107:5–22; *see also* Dkt. 62-18, Salzmann Decl. Ex. P, Investigative Testimony of Paula Permenter, at 116:19–117:1. Further, Defendants do not dispute that on May 3, 2018, O'Meara and Harmon exchanged emails confirming their "agreement of fee splits, and course of action for prospects and future deals[]" that would divide the underwriter's two percent fee between them as follows.  Dkt. 62-17, Salzmann Decl. Ex. O.  For Bella Mente, BB&T and Defendants agreed that they would split BB&T's two percent underwriter fee of $20.00 per $1,000.00 of the total bond amount as "$7.50 Choice/$12.50 BBT." *Id.*  For Liberty Tree, BB&T and Defendants agreed that Choice would receive $5.00 and "BB&T will receive $15.00" of

---

other than for the movant.  *Soremekun*, 509 F.3d at 984.  Thus, the Court denies summary judgment on SEC's eighth claim.

[7] *See* Municipal Securities Rulemaking Board, *Municipal Advisors: Understanding Standards of Conduct* (April 2016), https://www.msrb.org/sites/default/files/2022-08/MSRB-Rule-G-42-for-Municipal-Advisors.pdf.

the $20.00 underwriter fee charged for every $1,000.00 of the total bond amount.  *Id.*; *see also* Dkt. 62-19, Salzmann Decl. Ex. Q.[8]  After negotiating this arrangement, Harmon communicated to other bank employees that BB&T expected Choice to refer future school bond business to them: BB&T "ha[s] already seen transaction volume flow both ways, even after only a few days" and anticipated "more deal flow coming [their] way from referrals" from Defendants.  Dkt. 62-16, Salzmann Decl. Ex. N.  Thus, the SEC's evidence demonstrates that Defendant and BB&T entered into an agreement to divide a portion of BB&T's underwriter fee in exchange for Choice referring its school clients to use BB&T as the underwriter.

Defendants do not dispute any of the above facts but instead contend that their arrangement with BB&T does not constitute illegal fee-splitting. Dkt. 65-1 at 14–18. They argue that a fee-splitting arrangement is only illegal when there is a secret kickback, i.e. where the entirety of the fees first goes to one recipient and that recipient further divides the fees pursuant to a secret agreement.  *Id.*  According to Defendants, because Bella Mente and Liberty Tree knew what fees BB&T and Choice separately charged and their respective fees were paid to BB&T and Choice directly, Defendants did not engage in an illegal fee-splitting agreement.  *Id.*

Based upon the plain language of the MSRB Rule G-42, the Court disagrees with the Defendants' interpretation of what constitutes illegal fee-splitting arrangements. Looking to the plain language of MSRB Rule G-42(e), the rule clearly and unambiguously prohibits any (1) fee-splitting arrangement; (2) between the underwriter of a bond and the

---

[8] Defendants also entered into similar fee division agreements to split a two percent fee for three other schools: Temecula Valley "$6 Choice/$14 bbt"; La Verne "$8/$12"; and Monterey Bay "$10/$15." Dkt. 62-17, Salzmann Decl. Ex. O. The fact that Choice's fee came out of BB&T's underwriting fees is supported by O'Meara's email to Erin Feeley, the executive director of Bella Mente, where O'Meara stated, "BB&T has agreed to reduce its fee to accommodate Choice Advisors."  Dkt. 62-21, Salzmann Decl. Ex. S.  He similarly also communicated to her in person that "[he] thought [he] probably could get BB&T to significantly reduce their fee" if Feeley hired Choice as a municipal advisor.  Dkt. 62-4, O'Meara Dep. Tr. 163:16–164:21.

municipal advisor; (3) concerning any municipal securities transactions, such as school bond offerings; (4) which the underwriter and municipal advisors is providing advice. MSRB Rule G-42(e)(i)(D); *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976) ("The starting point in every case involving construction of a statute is the language itself." (internal citations and alteration omitted)); *United States v. Johnson*, 680 F.3d 1140, 1144 (9th Cir. 2012) ("Statutory interpretation begins with the plain language of the statute." (internal citation omitted)).

While MSRB Rule G-42 provides no further definition of a fee-splitting arrangement, the dictionary defines fee-splitting as "the practice of dividing a fee for professional services between two professional persons,"[9] or "payment by a specialist . . . of a part of his or her fee to the person who made the referral."[10]  As explained above, the underwriter, BB&T, agreed that every school which Choice referred to BB&T for underwriter services, BB&T would divide its industry-standard two percent underwriting fee as follows: 1.25% to BB&T and 0.75% to Choice for Bella Mente, and 1.50% to BB&T and 0.50% to Choice for Liberty Tree.  *See* Dkt. 62-17, Salzmann Decl. Ex. O.  Agreements such as these both divide a fee between two professionals and reward one party to the agreement for referring clients to the other.  They also create a financial incentive for the municipal advisor to guide its clients to a particular bank underwriter, here BB&T, creating a conflict of interest for the municipal advisor.[11]

---

[9] Fee-splitting, Dictionary.com, https://www.dictionary.com/browse/fee-splitting (last visited January 8, 2024).

[10] Fee-splitting, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/fee%20splitting (last visited April 3, 2024); *see also* Fee-splitting, Collinsdictionary.com, https://www.collinsdictionary.com/us/dictionary/english/fee-splitting (last visited April 3, 2024).

[11] Defendant argues it is common in the municipal bond industry for municipal advisors to negotiate the fees of all other participants in the bond transaction including underwriters.  Dkt. 65-1 at 11. Defendants also argue that the fee division reflected the reality that "a large portion of the work that BB&T might need to be doing . . . would now be falling onto [O'Meara's] shoulders rather than onto BB&T's." Dkt. 62-4, O'Meara Dep. Tr. 72:18–74:19.  Neither of these arguments (and any supporting evidence) create factual disputes regarding whether Defendants and the bank agreed to split the bank's fee for schools that Defendants referred to the bank.  The Court is also not persuaded that the substance of this agreement was legal when the MSRB specifically prohibits any fee-splitting agreements between the

14

The Court finds no justification for importing a secret kickback requirement into the plain language of MSRB Rule G-42, which broadly prohibits all fee division agreements between municipal advisors and bank underwriters.  First, as seen below, the rule allows for no fee-splitting arrangements between municipal advisors and bank underwriters, whether disclosed or undisclosed.  MSRB Rule G-42(e)(i)(D).  The entirety of MSRB Rule-G42(e)(i)(D) states municipal providers are prohibited from "making, or participating in, **any** fee-splitting arrangement with underwriters on any municipal securities transaction as to which it has provided or is providing advice, **and any undisclosed** fee-splitting arrangements with providers of investments or services to a municipal entity or obligated person client of the municipal advisor." MSRB Rule G-42(e)(i)(D) (emphasis added).  By prohibiting *all* agreements between municipal advisors and underwriters and *only undisclosed* agreements between municipal advisors and other providers of investment services, the rule makes clear that the former is prohibited whether or not it is disclosed.  Second, when two parties agree to divide fees to incentivize referrals, the Court sees no meaningful distinction between payments that are structured to go to both parties simultaneously or payments that go to the underwriter first and then are further divided with the municipal advisor.  Regardless of how the payments are structured, all such agreements to split fees create a conflict of interest on the part of the municipal advisor and the corresponding risk that clients' interests will be compromised because the municipal advisor will not be working solely for their benefit.

Based on the undisputed facts regarding the nature of Defendant and BB&T's "agreement of fee splits," Dkt. 62-17, Salzmann Decl. Ex. O, and the plain language of the regulation, the Court finds that Defendants engaged in a prohibited fee-splitting agreement with BB&T in violation of MSRB Rule G-42(e).  It therefore grants partial summary judgment on SEC's sixth claim to the extent it is based on an illegal fee-splitting agreement

---

advisor and the bank because of the referral incentives and conflicts of interest created by such arrangements.

in violation of MSRB Rule G-42(e).  For the same reasons, the Court finds that Defendants have not proved there is an absence of evidence to support their claim that they did not enter into an illegal fee-splitting agreement.  Thus, the Court denies Defendants' motion for partial summary judgment on the SEC's sixth claim.  The Court also grants partial summary judgment as to the SEC's seventh claim that Defendants violated Section 15B(c)(1)'s prohibition against acts contravening the MSRB Rules, based on Defendants' violation of MSRB Rule G-42(e)'s restriction against fee-splitting agreements.

## C.  Breaches of Fiduciary Duties

The Court will next consider whether Defendants breached their fiduciary duties to their clients in violation of Section 15B(c)(1) and MSRB Rule G-42 when they failed to disclose (1) Defendants' failure to register with the SEC and MSRB; (2) O'Meara's dual employment with BB&T and Choice; and (3) Defendants' impermissible fee-splitting agreement with BB&T.

### 1. *Scope of Fiduciary Duties Under Section 15B(c)(1) and MSRB Rule G-42*

To begin, the Court examines the scope of fiduciary duties that municipal advisors are required to abided by under Section 15B(c)(1) and MSRB Rule G-42.  Section 15B(c)(1) was amended by the Dodd-Frank Act to prohibit violations of the MSRB Rules and impose fiduciary duties on municipal advisors as follows:

> A municipal advisor and any person associated with such municipal advisor shall be deemed to have a fiduciary duty to any municipal entity for whom such municipal advisor acts as a municipal advisor, and no municipal advisor may engage in any act, practice, or course of business which is not consistent with a municipal advisor's fiduciary duty or that is in contravention of any rule of the Board.

15 U.S.C. § 78o-4(c)(1).  Because federal courts have not interpreted this newer statute, the Court looks to cases governing similar securities law for guidance on the scope of the fiduciary duties required by this statute.  The Supreme Court has recognized that § 206(2) of the Investment Advisor's Act of 1940, 15 U.S.C. § 80b-6(2), ("§ 206(2)") creates a fiduciary duty for persons who advise clients about securities investments.  *Transamerica*

*Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17–18 (1979) (holding that § 206(2) establishes "federal fiduciary standards" that govern the conduct of investment advisors). In *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963), the Supreme Court held that under § 206(2), investment advisors' fiduciary duties included the duty of full disclosure requiring the "utmost good faith, and full and fair disclosure of all material facts," as well as an affirmative obligation "to employ reasonable care to avoid misleading" their clients. In reaching this conclusion, the Supreme Court relied on the fact that the passage of the Investment Advisers Act of 1940 reflected "a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 692–93 (1980) (explaining the Court's reasoning in *Capital Gains*, 375 U.S. at 191–192 (footnote omitted)).

Whether information is "material," such that advisors must disclose it to their clients, "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011). This objective standard is met if "a reasonable investor would have considered [the information] useful or significant." *Id.* (internal citations omitted). To meet the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Sec. & Exch. Comm'n v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011) (internal citations omitted). "[P]otential conflicts of interest are 'material' facts" to clients. *Vernazza v. Sec. & Exch. Comm'n*, 327 F.3d 851, 859 (9th Cir. 2003), *as amended*, 335 F.3d 1096 (9th Cir. 2003). That is because individuals seeking advice must "be permitted to evaluate such overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving 'two masters' or only one, 'especially if one of the masters happens to be economic self-interest.'" *Capital Gains*, 375 U.S. at 196 (quoting *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 549 (1961)).

The MSRB Rules which regulate financial professionals in the municipal securities market echo and reinforce the same fiduciary duties and principles of full disclosure explained by the Supreme Court in *Capital Gains*. *See* MSRB Rule G-42(a), (b), and (c). MSRB Rule G-42(a), which sets forth the core standards of conduct for municipal advisors, states that municipal advisors owe their clients a "fiduciary duty that includes a duty of loyalty and a duty of care." MSRB Rule G-42(a)(ii). The duty of loyalty includes, but is not limited to, dealing honestly and with the utmost good faith with clients and requires municipal advisors to "act in the client's best interests without regard to the financial or other interests of the municipal advisor." MSRB Rule G-42, *Duties of Non-Solicitors Municipal Advisors Supplementary Materials .02*, https://www.msrb.org/Rules-and-Interpretations/MSRB-Rules/General/Rule-G-42 (last visited April 1, 2024). MSRB Rule G-42(b) further specifies that a municipal advisor must "prior to or upon engaging in municipal advisory activities, provide to the municipal entity or obligated person client full and fair disclosure in writing of: all material conflicts of interest, including . . . any fee-splitting arrangements involving the municipal advisor and any provider of investments or services" to the client. MSRB Rule G-42(b)(i)(D). The municipal advisor must also disclose "any other actual or potential conflicts of interest, which the municipal advisor is aware after reasonable inquiry could reasonably be anticipated to impair the municipal advisor's ability to provide advice to or on behalf of the client in accordance with the standards of conduct of section (a)" of MSRB Rule G-42. MSRB Rule G-42(b)(i)(F). MSRB G-42(c) also specifies that the municipal advisor must disclose in writing the "form and basis" of all compensation and all conflicts. MSRB Rule G-42(c)(i), (ii). Thus, based on the above, under Section 15B(c)(1) and MSRB Rule G-42 a municipal advisor's fiduciary duties are comprised of the duty of "full disclosure of all material facts," *Capital Gains*, 375 U.S. at 194, which includes disclosure of "any other actual or potential conflicts of interest," MSRB Rule G-42(b), that may impair the municipal advisor's ability to provide advice to or on behalf of the client's bests interest.

///

### 2. Failure to Disclose Lack of Registration

Having determined the scope of Defendants' fiduciary duties, the Court now considers whether the undisputed facts establish that Defendants breached their fiduciary duties when they failed to disclose their lack of registration to their clients. As discussed above, there is no dispute that Defendants illegally acted as municipal advisors before they were registered with the SEC and MSRB. *See* Dkts. 62-6, Salzmann Decl. Ex. D; 62-8, Salzmann Decl. Ex. F; 62-13 at 5:3–6:19, Def. O'Meara's Responses to RFAs Set 1, Nos. 3–8; 62-14, Salzmann Decl. Ex. L; 62-21, Salzmann Decl. Ex. S; 62-23, Salzmann Decl. Ex. U; 62-24, Salzmann Decl. Ex. V. And as admitted by Defendants, they did so without ever informing the schools that they were not legally registered. *See* Dkts. 63, 65, 72; *see also* Dkts. 62-13 at 5:15–6:19, Def. O'Meara's Responses to RFAs, Set 1, Nos. 5–8 (admissions that prior to August 27, 2018, and October 16, 2018, O'Meara did not disclose to Liberty Tree and Bella Menta that Choice was not registered with the SEC and MSRB, respectively).

Defendants also offer no explanation or evidence as to why this information—that they lacked legal permission to operate as municipal advisors—would not be material information to the schools which Defendants sought to become potential clients. *See* Dkts. 63, 65, 72. School districts hire municipal advisors in order to benefit from their expertise and knowledge of these complex transactions. *See* Municipal Securities Rulemaking Board, *Roles and Responsibilities: The Financing Team in an Initial Municipal Bond Offering*, https://www.msrb.org/sites/default/files/Financing-Team.pdf (last visited on February 28, 2024). Any reasonable potential client would want to know whether their advisor was properly licensed or registered and, therefore, whether they were legally permitted to provide the services in question. *Sec. & Exch. Comm'n v. Sztrom*, 538 F. Supp. 3d 1050, 1061 (S.D. Cal. 2021) (finding a reasonable investor would have considered it important to know that the individual giving them investment advice and making trades on their behalf was not associated with any registered investment adviser). Defendants' failure to disclose this information impeded the schools' ability to evaluate whether

Defendants were best suited to provide the advisory services for their needs given their lack of registration. *See id.* For example, the school clients were not fully able to consider the implications of a lack of registration, including considering whether Defendants were qualified to render services and exploring any possible legal or practical consequences of proceeding with unregistered advisors. *See id.* As this information bears on municipal advisors' fitness to perform the very work for which they were hired and reasonable clients would have wanted to consider the implications of this information before engaging a professional, Defendants' failure to disclose this information constitutes a breach of their fiduciary duties in violation of Section 15B(c)(1) and MSRB Rule G-42. *Capital Gains*, 375 U.S. at 191–92, 194 (finding that the investment advisors' fiduciary duty included the duty of full disclosure requiring the "utmost good faith, and full and fair disclosure of all material facts").

Thus, the Court grants partial summary judgment on the SEC's second claim for breach of fiduciary duties in violation of Section 15B(c)(1) and sixth claim for breach of fiduciary duties in violation of MSRB Rule G-42 for failure to disclose Defendants' lack of registration.

*3. Failure to Disclose the Conflict of Interest Created by O'Meara's Overlapping Employment*

The Court next turns to whether Defendants breached their fiduciary duties by failing to disclose the conflict posed by the fact that they performed municipal advisory services for the schools while O'Meara was still employed as an underwriter.

Here, the undisputed evidence shows that O'Meara engaged with and performed advisory services for Bella Mente while he was still employed as an underwriter at BB&T. Dkt. 62-4, Salzmann Decl. Ex. B, at 68:1–9. Although he had given his resignation notice on May 1, 2018, O'Meara was still employed with BB&T until May 15, 2018. *See* Dkts. 62-4 at 68:1–9; 62-16, Salmann Decl. Ex. N; 62-23, Salzmann Decl. Ex. U. Defendants do not dispute that on May 8, 2018, O'Meara sent an engagement letter to Bella Mente finalizing the selection of Choice as its municipal advisor. Dkt. 62-1, Salzmann Decl. Ex.

S.  It is also undisputed that on the same day, O'Meara sent Bella Mente an engagement letter, this time on behalf of BB&T, confirming the bank as Bella Mente's underwriter. Dkt. 62-23, Salzmann Decl. Ex. U.[12]

The SEC argues that Defendants breached their fiduciary duty to Bella Mente by failing to inform it that O'Meara's overlapping employment presented a conflict of interest that could compromise its interests in the bond issuance process.  Dkt. 62-1 at 16–17.  The SEC points to the engagement letter Defendants sent to Bella Mente which affirmatively misrepresents that (1) "Choice Advisors has no known actual or potential material conflicts of interest that might impair its ability either to render unbiased or competent advice or to fulfill its fiduciary duty to Client" and (2) "Choice Advisors is not aware of any other engagement or relationship Choice Advisors has that might impair [its] ability to either to render unbiased or competent advice or to fulfill its fiduciary duty to [its client]."  Dkt. 62-21, Salzmann Decl. Ex. S.

While Defendants do not dispute the simultaneous employment, *see* Dkt. 65-1 at 11–14, they argue there was no breach of fiduciary duty because Bella Mente and Liberty Tree both knew of O'Meara's overlapping employment, *id.* at 12:16–24, 13:22–14:2; *see also* Dkt. 72.  Defendants argue that the following evidence supports their position that they communicated this information to both of their clients: (1) O'Meara's declaration; (2) the declaration of Burt Hands, board member of Liberty Tree; and (3) the fact that Erin Feeley, executive director of Bella Mente, sought a recommendation letter from O'Meara.  Dkts. 65-3, O'Meara Decl. ¶ 9; 65-5, Hands Decl. ¶ 5; 65-12,  Feeley Dep. Tr. 157:24–158:4.

After reviewing the evidence, the Court disagrees.  O'Meara's declaration merely contains a vague statement that "prior to leaving BB&T, [he] informed all the schools [he] was working with … that [he] would be leaving BB&T to form Choice."  Dkt. 65-3, O'Meara Decl ¶ 9.  The declaration of Burt Hands is similarly vague and ambiguous about

---

[12] The evidence is less clear with regard to Liberty Tree as Defendants sent this school an engagement letter on O'Meara's penultimate day with the company.  Dkt. 62-24, Salzmann Decl. Ex. V.

the timing and content of any disclosure; it states only that he "understood that Matt switched roles between BB&T and Choice Advisors during the course of our professional relationship." Dkt. 65-5, Hands Decl. ¶ 5. Finally, the fact that Erin Feeley sought a letter of recommendation from O'Meara in the event she left her job, Dkt. 65-12, Feeley Dep. Tr. 157:24–158:4, is even further afield from the pertinent inquiry; it has no bearing on whether she knew about the conflict of interest posed by the fact that O'Meara was still working at BB&T at the time that he advised her to retain BB&T. Defendants point to no other evidence in the record to support their contention that Feeley knew about the implications of O'Meara's overlapping employment and conflict of interest. *See* Dkts. 65, 72.

The conflict of interest arising from O'Meara's simultaneous work for the bank and Bella Mente was material information Bella Mente should have had during its selection of municipal advisors. This information was critical to Bella Mente's ability to evaluate whether O'Meara and Choice could adequately serve its best interests while O'Meara was still acting as an underwriter for BB&T. Schools contemplating bond offerings and banks offering underwriting services have competing interests: the school wants the bank that will offer it the best terms, while the bank wants the school's business on the most profitable terms for itself, regardless of whether the school can do better elsewhere. Municipal Securities Rulemaking Board, *What to Expect From Your Underwriter*, https://www.msrb.org/sites/default/files/MSRB-Rule-G-17-For-Issuers.pdf (last visited on March 18, 2024). Defendants' failure to disclose the conflict of interest posed by O'Meara's dual employment deprived Bella Mente of the chance to gauge whether its advisor was prioritizing its interests or whether O'Meara was "serving two masters" when he referred Bella Mente to BB&T for underwriting services. *Capital Gains*, 375 U.S. at 197 (reasoning that investors should be allowed to evaluate whether the advisor had overlapping motivations and was "serving two masters or only one"). Because Defendants failed to disclose material information that would aid Bella Mente's assessment of whether its interests would be adequately served by hiring O'Meara and Choice, the Court finds

that this failure to disclose O'Meara's dual employment is a breach of fiduciary duty in violation of Section 15B(c)(1) and MSRB Rule G-42(b)(i)(D), (F) and G-42(c)(i), (ii). *Vernazza*, 327 F.3d at 859, *as amended*, 335 F.3d 1096 (9th Cir. 2003) (holding that defendant's misrepresentations about potential conflicts of interest to be material facts owed to clients). Thus, the Court grants partial summary judgment on the SEC's second claim for breach of fiduciary duties in violation of Section 15B(c)(1) and denies Defendants' motion for partial summary judgment on the SEC's second claim for breach of fiduciary duties in violation of Section 15B(c)(1). For the same reasons, the Court grants partial summary judgment on SEC's sixth claim for violations of MSRB Rule G-42(b)(i)(D), (F) and G-42(c)(i), (ii) to the extent this claim is based on Defendants' failure to disclose the conflict of interest caused by O'Meara's simultaneous employment. Because the same failure to disclose in violation of the MSRB Rules also violates Section 15B(c)(1), the Court also grants partial summary judgment on SEC's seventh claim that Defendants violated Section 15B(c)(1) based on their violations of MSRB Rules G-42(b)(i)(D), (F) and G-42(c)(i), (ii).

### 4. Disclosure of Conflict of Interests Created by Fee-Split Agreement

Next, the Court examines whether the SEC has met its burden to prove that Defendants violated MSRB Rule G-42 by failing to disclose the conflict of interest created by their fee-splitting agreement with BB&T.

The SEC and Defendants respectively point to evidence in the record that could support either conclusion on this issue. The SEC argues that Defendants misled the school clients because Defendants' engagement letters failed to disclose that Choice had any affirmative or potential conflicts of interest. Dkt. 62-1 at 17–19, 21–22. The SEC points to the engagement letters sent to Bella Mente and Liberty Tree which affirmed that "Choice Advisors has no known actual or potential material conflicts of interest that might impair its ability to either render unbiased or competent advice or to fulfill its fiduciary duty to Client." Dkts. 62-21, Salzmann Dec. Ex. S; 62-24, Salzmann Decl. Ex. V. The letters also affirmatively represented that Choice neither had other engagements or relationships

impairing their ability to provide advice to the schools and that "Choice Advisors does not share fees with any other parties and any provider of investments or services to the Client." Dkts. 62-21, Salzmann Decl. Ex. S; 62-24, Salzmann Decl. Ex. V.

Defendants on the other hand argue that the schools knew of the fee-splitting agreement between Choice and BB&T based on the schools' communications with O'Meara.  *See* Dkt. 65-1 at 12, 17–18.  Defendants point to an email O'Meara sent to Erin Feeley, executive director of Bella Mente, on May 8, 2018, stating, "As a reminder, BB&T has agreed to reduce its fee to accommodate Choice Advisor."  Dkt. 65-14, Def.'s Ex. L. The Court agrees this exchange could support the inference that O'Meara and Feeley had discussed the fee-split arrangement at least once prior to May 8, 2018.  *See id.*  Reviewing the evidence in the record in the light most favorable to Defendants, the Court finds that Defendants have created a triable issue that O'Meara informed Erin Feeley about the fee-splitting arrangement on one or two occasions.  *See id.*

Given the existence of a triable issue regarding Defendants' disclosure of their fee-splitting agreement, the Court denies the SEC's partial summary judgment motion on its second claim for breach of fiduciary duty in violation of Section 15B(c)(1); its sixth claim for breach of fiduciary duties in violation of MSRB Rule G-42; and its seventh claim for violations of Section 15B(c)(1)'s prohibition against any violations of the MSRB Rules, to the extent that these claims are based on Defendants' failure to disclose their fee-splitting agreement with BB&T.

**D. Deceptive, Dishonest, or Unfair Practices**

Finally, the Court considers whether Defendants' (1) performance of advisory services without being registered; (2) impermissible fee-splitting agreement with BB&T; (3) operation in a dual capacity as both bank underwriter and municipal advisor while O'Meara was still employed by BB&T; and (4) failure to disclose the material conflicts of interest created by these acts constitute unfair dealings and deceptive, dishonest, or unfair practices in violation of MSRB Rule G-17.  MSRB Rule G-17 provides that "[i]n the conduct of its municipal securities business, each broker, dealer, and municipal securities

dealer shall deal fairly with all persons *and* shall not engage in any deceptive, dishonest, or unfair practice." (emphasis added).  Defendants stipulated on the record during the February 14, 2024 hearing that the above acts, if committed by them, would constitute failures to "deal fairly" with the school clients in violation of this rule.  *See* Dkt. 88.[13] Based on this stipulation, the Court grants partial summary judgment on the SEC's fifth claim for violation of MSRB Rule G-17 to the extent this claim is based on Defendants' (1) engagement in municipal advisory services without being registered and failure to disclose the lack of registration; (2) impermissible agreement to split fees with BB&T; and (3) failure to disclose their performance as both bank underwriter and municipal advisor while O'Meara was still employed by BB&T.  Given this violation of MSRB Rule G-17, the Court also grants partial summary judgment as to the SEC's seventh claim of violation of Section 15B(c)(1), which prohibits any acts in contravention of any MSRB Rule.

## V. CONCLUSION AND ORDER

For the reasons set out above, the Court GRANTS IN PART and DENIES IN PART the SEC's motion for partial summary judgment [Dkt. 62].[14]  The Court also DENIES Defendants' motion for partial summary judgment in its entirety [Dkt. 65].

---

[13] Defendants dispute that the same acts constitute a violation under MSRB Rule G-17's prohibition that a municipal advisor "shall not engage in any deceptive, dishonest, or unfair practice." Dkt. 84, Def.'s Suppl. Br.; *see also* Dkt. 88.  The Court finds that based on the plain language of MSRB Rule G-17 and the limited guidance cited by both parties' moving papers that these same actions may also constitute deceptive and dishonest acts.  However, given the dearth of guidance and authority on the issue and Defendants' stipulation that these acts constitute failures to "deal fairly" with clients in violation of the same rule, the Court declines to reach this issue.

[14] Defendants also moved for summary judgment on the SEC's first claim for violations of Section 15B(a)(5). Dkts. 65, 65-1. They argued that scienter is required for Defendants' actions to constitute "deceptive or manipulative acts" in violation of this statute and that the SEC had not created a triable issue on this *mens rea* element. Dkt. 65-1 at 5, 9–11.  For the reasons stated on the record, the Court finds that the SEC did create a triable issue on scienter because the action they allege against Defendants (i.e., entering into a fee-splitting agreement, providing services without being registered, and engaging in overlapping employment) are, by their very nature, intentional acts.  Dkt. 82, Hr'g Tr. 23:6–25:1. However, because the SEC has stipulated to dismiss this claim pending the Court's issuance of the instant opinion and ruling, Dkt. 87, the Court does not address this claim any further in this written order.

The Court also sets forth the following deadlines regarding the SEC's motion for civil penalties and to enter judgment against Defendants O'Meara and Choice:

1. The SEC shall file its motion by **May 15, 2024**.

2. Defendants' opposition brief shall be filed by **June 14, 2024**.

3. The hearing to address the SEC's motion for civil penalties and to enter judgment against Defendants O'Meara and Choice is set for **June 26, 2024 at 9:30 a.m.** Unless otherwise directed by the Court, no reply briefs shall be filed.

**IT IS SO ORDERED**.

Dated: April 15, 2024

_____

Honorable Jinsook Ohta
United States District Judge