UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>v.<br><br>CHOICE ADVISORS, LLC, and MATTHIAS O'MEARA,<br><br>                    Defendants. | Case No.:  21-CV-1669-JO-MSB<br><br>**AMENDED ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR ENTRY OF FINAL JUDGMENT INCLUDING CERTAIN REMEDIES** |

Plaintiff Securities and Exchange Commission ("SEC") brought a civil law enforcement action against municipal advisors, Defendants Choice Advisors, LLC ("Choice") and Matthias O'Meara, alleging they violated securities laws and breached their fiduciary duties in providing services to their charter school clients. Dkt. 1 ("Compl."). After the Court granted partial summary judgment in favor of the SEC, the SEC moved for final entry of judgment seeking injunctive relief, disgorgement, and penalties against Defendants. Dkt. 90. For the reasons set forth below, the Court issues a final judgement against Defendants granting in part and denying in part the relief requested by the SEC.

## I.     PROCEDURAL HISTORY

On April 15, 2024, the Court granted partial summary judgment on several of the

1  SEC's claims. Dkt. 89 ("MSJ Order"). It found Defendants (1) performed municipal
2  advisory services for their school clients without being registered to provide these services
3  as required by law; (2) entered into an impermissible agreement to split fees with a bank
4  underwriter, BB&T; (3) provided municipal advisory services to its school clients while
5  O'Meara was still employed by BB&T; and (4) failed to disclose the material conflicts of
6  interest created by the above to their school clients. *Id.* at 9:23–11:22, 15:21–16:7, 19:1–
7  23:15, 24:21–25:12. Based on this conduct, the Court granted summary judgment in favor
8  of the SEC on its second, fifth, sixth, and seventh claims against Choice and O'Meara for
9  violations of (1) Section 15B(c)(1) of the Securities Exchange Act of 1934 ("Exchange
10 Act"), 15 U.S.C. § 78o-4(c)(1); (2) Municipal Securities Rulemaking Board ("MSRB")
11 Rule G-17; and (3) MSRB Rules G-42(b)(i)(D), (b)(i)(F), (c)(i-ii), (e)(i)(D). *Id.* at 15:21–
12 16:7, 19:1–23:15, 24:21–25:12. The Court also granted summary judgment in favor of the
13 SEC on its third and fourth claims against Choice only for violations of (1) Section
14 15B(a)(1)(B) of the Exchange Act, 15 U.S.C. § 78o-4(a)(1)(B), and (2) MSRB Rule A-12.
15 *Id.* at 9:23–11:22.

16  On June 7, 2024, the SEC subsequently dismissed its first claim against Choice and
17 O'Meara for violations of Section 15B(a)(5) of the Exchange Act, 15 U.S.C. § 78o-4(a),
18 and its eighth claim against only O'Meara for aiding and abetting Choice's failure to
19 register in violation of Section 15B(a)(1)(B) and (c)(1) of the Exchange Act, 15 U.S.C. §
20 78o-4(a)(1)(B) and (c)(1), and MSRB Rule A-12. Dkts. 93, 94.

21  Following the resolution of all claims as set forth above, the SEC requested a final
22 judgment imposing the following remedies: (1) a permanent injunction enjoining
23 Defendants from future violations of the federal securities laws; (2) disgorgement in the
24 amount of $133,149 plus $44,150 in prejudgment interest from O'Meara and disgorgement
25 in the amount of $79,889 plus $26,490 in prejudgment interest from Choice; and (3)
26 imposition of a civil penalty of $133,149 against O'Meara and $250,000 against Choice.
27 Dkt. 90-1 at 6:1–9, 7:7–8:4, 17:21–20:15, 23:11–18 ("Mot. for J."). On July 17, 2024, the
28 Court held an evidentiary hearing on O'Meara's testimony regarding the sincerity of his

assurances against future violations, and oral argument on the SEC's motion requesting final judgment. Dkt. 99. For the reasons stated on the record at the July 17, 2024 hearing and summarized below, the Court issues a final judgment granting in part and denying in part Plaintiff's request for penalties.

## II.  DISCUSSION

### A. Injunctive Relief

The SEC requests that the Court enjoin Defendants from further violations of the federal securities laws. Mot. for J. at 6–10. Injunctive relief against future securities law violations is the "primary statutory remedy for violations of the federal securities laws." *SEC v. Pattison*, No. C-08-4238 EMC, 2011 WL 723600, at *1 (N.D. Cal. Feb. 23, 2011), *aff'd sub nom. SEC v. Sabhlok*, 495 F. App'x 786 (9th Cir. 2012) (citing to *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984)); 15 U.S.C. § 78u(d). The Court is authorized to order permanent injunctions pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d). Such relief may be granted based upon the SEC's showing that there is a "reasonable likelihood" of future violations. *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996); *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980) ("*Murphy I*"). "In predicting the likelihood of future violations," the court "must assess the totality of the circumstances surrounding the defendant and his violations," including: "(1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; and (5) the sincerity of his assurances against future violations." *Fehn*, 97 F.3d at 1295 (citing to *Murphy I*, 626 F.2d at 655).

The Court finds the *Murphy* and *Fehn* factors weigh in favor of enjoining Defendants from future securities law violations for the following reasons.

#### 1. Scienter Regarding Past Conduct

The Court first considers Defendants' scienter in determining whether their conduct merits injunctive relief. *Aaron v. SEC*, 466 U.S. 680, 701 (1980) (Courts "may consider

scienter or lack of it as one of the aggravating or mitigating factors to be taken into account in exercising its equitable discretion in deciding whether or not to grant injunctive relief."). In the context of securities laws, "scienter" is generally defined as the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n.12 (1976).

Here, Defendants knew they entered into an agreement to split fees with the underwriter and that, for a short period, O'Meara was employed by both the underwriter and his school clients. MSJ Order at 12–16, 20:17–23:15. Regardless of whether Defendants knew that these arrangements violated the law, their actions demonstrated a disregard for the conflicts of interest created by such an arrangement and its potential to financially disadvantage their clients. MSJ Order at 12–16. As the Court found at summary judgment, Defendants also knowingly engaged in municipal advisory services without being properly registered and withheld this important information from their clients. MSJ Order 9:23–11:22, 19:1–20:16. As seen in emails between Defendants and the lawyer they retained to assist with their registrations, Defendants were well aware that they lacked registration status while representing their charter school clients. Dkts. 62-11, 62 12, Exs. I, J to SEC's Summ. J. Mt. (O'Meara responding "We are legit!!!," to his lawyer's update that their registration was finally completed five months after engaging clients).

While the Court finds credible O'Meara assertions that he did not intend to cheat, injure, or financially disadvantage their clients, Defendants' actions nevertheless demonstrate a disregard for (1) compliance with regulations intended to protect their clients and (2) their obligation to honor the fiduciary duties they owed to their clients. *See* MSJ Order at 10:17–11:14, 16:8–23:15. Although Defendants may have not had a specific intent to cheat their clients, they did intend to obtain and get paid for work that they were not legally permitted to perform and hid this fact from their clients. *See* MSJ Order 10:17–11:14; 19:1–23:15. As a sophisticated actor in the municipal securities industry O'Meara should have been aware of the potential conflicts of interest posed by his overlapping

employment and fee-splitting agreement with the bank that would underwrite the loan for these clients. *See* Dkt. 96-1 ("Defs.' Resp. Mot. Entry of Final J.") at 6:15–7:3. Yet the engagement letters Defendants sent to both school clients affirmatively misrepresented that Defendants had no potential conflicts of interest, stating that (1) "Choice Advisors has no known actual or potential material conflicts of interest that might impair its ability either to render unbiased or competent advice or to fulfill its fiduciary duty to Client" and (2) "Choice Advisors is not aware of any other engagement or relationship Choice Advisors has that might impair [its] ability to either to render unbiased or competent advice or to fulfill its fiduciary duty to [its client]." Dkts. 62-21, 62-24, Ex. S, V to SEC's Summ. J. Mtn.  As the Court found at summary judgment, this information was critical to Bella Mente's ability to evaluate whether Defendants could adequately serve its best interests while O'Meara was still acting as an underwriter for BB&T. MSJ Order at 22:11–23:5. By misrepresenting and withholding information about O'Meara's fee-splitting arrangement and overlapping employment with the underwriter, Defendants knew or should have known that they prevented their clients from deciding for themselves whether they wanted to proceed with an advisor who was operating in a dual role and had conflicts of interest that could affect their representation.  MSJ Order 19:1–23:5; *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 196–197 (1963) (reasoning investors should be allowed to evaluate whether their advisor had overlapping motivations and was "serving two masters or only one")(internal citations omitted).

For the above reasons, the Court finds Defendants acted with a culpable degree of scienter in their dealings with their two charter school clients and this factor weighs in favor of an injunction.

*2. Isolated or Recurrent Nature of the Violations*

Next, in weighing the need to issue an injunction in this case, the Court considers whether Defendants' violations were isolated or recurrent in nature.  While there is "[n]o per se rule requiring the issuance of an injunction upon the showing of [a] past violation," *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 701 (9th Cir.), *cert. denied*, 439 U.S. 953

(1978), "[t]he existence of past violations may give rise to an inference that there will be future violations[.]" *Murphy I*, 626 F.2d at 655. "[T]he fact that the defendant is currently complying with the securities laws does not preclude an injunction." *Id.*; *Fehn*, 97 F.3d at 1295.

The Court acknowledges the violations here concerned only two clients and occurred at the outset of O'Meara's career as a municipal advisor. MSJ Order at 2:6–10, 3:7–5:10. But the Court also notes that this case did not concern a one-time mistake but instead involved several instances where Defendants disregarded their legal obligations and fiduciary duties to their clients in favor of their own financial interests. *See* MSJ Order at 3:7–6:5, 10:17–11:14; 19:1–23:15. Also, although O'Meara was new to the role of being a municipal advisor, he had been working as a bank underwriter dealing with municipal clients long before making this career change. MSJ Order at 3:7–13; Dkt. 62-4 at 26:15–27:12 ("O'Meara Dep. Tr."); Defs.' Resp. Mot. Entry of Final J. at 6:15–7:3. As an experienced and sophisticated actor in the municipal securities industry, O'Meara had, or should have had, at least a basic grasp of fiduciary obligations at the time of his misconduct. MSJ Order at 3:7–13; O'Meara Dep. Tr. at 26:15–27:12; Defs.' Resp. Mot. Entry of Final J. at 6:15–7:3. On balance, the Court finds that the second *Murphy* and *Fehn* factor is either split evenly or weighs slightly in favor of a need for an injunction.

*3. Recognition of the Wrongfulness of Conduct*

Defendants' failure to appreciate the wrongfulness of their conduct also weighs in favor of an injunction. The Ninth Circuit recognizes a wide range of factors a court may consider with regard to this factor, including whether a defendant continues to blame others or insist on the validity of his conduct. *See SEC v. Murphy*, 50 F.4th 832, 851 (9th Cir. 2022) ("*Murphy II*") (district court acted within its discretion in determining a defendants' insistence that they did nothing wrong outweighs their assurances against future violations); *Fehn*, 97 F.3d at 1296 (lack of remorse may be inferred from a defendant's continued insistence on validity of his conduct); *Murphy I*, 626 F.2d at 656 (noting a defendant's continued insistence that he did nothing wrong supported the conclusion that

1 | an injunction was appropriate).

2 | First, despite the Court's ruling on liability, O'Meara and Choice continued to advance arguments that minimized their wrongful conduct, Defs.' Resp. Mot. Entry of Final J. at 5:9–11, 5:15–6:2, 7:4–10:15, and blame others for their predicament, *id.* at 5:9–11, 5:15–6:2, 7:4–9:16. Even after the Court found that the plain language of MSRB Rule G-42 clearly prohibited Choice's fee-splitting arrangements, MSJ Order at 13–15, O'Meara continued to fault the lack of guidance from the SEC and MSRB. Defs.' Resp. Mot. Entry of Final J. at 5:9–11, 8:4–9; Dkt. 96-3 at 6:12–26 ("O'Meara Decl."). O'Meara also attempted to shift part of the blame for his registration violations onto the length of the registration process and the delays caused by his lawyer. Defs.' Resp. Mot. Entry of Final J. at 7:4–8:2, 8:10–9:16; O'Meara Decl. at 4:18–6:11.

Second, O'Meara's testimony after the Court's summary judgment ruling indicates that he still does not fully appreciate the problematic nature of his actions and his disservice to his clients. During the July 17, 2024 evidentiary hearing, he asserted that his school clients "got what they paid for," were charged a fair price in the market, and did not complain about this performance. Dkt. 101 at 15:9–14 ("Tr. of July 17, 2024 Evidentiary Hearing"). This characterization demonstrates a fundamental misunderstanding of what transpired. His clients did not in fact get what they paid for because they paid for a registered municipal advisor that was legally permitted to provides these services. *See* 15 U.S.C. § 78o-4(a)(1)(B) (stating that municipal advisors cannot "provide advice to or on behalf of a municipal entity . . . with respect to municipal financial products or the issuance of municipal securities . . . unless the municipal advisor is registered" with the SEC); MSRB Rule A-12 (requiring all municipal advisors to register with the MSRB). And whether their clients knew it or not, by law, they were entitled to a municipal advisor that would not have divided loyalties and would not hide these conflicts from their clients. *See* 15 U.S.C. § 78o-4(c)(1); MSRB Rule G-42; *SEC v. Sztrom*, 538 F. Supp. 3d 1050, 1061 (S.D. Cal. 2021) (finding a reasonable investor would have considered it important to know that the individual giving them investment advice and making trades on their behalf was

not associated with any registered investment adviser). In light of Defendants' continued statements that the schools were treated fairly because the bond offerings they sought were successfully closed, Tr. of July 17, 2024 Evidentiary Hearing at 15:9–14; O'Meara Decl. at 7:10–16, the Court finds Defendants have not sufficiently understood the wrongfulness of their several breaches of fiduciary duties owed to their clients. The Court therefore concludes that this lack of understanding weighs in favor of an injunction.

*4. Defendants' Continued Employment in Securities Industry*

Next, Defendants' plans to continue to provide municipal advisory services to school clients weigh in favor of an injunction. In this role, Defendants may engage future clients who, like Liberty Tree Academy and Bella Mente Montessori, may be smaller charter schools, new to bond offerings and/or unsophisticated with regard to the fiduciary duties owed to them. *See* Defs.' Resp. Mot. Entry of Final J. at 15. A municipal advisor's role includes policing itself to avoid any conflicts of interest that could hurt his clients and proactively counseling his clients on the potential for any such conflicts and consequences. *See* MSRB Rule G-42 *Duties of Non-Solicitor Municipal Advisors Supplementary Materials .05 Conflicts of Interests*, https://www.msrb.org/Rules-and-Interpretations/MSRB Rules/General/Rule-G-42 (last visited September 16, 2024) ("Disclosures of conflicts of interest by a municipal advisor to its municipal entity or obligated person client must be sufficiently detailed to inform the client of the nature, implications and potential consequences of each conflict[]" and "also must include an explanation of how the municipal advisor addresses or intends to manage or mitigate each conflict."). Given that Defendants have failed these obligations in the past, MSJ Order at 19:1–23:15, and continue to show a lack of understanding of the problematic nature of their actions, Tr. of July 17, 2024 Evidentiary Hearing at 15:9–14; O'Meara Decl. at 7:10–16, the Court finds that an injunction is necessary to protect any future clients including those that may be less sophisticated first-time seekers of municipal bonds. *Fehn*, 97 F.3d at 1296 (defendant's continued client representation in the same area tends to suggest a risk of future violations). For these reasons, the Court finds that the fourth *Murphy* and *Fehn*

factor weighs in favor of an injunction.

> 5. *Sincerity of Assurances Against Future Violations*

While the Court accepts the sincerity of O'Meara's future intentions to comply with his legal obligations and fiduciary duties, the Court finds that an injunction against Choice and O'Meara individually is appropriate and needful given their past disregard of these same obligations and their continued failure to appreciate the full wrongful nature of their conduct. *Fehn*, 97 F.3d 1276, 1296 (9th Cir. 1996) (noting that without more, sincere assurances of an intent to refrain from aiding and abetting future violations are insufficient to militate against an injunction).

In sum, the Court finds that the totality of the *Murphy* and *Fehn* factors weigh in favor of imposing a permanent injunction against Defendants for future violations of the federal securities laws. Accordingly, the Court **GRANTS** the SEC's request for permanent injunction against Defendants O'Meara and Choice.

**B. Disgorgement and Prejudgment Interest**

In addition to injunctive relief, the SEC also seeks disgorgement plus prejudgment interest against Defendants O'Meara and Choice. Mot. for J. at 16–19. The Exchange Act authorizes the Court to award disgorgement in an amount that does not exceed a wrongdoer's net profits. 15 U.S.C. §§ 78u(d)(5),(7); *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020). Unlike damages, the primary purpose of disgorgement is not to compensate investors or other victims; instead, its goal is to force a defendant to relinquish the amount by which he was unjustly enriched. *See SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2013) (citing *FTC v. Bronson Partners*, 654 F.3d 359, 374 (2d Cir. 2011)); *Osborn v. Griffith*, 865 F.3d 417, 453 (6th Cir. 2017) (citing *SEC v. Cavanaugh*, 445 F.3d 105, 117 (2d Cir. 2006)). The measure of disgorgement should be a reasonable calculation of the profits from a defendant's wrongdoing, less legitimate business expenses, if any. *Liu*, 140 S. Ct. at 1946, 1950; *SEC v. Giguire, et al.*, No. 18-CV-1530-WQH-JLB, 2024 WL 3550395, at *5 (S.D. Cal. June 11, 2024). Once the SEC meets its burden of presenting a calculation that reasonably approximates the defendant's illegal profits from the

wrongdoing, "the burden shifts to the defendant[] to demonstrate that the disgorgement figure was not a reasonable approximation." *Id.*

Here, the SEC has provided the Court a reasonable calculation of disgorgement based on the gross sums received by Choice, including a breakdown of the amount that flowed to O'Meara, $133,149, and that remained with Choice, $79,889. *See* Mot. for J. at 23–19. Defendants do not dispute the accuracy of these calculations. *See* Defs.' Resp. Mot. Entry of Final J. Although Defendants had the opportunity to subtract any legitimate business expenses from the gross amounts calculated by the SEC, they chose not to. Tr. of July 17, 2024 Evidentiary Hearing at 21:8–22:3. The SEC's calculation, therefore remains the only and, therefore, the most reasonable calculation of ill-gotten gains available to the Court. *See SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 467 (5th Cir. 2022) (for the court to consider deducting legitimate business expenses, defendant must first identify any such expenses); *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (same).

In considering the specific facts of this case as discussed above and the public interest in divesting wrongdoers of unjust enrichment, the Court finds that disgorgement in the amount requested by the SEC is fair and reasonable. The Court also finds the SEC's request for prejudgment interest to be appropriate as wrongdoers should not profit from their illegal activities by receiving an interest free loan. *Contorinis*, 743 F.3d at 307–08 (prejudgment interest is designed to deprive a "wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government").[1]

Accordingly, the Court **GRANTS** the SEC's requests for disgorgement in the amount of $79,899 plus $27,559 in prejudgment interest from Choice and disgorgement in the amount of $133,149 plus $45,932 in prejudgment interest from O'Meara.

---

[1] The SEC calculates prejudgment interest based on the rate established for tax underpayments to the Internal Revenue Service. Mot. for J. at 19:4–19 (citing 26 U.S.C. § 6621(a)(2); 17 C.F.R. § 201.600(b)); *see also SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1099 (9th Cir. 2010) (district court did not abuse its discretion by calculating prejudgment interest based on tax underpayment rate).

### C. Civil Monetary Penalty

Finally, the SEC also requests the Court impose civil monetary penalties against both Choice and O'Meara. The Court may impose civil monetary penalties against any person who violates the Exchange Act after considering the facts and circumstances of the particular case before it. *See* 15 U.S.C. § 78u(d)(3). Courts in the Ninth Circuit have found it appropriate to couple civil penalties with disgorgement. *See, e.g., Giguire*, 2024 WL 3550395, at *9–11; *SEC v. Jensen*, No. 221CV06817CASGJSX, 2022 WL 1664258, at *7 (C.D. Cal. May 23, 2022); *SEC v. BIC Real Estate Dev. Corp.*, No. 1:16-cv-00344-LJO-JLT, 2017 WL 1740136, at *4–7 (E.D. Cal. May 4, 2017); *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185,1190–1191 (Nev. June 24, 2009); *SEC v. Abacus Int'l Holding Corp.*, No. C 99-02191, 2001 WL 940913, at *5 (N.D. Cal. Aug. 16, 2001). Because disgorgement merely approximates a return to the status quo, civil penalties are an important additional remedy to deter the wrongdoer from similar conduct in the future. *See Abacus Int'l Holding Corp.*, 2001 WL 940913, at *5. This Court agrees with the proposition that "[d]isgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if [it] is not detected, and requires only a return of ill-gotten gains if [it] is caught." *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331–32 (S.D.N.Y. 2007) (citations omitted).

In evaluating the appropriateness of the total civil penalty amount, courts employ the same *Murphy* and *Fehn* factors described above for determining the propriety of injunctions. *See, e.g.*, *Jensen*, 2022 WL 1664258, at *19–20 (applying *Murphy* factors and imposing a penalty equal to the gross amount of the defendants' pecuniary gain); *SEC v. Wilde*, No. SACV 11–0315 DOC(AJWx), 2012 WL 6621747, at *16 (C.D. Cal. Dec. 17, 2012) ("[B]ecause this factor test supported the imposition of a permanent injunction, it also supports the imposition of civil penalties."); *SEC v. Abellan*, 674 F. Supp. 2d 1213, 1222 (W.D. Wash. 2009) ("Like a permanent injunction, civil penalties are imposed to deter the wrongdoer from similar violations in the future; therefore those same factors governing the imposition of a permanent injunction apply here."); *CMKM Diamonds, Inc.*,

635 F. Supp. 2d at 1192 (same).

Based on the same *Murphy* and *Fehn* findings discussed above, the Court imposes civil penalties against Choice in the amount of $79,899 and against O'Meara in the amount of $133,149. The Court concludes that the additional deterrence of penalties is warranted in this case because, as discussed above, Defendants engaged in several instances of knowing misconduct and demonstrated disregard of their legal obligations, fiduciary duties, and the potential harmful effects on their clients, *supra* Section II.A. They also fail to demonstrate an appreciation of the wrongfulness of their actions. Defs.' Resp. Mot. Entry of Final J. at 5:9–11, 5:15–6:2, 7:4–10:15. Thus, to deter future misconduct and help restore confidence in the municipal securities industry, the Court imposes the above penalties. *SEC v. Spyglass Equity Sys., Inc.*, No. 211CV02371JAKMAN, 2012 WL 13008422, at *3 (C.D. Cal. Apr. 5, 2012) (citing *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998) ("The purposes of civil penalties are to punish the individual violator as well as deter future violations and thereby further the goals of encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry.") (internal citations omitted)).

While Defendants argue the Court should consider Defendants' ability to pay in determining whether penalties are appropriate, they failed to provide the Court with the information necessary to do so. *See* Defs.' Resp. Mot. Entry of Final J. In general, when challenging the imposition of a penalty, Defendants cannot rely on conclusory assertions that they are unable to pay. *See SEC v. RMR Asset Mgmt. Co.*, 553 F. Supp. 3d 820, 830 (S.D. Cal. 2021), *aff'd sub nom. Murphy II*, 50 F.4th 832, 849 (Defendants' failure to substantiate their claims of financial hardship are inconsequential to the court's analysis of civil penalties). Here, rather than provide the Court with sufficient financial information quantifying the Defendants' savings, assets, and ability to pay a penalty, Defendants elected to rely on general assertions about litigation costs and O'Meara being forced to downsize his home. Defs.' Resp. Mot. Entry of Final J. at 19:25–20:15; Tr. of July 17, 2024 Evidentiary Hearing at 22:4–24:20. Defendants therefore have not substantiated their

alleged inability to pay with quantifiable financial information, and thus the Court cannot assess an inability to pay based on assertions alone. *See, e.g., SEC v. Universal Exp. Inc.*, 646 F. Supp. 2d 552, 565 (S.D.N.Y. 2009) (even if the court considered "ability to pay" in determining remedies, defendant's "self-serving and conclusory assertions" were insufficient to support his claim of financial hardship); *see also SEC v. Brookstreet Sec. Corp.*, 664 F. App'x 654, 656 n.2 (9th Cir. 2016) ("Nothing in the Act requires courts to impose penalties based on a wrongdoer's illicit gain or ability to pay.").

Accordingly, the Court **GRANTS IN PART** the SEC's request and imposes a civil penalty of $133,149 against O'Meara and $79,899 against Choice.[2]

### III. CONCLUSON

Based on the above, the Court:

1. **GRANTS** the SEC's request for a permanent injunction against both Defendants as follows in the attached addendum;
2. **GRANTS** the SEC's request for disgorgement and prejudgment interest in the amounts of (1) $179,081 from O'Meara, composed of $133,149 in disgorgement and $45,932 in prejudgment interest; and (2) $107,448 from Choice, composed of $79,889 in disgorgement and $27,559 in prejudgment interest; and
3. **GRANTS** the SEC's request for civil penalties in the amount of $79,889 from Choice and $133,149 from O'Meara.

---

[2] The Court declines to conduct an analysis of the number of violations that occurred and whether a first-tier or second-tier penalty is applicable pursuant to 15 § 78u(d)(3)(B). The penalty imposed by the Court in this case is well within the limits of both the first-tier and second-tier penalty for just one violation of the Exchange Act because the gross pecuniary gain Defendants received for all of their violations was $133,149 to O'Meara and $79,889 to Choice. *See* Mot. for J. at 23:19–24:3; 15 §§ 78u(d)(3)(B)(i),(ii); Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2024), https://www.sec.gov/enforce/civil-penalties-inflation-adjustments (last accessed September 17, 2024)(setting forth that each violation of a first-tier penalty "shall not exceed the greater of" (I) $11,524 for a natural person, and $115,231 for corporations, or "(II) the gross amount of pecuniary gain to such defendant as a result of the violation" and a second-tier penalty "shall not exceed the greater of" (I) $115,231 for a natural person, and $576,158 for corporations, or "(II) the gross amount of pecuniary gain to such defendant as a result of the violation.")

1 | The Court also issues a final judgment in this case including the above relief and
2 | **ORDERS** the Clerk of the Court to **CLOSE** this case.
3 | **IT IS SO ORDERED.**
4 | Dated: October 7, 2024

_____
Honorable Jinsook Ohta
United States District Judge